Anthony Keith JOHNSON, Petitioner,

v.

John E. NAGLE, Warden and the Attorney General of the State of Alabama, Respondents.

No. CV-93-N-1121-S.

United States District Court, N.D. Alabama, Southern Division.

July 23, 1999.

John H Schafer, Sean F Foley, Deborah Forbes, Covington & Burling, Washington, DC, Debra Ann Palmer, Schiff Hardin & Waite, Washington, DC, for Anthony Keith Johnson, plaintiff.

J Clayton Crenshaw, James H Evans, Attorney General, Office of the Attorney General, Montgomery, AL, for State of Alabama, defendant.

Bill Pryor, J Clayton Crenshaw, James H Evans, Attorney General, Office of the Attorney General, Montgomery, AL, for John Nagle, Warden, defendant.

**Table of Contents**

I. Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1314
 A. Trial and Direct Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1314
 1. Trial Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1314
 2. Proceedings on Direct Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1316
 B. Post-Trial Proceedings in State Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1317
 C. The Federal Petition for a Writ of Habeas Corpus . . . . . . . . . . . . . . . . . . . 1324
II. Analysis of the Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1327
 A. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1327
 B. Intent, participation, and the "Third Man" Defense . . . . . . . . . . . . . . . . . . 1329
 1. Sufficiency of the Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1331
 i. Procedural Default on the Sufficiency of the Evidence Claim . . . . . . . . 1331
 ii. Merits of the Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1332
 2. Ineffective Assistance of Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1334
 i. Claims of Ineffective Assistance at Trial Generally . . . . . . . . . . . . . . . 1334
 ii. Counsel's Alleged Failure to Understand an Essential Element of
 Capital Murder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1335
 iii. *United States v. Cronic* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1337
 iv. *Strickland v. Washington* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1339
 a. Petitioner's Allegations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1342
 b. Ineffective Trial Strategy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1342
 (1) Pre-Trial Choice of Strategy . . . . . . . . . . . . . . . . . . . . . . . . . 1343
 (2) Failure to Argue Intent During Trial . . . . . . . . . . . . . . . . . . . 1344
 c. Failure of Argue Intent to the Judge . . . . . . . . . . . . . . . . . . . . . . 1346
 d. Defense Counsel's Argument to the Jury . . . . . . . . . . . . . . . . . . 1349
 e. Failure to Object to the Prosecution's Improper Closing Argu-
 ment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1350
 f. Accumulated Attorney Error . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1351
 v. Failure to Give a Felony Murder Instruction . . . . . . . . . . . . . . . . . . 1352
 vi. The Actual Innocence Exception to Procedural Default . . . . . . . . . . . 1352
 C. Other Claims of Ineffective Assistance of Counsel . . . . . . . . . . . . . . . . . . . . 1353
 1. Other Claims of Trial Counsel Error . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1353
 i. Cross-examination of David Lindsey . . . . . . . . . . . . . . . . . . . . . . . . . 1353
 a. Allegedly Contradictory Statements . . . . . . . . . . . . . . . . . . . . . . 1355
 b. Counsel's Efforts to Undermine Lindsey's Character . . . . . . . . . . 1356
 c. Failure To Present Conflicting Witness Testimony . . . . . . . . . . . . 1356
 ii. Ineffective Assistance Because of Claimed Improper Objection to
 Statistical Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1357
 2. Claims of Ineffective Assistance of Counsel on Appeal . . . . . . . . . . . . . . . 1359
 i. Adequacy of Statement of Facts On Appeal . . . . . . . . . . . . . . . . . . . 1360
 ii. Adequacy of Issues Presented on Appeal . . . . . . . . . . . . . . . . . . . . . 1360
 iii. Brief to Alabama Supreme Court on Direct Appeal . . . . . . . . . . . . . . 1362
 D. The *Brady* Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1362
 1. The "Exculpatory Evidence" Requirement . . . . . . . . . . . . . . . . . . . . . . . . 1363
 2. The Suppression Requirement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1363
 3. The Materiality Requirement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1364
 E. The *Cage* Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1365
 1. Procedural Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1366
 2. The Merits of the Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1366
 F. Fourth Amendment Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1373
 1. Procedural Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1373
 2. *Stone v. Powell* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1374
 3. Merits of the Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1376
 i. The Bullet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1376
 ii. The .357 Magnum Revolver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1378
III. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1381

## Memorandum of Opinion

EDWIN L. NELSON, District Judge.

The court has for consideration the petition for writ of habeas corpus brought pursuant to 28 U.S.C. § 2254 on behalf of Anthony Keith Johnson, an Alabama state prisoner, convicted of capital murder and sentenced to death. On this petition Johnson is represented by counsel from the firm of Covington & Burling. Counsel for the State of Alabama have filed a Habeas Corpus Checklist, a voluminous record of the proceedings from the Alabama trial and appellate courts, a revised Habeas Corpus Checklist, and an answer to the petition.

The court has conducted a hearing on the narrow issue of what information the petitioner conveyed to his trial counsel upon which they relied in formulating their trial strategy. Among other things, the petitioner has alleged that his trial attorneys rendered him ineffective assistance by choosing a flawed defense strategy based upon a mistaken understanding of the law and that the trial judge gave a constitutionally flawed jury instruction defining reasonable doubt. The court will address these and other matters *infra.*

## I. Procedural History.

### A. Trial and Direct Appeal.

#### 1. Trial Evidence.

On direct appeal, the Alabama Court of Criminal Appeals set forth the facts established at trial as follows:

> The record reveals that on the evening of March 11, 1984, the victim, Kenneth Cantrell, and his wife, Nell Cantrell, were at their home in Hartselle, Alabama. The Cantrells had been in the jewelry business for 24 years and at this time were conducting the business from their home.
>
> Mrs. Cantrell received a phone call from a person identifying himself as Bill Spears from Florence, Alabama, and he

asked to speak to Mr. Cantrell. He told Mr. Cantrell that he would like to purchase some jewelry from him, and they arranged a meeting a short time thereafter at the Cantrell home. Mr. Cantrell was apparently suspicious of the caller, because he asked his wife to hide his wallet and bring him his .38 caliber pistol.

> When Mrs. Cantrell heard a knock at the door, which led from their carport into the combined living room and dining room area of their home, she went to answer it. She observed that the man already had the storm door open, but she had to open the door to hear what he had to say. When she opened the door she encountered a man between 45 and 50 years of age who identified himself as Bill Spears. She noticed that he held one hand behind his back and she asked if he was concealing something. He said that he was not and showed her his hand.
>
> At the same time he motioned for another man who had been hiding in the carport to come forward. At this, the man already at the door grabbed Mrs. Cantrell, and the other man, wearing a blue bandana over his face and brandishing a "real shiney" gun in his hand, announced "This is a holdup."

*Johnson v. State,* 521 So.2d 1006, 1007–08 (Ala.Crim.App.1986).

At that point, according to the testimony at trial, Mrs. Cantrell broke free from the man holding her, eluded a second attempt by the first man to grab her, and fell at her husband's feet between the couch and coffee table. The first man crossed the room and positioned himself behind a couch he had overturned. The second man then entered the house and began shooting. During or just before the gunfight, Mr. Cantrell said, "Freeze ... I have got you covered," to which one of the men replied "No, we have got you, Cantrell." [1] While on the floor, Mrs. Cantrell was able

---

1. The testimony of Mrs. Cantrell with regard to the exact words spoken and the timing of the utterances is somewhat inconsistent. *See* supra note 19.

to observe that one of the men wore a pair of brown boots. She also testified that only two guns were fired during the exchange, and that the shots fired at her husband appeared to come from the direction of the second intruder. After several shots had been fired, there was a pause in the gunfire. One of the men said, "Come on in, Bubba ... we have got him." As the two men in the room made their way to the door, but before they reached it, Mr. Cantrell fired one final shot and someone said. "Oh." Mrs. Cantrell then heard the sound of shuffling feet, as if one of the intruders was being assisted out of the house. Tr. at 364–388.

Mrs. Cantrell waited a moment after the intruders left, looked up at her husband, noticed that he had blood all over him and that she had blood all over her but that she was not shot. She then called an ambulance and police to the scene.

Mr. Cantrell sustained six gunshot wounds in the exchange, three in the right side of his chest, one in the left side of his chest, one on the back of his right arm, and one to his right middle finger. The bullets which struck him in the chest passed through his lungs and the large arteries from the heart, causing rapid death.

On the evening of March 12, 1984, the day after the murder, appellant went to the home of David Lindsey, who was a friend, in Newell, Alabama. Appellant told Lindsey that he had been shot. When Lindsey inquired as to what had happened, appellant stated, "Well you know how it is when you have got the habit." Appellant told Lindsey that he knew he had been to Vietnam and asked if he knew a medic or someone who could get the bullet out. Lindsey told him that he knew no one who could do that.

At appellant's request, Lindsey, on the morning of March 13, 1984, drove him to a motel in Oxford to meet Gene Loyd. Lindsey testified that Loyd and appel-

lant were glad to see each other, and Loyd asked appellant where he had been. Appellant replied that he "had to get the hell out of Hartselle." He said that he and some friends had gone into a place to get some gold and that he had been shot.[2] According to Lindsey, appellant stated, "I got shot, but I got off a couple of rounds, and I believe I got that son of a bitch." Lindsey returned home, where he heard that a murder had occurred in Hartselle, and he contacted authorities.

Appellant was arrested on March 14, 1984, at the motel where he had been taken by Lindsey. A pair of brown boots, which appellant claimed to own, were found at the scene of the arrest. A bullet wound was discovered in his back; that wound was 50.5 inches from the ground when appellant was standing. A search warrant was obtained, and the bullet was removed from his back.

It was discovered that Mr. Cantrell had fired his R.G. brand revolver six times at the intruders. Most of the shots were in an upward direction from the point where he was sitting on his couch. The revolver was loaded with .38 special C.C.I. Blazer cartridges manufactured by Omark Industries. Four C.C.I. Blazer bullets were recovered from objects which they had struck at the scene. One bullet apparently passed through the ceiling and could not be found. One bullet passed through a pane of glass on the back door 46.375 inches from the ground. A search of cardboard boxes and the wall in this bullet's path failed to reveal the bullet. The four C.C.I. Blazer bullets found at the scene had the same number of lands and grooves as the bullets test fired from Mr. Cantrell's R.G. revolver, but it was impossible to definitely make a determination that Mr. Cantrell's revolver actually fired the bullets.

2. Lindsey's actual testimony was that the defendant said, "Me and some friends, we got— went into a place to get some gold, and I believe my buddy got shot." Tr. at 423.

The bullet which was removed from appellant's back was a .38 special C.C.I. Blazer. The bullet had the same number of lands and grooves as those test fired from Mr. Cantrell's R.G. revolver and those found at the scene, but again, it was impossible to make a definite determination that Mr. Cantrell's revolver actually fired the bullet.

The bullet which was removed from appellant's back had glass imbedded in its nose. Test comparisons of the glass removed from the bullet and that found in the pane on the back door, through which the unaccounted-for bullet had passed, revealed that all of their physical properties matched, with no measurable discrepancies. Based upon F.B.I. statistical information, it was determined that only 3.8 out of 100 samples could have the same physical properties, based upon the refractive index test alone, which was performed.

*Johnson v. State,* 521 So.2d 1006, 1008–09 (Ala.Crim.App.1986).

### 2. Proceedings on Direct Appeal.

After the petitioner was arrested as a murder suspect, Attorneys Joseph W. Propst and Thomas M. DiGiulian of Decatur, Alabama, were appointed to represent him. The court conducted a hearing on March 15, 1984, at which time the petitioner advised the court that he needed medical attention for a wound in the back, and the District Attorney informed him that the State would attempt to procure any physical evidence from medical treatment or surgical removal of a foreign object from his body for use in its capital murder investigation. After consulting with his court-appointed attorneys, the petitioner refused any medical treatment at that time. Because his medical condition continued to worsen, the petitioner was taken to the Emergency Room at Decatur General Hospital the next day for treatment. An x-ray revealed the presence of an object similar to a bullet in his back, but Johnson refused to allow physicians to remove it.

On March 26, 1984, the petitioner was formally charged with capital murder. At the preliminary hearing, conducted on April 19, 1984, the court found probable cause to believe that Johnson had committed the capital murder of Kenneth Cantrell and bound him over to the grand jury.

Thereafter, the District Attorney filed an application for a search warrant by which he sought court authorization to have the object surgically removed from Johnson's back. Following a full hearing on May 18, 1984, the Morgan County Circuit Court granted the application and, on May 22, 1984, Johnson's attorneys petitioned the Alabama Court of Criminal Appeals to stay the surgery and for a writ of prohibition, asserting that the proposed involuntary surgery would unconstitutionally invade his right to privacy, violate his right against self-incrimination, and violate his Fourth Amendment right against unreasonable searches and seizures. On May 24, 1984, the Alabama Court of Criminal Appeals denied both requests. His application for rehearing was also denied and, on May 28, 1984, Johnson was transported to Decatur General Hospital in Decatur, Alabama, where a bullet was surgically removed from his back.

In June 1984, the grand jury in Morgan County charged the petitioner by indictment with the intentional murder of Kenneth Cantrell during the course of a robbery, in violation of *Ala.Code* § 13A–5–40 (1975). A year later, on June 20,1985, the petitioner was found guilty by a jury of capital murder as charged in the indictment, and on June 21, 1985, the jury voted nine to three to recommend that Johnson be sentenced to life imprisonment without the possibility of parole. At the close of the separate sentencing hearing required by *Ala.Code* § 13A–5–47 (1975), on November 8, 1985, Morgan County Circuit Court Judge A.L. Hundley rejected the recommendation of the jury and sentenced Johnson to death.

Judge Hundley entered findings of fact with respect to both the petitioner's guilt and sentence of death. Regarding the aggravating circumstances defined at *Ala.*

*Code* § 13A–5–49, the trial court found that two were applicable:

1. The capital offense was committed by a person under sentence of imprisonment [§ 13A–5–49(1) ].

2. The capital offense was committed while the defendant was engaged in the commission of a robbery [§ 13A–5–49(4) ].

Moreover, the court found "that there are some statements in the pre-sentence report and some other aspects of the case that have certain mitigating aspects to them [and] [t]hese were considered ... including the jury's recommendation." The trial court found no other mitigating circumstances, either those defined by statute or otherwise, stating:

> The Court finds the aggravating circumstances are substantial and controlling. The mitigating circumstances (other than the jury's recommendation) can be found only by a strained search and are deemed insubstantial by the Court in the face of the evidence which demonstrates a vicious killing of a man in what should have been the quiet repose and safety of his own home. . . .

**B. Post–Trial Proceedings in State Court.**

On appeal to the Alabama Court of Criminal Appeals, where he was represented by newly appointed appellate counsel, John Mays, the petitioner raised four claims:

1. The trial court erred in permitting the State to challenge juror Carrell for cause (against capital punishment) over the petitioner's objection.

2. The trial court erred when it refused to instruct the jury that it could not consider the theft by use of force allegation in the capital murder indictment as an aggravating circumstance in the penalty phase of the trial.

3. The trial court erred in refusing the petitioner's motions for judgment of acquittal on the grounds that there was no proof that he was in Morgan County when the murder was committed and there was no proof that the gun he possessed at the time he was arrested was used in the shooting.

4. The trial court erred when it refused to strike information from the pre-sentence report indicating that marijuana was found at the scene when the petitioner was arrested.

The Alabama Court of Criminal Appeals affirmed the conviction and sentence on November 25, 1986, in a written opinion; an application for rehearing was denied on January 27, 1987.[3] The Alabama Supreme Court affirmed both the conviction and the sentence on February 5, 1988, and the United States Supreme Court denied Johnson's petition for the writ of certiorari on October 3, 1988. *Johnson v. State*, 521 So.2d 1006 (Ala.Crim.App.1986), *aff'd*, 521 So.2d 1018 (Ala.1988), *cert. denied*, 488 U.S. 876, 109 S.Ct. 193, 102 L.Ed.2d 162 (1988).

After the direct review process was completed, Johnson's present counsel then undertook to represent him in post-conviction proceedings and have continued to do so until the present.[4] They filed a petition for

---

**3.** In its opinion, the Court of Criminal Appeals, under its Rule 45A power to review plain errors and defects in trial proceedings, also addressed the matter of whether the removal of the bullet from the defendant's body against his wishes violated the Fourth Amendment's limitation on surgical probing for evidence outlined in *Winston v. Lee*, 470 U.S. 753, 105 S.Ct. 1611 (1985). *Johnson v. State*, 521 So.2d 1006, 1014–15 (Ala.Cr.App.1986), *aff'd*, 521 So.2d 1018 (Ala.1988), *cert. denied*, 488 U.S. 876, 109 S.Ct. 193, 102 L.Ed.2d 162 (1988).

**4.** This and other courts have repeatedly observed that the practice of large big-city firms of undertaking the representation of individuals charged with and convicted of capital offenses only after they have been convicted, sentenced and had their direct appeals rejected, more often than not represents nothing more than desperate last-minute rescue missions, doomed to failure. Almost always, as here, by the time lawyers from these firms arrive, the result of their efforts is dictated by what has gone before. It is simply a case of too little, too late. May the court respectfully suggest that Johnson's present lawyers would

relief pursuant to the then applicable rule, Ride 20 of the Alabama Temporary Rules of Criminal Procedure, in the Circuit Court of Morgan County on April 4, 1989, raising sixteen principal claims, some with numerous sub-parts, each challenging either the conviction or the death sentence. They were:

1. The proof at trial failed to demonstrate beyond a reasonable doubt all elements of capital murder. According to Johnson, the State did not:

 (a) prove beyond a reasonable doubt that he was a participant in the shooting of Mr. Cantrell;

 (b) offer any evidence that he had the requisite intent to kill;

 (c) introduce sufficient evidence that the petitioner engaged in a robbery or attempted robbery;

 (d) prove that Johnson's gun could have fired the bullets that killed the victim;

 (e) ask Mrs. Cantrell to identify the petitioner, his boots, or his gun;

 (f) present evidence that petitioner's gun was fired; or

 (g) introduce sufficient evidence to instruct the jury on the theory of complicity.

2. The petitioner received ineffective assistance of trial counsel in a number of respects:

 (a) His attorneys failed to:

 (1) demonstrate that the State failed to prove that the petitioner intended to kill the victim;

 (2) demonstrate that the petitioner was not a participant in the shooting;

 (3) demonstrate that the State failed to prove the petitioner's complicity in the killing;

 (4) adequately investigate the evidence available to the State to see that the fatal flaw in the State's case was that the petitioner lacked the requisite intent to kill the victim or to aid others in that killing;

 (5) demonstrate there was no motive to kill the victim;

 (6) adequately cross-examine Mrs. Cantrell to demonstrate that she could not identify the petitioner;

 (7) present any analysis of the evidence;

 (8) present to the jury any theory consistent with the State's evidence and the petitioner's innocence;

 (9) adequately cross-examine David Lindsey to impeach him based on prior convictions;

 (10) properly highlight the presence of a third person in the robbery; and

 (11) inform the jury that evidence of the petitioner's mere presence at the crime scene was insufficient to convict.

 (b) His attorneys failed to request a jury instruction on the lesser-included offense of felony murder and failed to grasp the difference between felony murder and capital murder;

 (c) His attorneys failed to file a timely motion to suppress the seizure of the .357 magnum revolver that was found when the petitioner was arrested and introduced into evidence as the gun seen by Mrs. Cantrell in the hand of the "second man";

 (d) His attorneys failed to raise intoxication as a basis to negate the intent element required to convict the petitioner of capital murder and failed to request a competency hearing to investigate whether the petitioner's drug addiction foreclosed him from participating in his own defense; and

 (e) His attorneys failed to:

likely have done him more good had they shown up in the Circuit Court of Morgan County, Alabama in March of 1984.

(1) adequately investigate and prepare for trial;

(2) failed to adequately interview key witnesses and potential witnesses;

(3) failed to develop facts concerning the petitioner's drug use, and

(4) failed to investigate the basis for the State's expert-witness testimony.

3. The trial court erred by refusing to provide funds for the appointment of ballistics and glass experts to assist the petitioner in his defense in violation of *Ake v. Oklahoma.*

4. The State failed to disclose exculpatory evidence prior to trial in violation of *Brady v. Maryland:*

(a) that three or four persons were involved in the robbery;

(b) that a suspect had been interviewed and held by the Hartselle Police Department;

(c) that Mrs. Cantrell was asked by the State prior to trial to identify certain persons and items and to identify the petitioner as a participant in the crime; and

(d) that blood was discovered on a post in the living room. which, if it had been disclosed, could have been tested by the petitioner to demonstrate that he was not the "second man."

5. The trial court erred when it overrode the verdict of the jury that Johnson be sentenced to a term of life imprisonment without possibility of parole.

6. The trial court erred when it accepted into evidence certain items which had been seized in violation of the petitioner's Fourth Amendment right to be free of unreasonable searches and seizures. They were:

(a) the bullet that was surgically removed from the petitioner's back against his will; and

(b) the .357 magnum revolver that was seized without a warrant at the time of the petitioner's arrest and was not in "plain view" but was hidden under a mattress.

7. The prosecutors unconstitutionally removed all black persons from the jury panel in violation of *Batson v. Kentucky.*

8. The petitioner's appellate counsel was constitutionally ineffective because he failed "to raise numerous meritorious claims that, if raised, would have been grounds for reversal," such as:

(a) the petitioner's trial counsel was ineffective;

(b) the trial court erred by refusing to provide funds in order that Johnson could have obtained the assistance of expert witnesses for the defense;

(c) the State failed to disclose certain exculpatory evidence;

(d) the State's removal of a bullet from the petitioner's back was unconstitutional;

(e) the State's warrantless search and seizure of the gun at the time of the petitioner's arrest was unconstitutional;

(f) the facts found by the sentencing court were not supported by the evidence of record;

(g) the facts stated in the pre-sentence report were inaccurate and not supported by the record;

(h) the trial court erred in finding that there were no circumstances that mitigated against the death penalty;

(i) the trial court unconstitutionally enhanced the petitioner's sentence because he refused to reveal the identities of the other persons present at the crime, in violation of Johnson's right to remain silent:

(j) the trial court's imposition of a death sentence was unconstitutional; and

(k) the State's evidence failed to demonstrate that the petitioner was a participant in the shooting and that the petitioner had the intent to kill.

9. The trial court judge improperly imposed the death sentence on the basis of facts and inferences not reasonably supported by the record and the trial court judge's written findings of fact show a misunderstanding of the evidence at trial and ignored facts that tended to exonerate the petitioner.

10. The pre-sentence report was inaccurate, prejudicial, and contained facts and inferences about the shooting that were unsupported by the record evidence.

11. The trial court failed to find the existence of mitigating factors when sentencing the petitioner to death, such as the fact that he did not have a significant history of criminal activity, his participation in the crime was minor, his addiction to narcotics, his age, and the jury's recommendation that he be sentenced to life without parole.

12. Johnson's counsel at sentencing were ineffective because they failed:

(a) to present mitigating evidence of the petitioner's severe chemical dependency and its effects on his actions, and failed to present expert medical testimony on that point; and

(b) to object to portions of the pre-sentence report containing factual conclusions about the shooting that were unsupported by any evidence at trial.

13. The trial court judge improperly considered the petitioner's silence to be a nonstatutory aggravating factor and used it to improperly enhance his sentence to death.

14. The imposition of the petitioner's death sentence is unconstitutional because there is no evidence to demonstrate beyond a reasonable doubt that the petitioner intended to kill or was a major participant in the killing of the victim.

15. Alabama's statutory jury override provision is unconstitutional and contains none of the procedural safeguards mandated by the Constitution.

16. The petitioner's sentence was obtained pursuant to a capital punishment statute that is facially unconstitutional because the trial judge in Alabama, not the jury, determines the existence of aggravating factors required for a capital conviction and this deprived the petitioner of his right to have a jury determination on every element required for capital murder.

Johnson's attorneys filed an amended Rule 20 petition on November 9, 1989, raising additional claims: [5]

1. The evidence at most demonstrated that the petitioner was a "third man" who entered the Cantrell home after the shootout occurred.

2. The prosecutor improperly argued to the jury that only two men were involved in the shooting when in fact the prosecutor knew or had reason to know there were three men involved and that the other two men, Garland and Wayne McCulloch, did the shooting.

3. The State withheld evidence favorable to Johnson in violation of *Brady v. Maryland* which showed that Garland and Wayne McCulloch actually shot Mr. Cantrell.

4. The trial court erred by failing to instruct the jury on the lesser-included offense of felony murder.

On March 16, 1990, the Circuit Court of Morgan County denied the Rule 20 petition without a hearing and without specifying the facts upon which it relied. The Court of Criminal Appeals, acting on the joint motion of the parties, remanded the case on April 10, 1990, instructing the trial court to make and enter specific findings of fact. On April 30, 1990, Judge Hundley recused himself from any further participation in the proceedings and Judge John Jolly, a judge of the Circuit Court of Franklin County, Alabama, was designated

---

**5.** By this amendment counsel also withdrew the petitioner's *Batson* claim.

to conduct further proceedings on the Rule 20 petition.

Judge Jolly conducted a "summary disposition" hearing on August 29,1990, and a full evidentiary hearing on November 15 and December 17,1990. Before any decision could be made, however, the petitioner filed yet another amendment to the Rule 20 petition on March 12, 1991, raising three more claims. They were:

1. The trial court erred by improperly instructing the jury on the meaning of "reasonable doubt" in violation of *Cage v. Louisiana.*

2. The State violated *Brady v. Maryland* by failing to disclose statements by potential witnesses which tended to impeach the testimony of David Lindsey, one of the State's key witnesses.

3. The petitioner received ineffective assistance of trial counsel because his attorneys:

 (a) failed to object to the jury instructions on the meaning of reasonable doubt;

 (b) failed to object to the trial court sending the capital murder and complicity charges to the jury;

 (c) improperly stated to the jury that proof of felony murder would support a capital murder conviction;

 (d) failed to object to the prosecutor's prejudicial closing argument which misstated the applicable law;

 (e) inadequately objected to the State's statistical evidence;

 (f) ineffectively cross-examined David Lindsey;

 (g) failed to properly argue at the sentencing hearing that the petitioner's participation in the killing was relatively minor;

 (h) failed to raise any objections during the sentencing hearing about the trial court's incorrect findings of fact;

 (i) failed to argue at the sentencing hearing that the court was required to find the existence of mitigating circumstances;

 (j) failed to argue at the sentencing hearing that the petitioner's sentence was unconstitutional because it was based on erroneous findings of fact and an incomplete and misleading pre-sentence report; and

 (k) failed to argue at the sentencing hearing that the trial court judge's override of the jury's recommended sentence violated the Alabama Constitution and the United States Constitution.

On May 23, 1991, Judge Jolly denied the Rule 20 petition stating:

Upon consideration of the pleadings of record, oral testimony and exhibits offered in the hearings held in this cause, legal briefs and legal citations of the respective parties to this proceeding, it is ORDERED, ADJUDGED and DECREED by the Court that the petitioner's Petition for Relief from Conviction and Sentence heretofore filed in this cause on April 3, 1989 is hereby denied and overruled.

On appeal, the Alabama Court of Criminal Appeals again remanded the case to the trial court with directions that it make written findings of fact to support its order denying the Rule 20 petition, as required by Rule 20.9(d) of the Alabama Temporary Rules of Criminal Procedure and the prior order of the appellate court. Judge Jolly filed a more specific order on June 17, 1991, denying the Rule 20 petition, stating:

In response to the joint motion heretofore filed by the respective parties to this proceeding, the Court hereby makes the following specific findings of fact as to the various issues raised by the appellant in his petition:

1. The following claims by the petitioner are procedurally barred as they could have been raised at trial or on appeal:

 a. Search and seizure involving the weapon

 b. Lesser included offense

 c. Reasonable doubt jury instruction

 d. Factual basis of sentence findings

e. Pre-sentence report

f. Statutory mitigating circumstances

g. Intent to kill

h. Jury verdict override provision

i. Sufficiency of the evidence to sustain the conviction of petitioner

j. Search and seizure involving removing the bullet from the petitioner's body

2. In addition, the above claims 1 a–j also lack legal merit.

3. The following claims by the petitioner are not procedurally barred:

a. *Brady v. Maryland* claim

b. Guilt stage ineffective assistance claim

c. Appellate level ineffective assistance claim relating to guilt stage issues

d. Sentencing stage ineffective assistance claim

e. Appellate level ineffective assistance claim relating to sentencing stage issues

4. The above claims 3 a–e lack legal merit.

Therefore, it is hereby ORDERED, ADJUDGED and DECREED by the Court that the petitioner's Petition for Relief from Conviction and Sentence heretofore filed in this cause on April 3, 1989 is hereby denied and overruled.

On appeal from the denial of his Temporary Rule 20 motion, Johnson argued:

1. The evidence was insufficient to support the conviction because the State failed to prove every element of capital murder, including arguments:

(a) that the record did not establish Johnson's participation in the crime;

(b) that Mrs. Cantrell did not identify the petitioner as a participant;

(c) that Mrs. Cantrell's testimony established that the petitioner was not the "second man";

(d) that the testimony of David Lindsey was not sufficient to counter the record which showed that the petitioner did not participate in the shooting;

(e) that the State failed to prove intent to kill; and

(f) that the conviction could not be sustained on a mere complicity theory.

2. The State withheld exculpatory evidence from the defense in violation of *Brady v. Maryland* such as:

(a) the investigatory report of the crime prepared by the Alabama Bureau of Investigation which stated that a confidential informant told an investigating officer that Garland and Wayne McCulloch "did the shooting" and that Wayne McCulloch had a .32 caliber gun;

(b) portions of the same document indicating that the victim fired at the robbers first;

(c) documentary evidence that the State was investigation two other suspects;

(d) statements made by witnesses present with petitioner at the McCombs Motel when he allegedly made incriminating statements to Lindsey and when he was later arrested;

(e) other information that could have been used to impeach witness Lindsey; and

(f) information that there were three men at the Cantrell house instead of two as alleged by the prosecutor.

3. The trial court erred by not charging the jury on the lesser-included offense of felony murder.

4. The trial court improperly admitted into evidence items that were unconstitutionally seized, such as the bullet that was surgically removed from the petitioner's back and the .357 magnum revolver that was seized pursuant to an illegal warrantless search at the time of the petitioner's arrest.

5. The trial court erred by not properly instructing the jury on reasonable doubt.

6. The petitioner was denied the effective assistance of trial counsel because his attorneys:

(a) failed to distinguish between felony murder and capital murder and therefore failed to subject the State's evidence to any meaningful adversarial testing;

(b) failed to argue that the petitioner was not a participant in the shooting;

(c) failed to object to sending the capital murder and complicity charges to the jury;

(d) failed to argue that the petitioner lacked the requisite intent to kill;

(e) failed to request a felony-murder jury charge;

(f) improperly stated to the jury that proof of felony murder would support a capital murder conviction;

(g) failed to object to the prosecutor's improper closing argument concerning a misstatement of the law and facts that were unsupported by the evidence;

(h) inadequately cross-examined witness Lindsey and failed to develop sufficient impeachment material against him;

(i) failed to adequately object to the admission of the State's statistical evidence relating to glass fragments; and

(j) did not file a motion to suppress the .357 revolver that was obtained illegally from a warrantless search.

7. The petitioner received ineffective assistance of appellate counsel because his attorney:

(a) argued only two frivolous grounds with respect to the petitioner's guilt;

(b) merely photocopied his appellate brief to the Alabama Court of Criminal Appeals and labeled it a petition for writ of certiorari, and therefore failed to make any argument to the Alabama Supreme Court;

(c) stated key facts in the brief incorrectly;

(d) failed to distinguish between felony murder and capital murder;

(e) failed to argue the following issues on direct appeal:

(1) the exculpatory nature of Mrs. Cantrell's testimony,

(2) the absence of evidence of specific intent to kill,

(3) there was evidence that the petitioner was not a participant in the killing,

(4) the State's failure of proof,

(5) the trial judge's failure to instruct the jury on felony murder,

(6) the erroneous admission of prejudicial evidence,

(7) the admission of evidence that had been wrongfully seized,

(8) the ineffective assistance of counsel at trial and at sentencing,

(9) erroneous information in the pre-sentence report,

(10) material errors and omissions in the trial court's findings of fact on sentencing,

(11) the failure to account for petitioner's drug addiction in sentencing,

(12) the existence of mitigating factors ignored by the trial judge, and

(13) Alabama's unconstitutional jury override provision.

8. The trial court judge erred by failing to find the existence of statutory mitigating circumstances such as the petitioner's lack of a significant history of criminal activity and minor participation in the crime.

9. The pre-sentence report contained inaccurate and prejudicial facts unsupported by the trial record and failed to include evidence that would have been helpful to the petitioner.

10. The sentence was imposed on the basis of facts and inferences not supported by the record.

11. Alabama's statutory jury override provision is unconstitutional because of the lack of constitutionally required procedural safeguards.

12. The petitioner was denied the effective assistance of counsel at his sentencing hearing because his attorneys:

(a) failed to present adequate evidence of Johnson's drug use as a mitigating factor;

(b) failed to object to the incorrect statement of facts in the pre-sentence report;

(c) failed to adequately argue as a mitigating factor that the petitioner was, at most, a relatively minor participant in the shooting; and

(d) failed to object that the petitioner was improperly sentenced based on the trial court's incorrect findings of fact.

The Alabama Court of Criminal Appeals affirmed the denial of the Rule 20 petition on September 18, 1992, in a written opinion. *Johnson v. State,* 612 So.2d 1288 (Ala. Crim.App.1992). The petitioner's application for rehearing was denied on November 13, 1992, and the Alabama Supreme Court denied his petition for the writ of certiorari on February 19, 1993. The record does not suggest that Johnson again sought relief by way of a petition for the writ of certiorari in the United States Supreme Court.

### C. The Federal Petition for a Writ of Habeas Corpus.

In the present petition, filed on June 7, 1993, Johnson asserts seven principal grounds for relief. The petition itself is stated in the most conclusory of terms, but adopts specific arguments set forth in the petitioner's *Memorandum in Support of Habeas Corpus Petition.* Those grounds for relief are as follows: [6]

1. There was insufficient evidence to establish the petitioner's guilt beyond a reasonable doubt.[7] *Petitioner's Memorandum* at 20–26.

2. The prosecution withheld material exculpatory evidence prior to trial.[8] *Petitioner's Memorandum* at 26–33.

3. The petitioner's trial counsel were ineffective because they:

(a) failed to appreciate the distinction between felony murder and capital murder and, therefore, failed to subject the State's evidence to meaningful adversarial testing in violation of *United States v. Cronic, Petitioner's Memorandum* at 40–42;

(b) failed to comprehend that to convict a defendant of capital murder, the State was required to prove that the defendant intended to murder the victim, and as a result, they:

(1) failed to argue that the petitioner was not a participant in the shooting, *Petitioner's Memorandum* at 42;

(2) failed to object to the trial court's instruction to the jury on capital murder and complicity, *Petitioner's Memorandum* at 42–44;

(3) failed to argue that the petitioner lacked the requisite intent to kill, *Petitioner's Memorandum* at 44; [9]

(4) failed to request that the jury be instructed on felony murder as a lesser-included offense of capital

---

**6.** The citation following each of the claims for relief refers to the page or pages of the petitioner's *Memorandum* at which the specific ground is stated.

**7.** Stated differently, the petitioner argues that he was convicted and sentenced to death in violation of the due process clause of the Fourteenth Amendment because there was insufficient proof that he either participated in the killing or had the specific intent to kill.

**8.** This claim focuses on the prosecution's alleged failure to disclose (1) an A.B.I. (Alabama Bureau of Investigation) investigative report, (2) statements made by several men present in the motel room at the time of the petitioner's arrest, and (3) other documentary evidence implying the existence of other suspects in the crime. *See Petitioner's Memorandum* at 26–27.

**9.** This claim includes an argument that counsel failed to argue that the petitioner was not a "participant in the murder," but this aspect of the claim seems merely to repeat the previous claim 3(b)(1) that the petitioner was not a participant.

murder, *Petitioner's Memorandum* at 45–46;

(5) improperly stated to the jury in closing arguments that proof of felony murder would support a capital murder conviction, *Petitioner's Memorandum* at 46;

(6) failed to object to the prosecutor's improper closing argument on the law of complicity, *Petitioner's Memorandum* at 46–48;

(b) inadequately cross-examined witness David Lindsey, *Petitioner's Memorandum* at 49–50;

(c) failed to raise the proper objection to the State's statistical evidence relating to glass fragments, *Petitioner's Memorandum* at 50–52; and

(d) failed to file a motion to suppress illegally obtained evidence, *Petitioner's Memorandum* at 53–55.[10]

4. Petitioner was denied the effective assistance of appellate counsel because his appellate attorney:

(a) submitted an inadequate appellate brief containing a 32–page "mishmash" of facts, omitting some and incorrectly stating others,[11] *Petitioner's Memorandum* at 56–60;

(b) failed to argue on direct appeal certain meritorious issues while arguing two frivolous issues related to the petitioner's guilt,[12] *Petitioner's Memorandum* at 60–61; and

(c) failed to make any argument to the Alabama Supreme Court during its review of the conviction and sentence, *Petitioner's Memorandum* at 61–62;

5. The trial court failed to instruct the jury on felony murder as a lesser-included offense of the crime of capital murder. *Petitioner's Memorandum* at 34–36.

6. The trial court improperly instructed the jury on the definition of reasonable doubt in violation of *Cage v. Louisiana*. *Petitioner's Memorandum* at 36–39.

7. The trial court improperly admitted certain pieces of evidence that were obtained in violation of the Fourth Amendment.[13] *Petitioner's Memorandum* at 62–69.

Pursuant to the court's order dated June 23, 1993, the respondents filed a habeas corpus checklist on July 22, 1993, attaching numerous documents and records from the state-court proceedings, and filed a brief on August 23, 1993. The petitioner filed responses on September 21, 1993, and September 22, 1993. A hearing was conducted

---

**10.** This claim relates solely to the seizure of the .357 magnum revolver at the time of the petitioner's arrest. No argument is directly advanced that counsel were ineffective in any way with respect to their opposition to the surgical removal of the bullet from the petitioner's back. The petitioner does argue that ineffective assistance excuses the procedural default of the claim related to the removal of the bullet.

**11.** This claim is, in essence, that the statement of facts in the appellate brief was incompetently drafted because it stated some facts incorrectly and omitted certain other critical facts. For example, the petitioner argues that the brief failed to mention that Mrs. Cantrell's testimony tended to negate the conclusion that petitioner was one of the killers and failed to show the absence of evidence of intent to kill.

**12.** The petitioner points out only in conclusory terms certain issues he contends should

have been asserted on direct appeal in lieu of those actually raised. These include the alleged failure of proof that petitioner had the intent to kill, the evidence that the petitioner was not a participant in the killing, the trial court's failure to instruct the jury on felony murder, the trial court's erroneous admission of prejudicial evidence, the trial court's improper admission of evidence seized unconstitutionally, and the ineffectiveness of trial counsel. The petitioner also contends that appellate counsel failed to appreciate the distinction between capital murder and mere felony murder.

**13.** Under this claim, the petitioner contends that the surgical removal of the bullet from his back and the seizure of the .357 magnum revolver at the time of his arrest both violated the Fourth Amendment prohibition against unreasonable searches and seizures.

on October 27, 1993, by United States Magistrate Judge Paul W. Greene to determine whether the petitioner and his counsel were aware of the substantial procedural barriers to habeas corpus review in a subsequent petition and the necessity of presenting all claims in a single petition.

The petitioner filed a response on June 6, 1994, and the respondents filed a response on July 18, 1994. By order dated June 29, 1994, the court requested from the parties their views regarding the necessity for an evidentiary hearing. The petitioner filed a response on July 22, 1994, asserting that an evidentiary hearing was necessary only "for the court to hear expert testimony that would establish for this federal record standards of counsel effectiveness in death penalty cases that prevail in Alabama state courts." By order dated August 10, 1995, the court determined that it could address all of the claims presented in the habeas corpus petition on the basis of the state court record without holding an evidentiary hearing. That order also directed the respondents to file an answer to the petition for writ of habeas corpus along with a brief addressing issues of law. The respondents filed an answer to the petition on October 2, 1995.

By order of January 16, 1996, the court set an evidentiary hearing for February 29, 1996, on the " narrow factual issue" concerning "what petitioner told counsel about the crime and his role in it in order to assess whether their strategic and tactical choices were reasonable in the light of the information known to them." On February 12, 1996, the petitioner filed a motion for reconsideration to set aside the order setting a hearing, which was denied on February 13, 1996. On February 20, 1996, the petitioner "appealed" the order setting the evidentiary hearing to the Eleventh Circuit Court of Appeals, and also moved that court to stay this court's order setting the evidentiary hearing. By order of February 28, 1996, the Eleventh Circuit stayed the order setting the hearing and directed this court to conduct an *in camera* hearing in order "to determine whether and to what extent appellant's communication presumptively protected by the attorney-client privilege is relevant to the specific ineffective assistance of counsel claims raised by appellant in his habeas petition."

An *in camera* hearing was conducted on February 29, 1996. By order dated March 1, 1996, the petitioner's trial attorneys were directed to file under seal all materials that contained communications from the petitioner to them concerning his knowledge of or participation in the events surrounding the robbery and murder, and another *in camera* hearing was scheduled for March 19, 1996. On March 7, 1996, the petitioner's trial attorneys filed the requested documents under seal. The petitioner again "appealed" to the Eleventh Circuit Court of Appeals, seeking to stay the hearing that was then scheduled for March 19, 1996. On March 7, 1996, the Court of Appeals denied the petitioner's motion for stay, stating: "Given trial counsel's apparent failure of memory, the district court's decision to order production under seal of trial counsel's notes for purposes of the *in camera* relevance hearing is reasonable and necessary." This court then proceeded with the hearing.[14]

---

14. This court has yet to hear any adequate explanation of the jurisdictional basis upon which the Eleventh Circuit undertook to review the trial court's conduct of this evidentiary hearing and to direct the manner in which that hearing would be conducted. In the real world state habeas petitioners usually strive mightily to induce the federal district court to allow an evidentiary hearing. Here, however, Johnson's counsel wanted no part of any such hearing. Their reasons became obvious as a result of the information revealed at that hearing. Trial counsel's testimony made it clear that what Johnson had told his attorneys about his personal participation in the robbery and murder of Mr. Cantrell completely refuted his present attorneys "fictionalized" account of his participation, upon which most of their present arguments are founded. *See infra* at pp. 1343–44. It is fair to say that present counsel would, if they could, simply rewrite the "facts" to suit their own concept of the manner in which Johnson's trial attorneys should have conducted themselves. Most disturbing perhaps is that the hearing re-

On April 10, 1996, the petitioner filed a response to the respondent's memorandum dated April 1, 1996. On October 20, 1997, the petitioner filed a motion to amend his reply brief in support of the petition in order to add as an additional cause of the claimed ineffectiveness of counsel that trial counsel did not permit the petitioner to testify at trial.[15] On March 20, 1998, the court denied the motion to amend.

## II. Analysis of the Claims.

### A. Introduction.

■ A state prisoner "in custody in violation of the Constitution or laws or treaties of the United States" may petition an appropriate court of the United States for a writ of habeas corpus to obtain release from his or her unlawful confinement. 28 U.S.C. § 2254(a); [16] *See Brown v. Allen*, 344 U.S. 443, 485, 73 S.Ct. 397, 407–08, 97 L.Ed. 469 (1953). The writ exists as the appropriate cause of action for a state prisoner seeking to challenge in federal court the "fact or length" of his confinement. *Wilson v. Foti*, 832 F.2d 891, 892 (5th Cir.1987).

■ The petition for the writ of habeas corpus in a federal court is a collateral attack on the finality of state court proceedings on a matter largely of state concern. *See In re Kaine*, 55 U.S. 103, 113–14, 14 How. 103, 14 L.Ed. 345 (1852). Therefore, review of a state court judgment is limited in scope because of demanding interests in federalism and the finality of judgments. *See Coleman v. Thompson*, 501 U.S. 722, 748, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) (" '[T]he Great Writ entails significant costs.' ... The most significant of these is the cost to finality in criminal litigation that federal collateral review of state convictions entails"); *Frank v. Mangum*, 237 U.S. 309, 329, 35 S.Ct. 582, 590, 59 L.Ed. 969 (1915) ("[W]here ... a criminal prosecution has proceeded through all the courts of the state, including the appellate as well as the trial court, the result of

vealed that present counsel were aware as early as 1988, before they filed their first Rule 20 petition, that Johnson had told his trial attorneys that he was, in fact, present at and participated in the robbery; that he personally fired shots at Mr. Cantrell; and that he was himself wounded by Mr. Cantrell. For present counsel to claim in post-conviction proceedings that petitioner was *actually innocent*, and that this would have become clear at trial if only the trial attorneys had made the right arguments is, at best, disingenuous. The best counsel could do was what they did—put the State to its proof. In an effort to avoid having the true facts revealed, habeas counsel "appealed" this court's order setting the limited evidentiary hearing and the Eleventh Circuit, with no explanation of its jurisdiction, entered an order first staying the hearing and then directing this court to conduct an *in camera* hearing to determine whether and to what extent Johnson had waived his attorney client privilege by attacking the competency of his attorneys. This court, of course, recognizes that the appellate court could have treated the "appeal" as a petition for the writ of mandamus, though it was not so styled. But if that is what it did, wherein did it find that this court had abused its discretion by setting a hearing, or conclude that petitioner was clearly entitled to stop the court and the State from determining what information trial counsel had in hand so that a realistic assessment could be made of whether they conducted themselves reasonably in light of that information?

15. Given what we now know that Johnson had told his lawyers about his active participation in the robbery and murder of Mr. Cantrell, this claim, had the amendment been allowed, would have been farfetched at best. First, it is clear that Johnson emphatically had told his lawyers that he would not testify. Second, he could not have testified consistently with his statements to his lawyers without confessing, on the witness stand and under oath, to capital murder. Finally, the court trusts that habeas counsel would not now suggest that Johnson's trial counsel should have participated in some contrived testimony from him that would have had the effect of exonerating him.

16. 28 U.S.C. § 2254(a) reads:

The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

the appellate review cannot be ignored when afterwards the prisoner applies for his release on the ground of a deprivation of Federal rights sufficient to oust the state of its jurisdiction to proceed to judgment and execution against him. This is not a mere matter of comity, as seems to be supposed. The rule stands upon a much higher plane, for it arises out of the very nature and ground of the inquiry into the proceedings of the state tribunals, and touches closely upon the relations between state and Federal governments.").

■■■ To obtain a writ of habeas corpus on a federal claim, a petitioner must overcome a number of procedural and substantive hurdles. These hurdles serve to ensure that the principles of federalism and finality are served by giving state courts due deference in the resolution of habeas claims. First, the petitioner must not have procedurally defaulted his federal claims in the state courts. *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). The petitioner must give the state courts a full and fair opportunity to consider all of his claims of error, including federal constitutional claims. *See also Stone v. Powell,* 428 U.S. 465, 494 n. 35, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) ("Despite differences in institutional environment and the unsympathetic attitude to federal constitutional claims of some state judges in years past, we are unwilling to assume that there now exists a general lack of appropriate sensitivity to constitutional rights in the trial and appellate courts of the several States. State courts, like federal courts, have a constitutional obligation to safeguard personal liberties and to uphold federal law"). A procedural default occurs when a federal claim is not raised in such a way as to permit full review by the courts of the state. A habeas petitioner who has failed to follow a state's procedural rules in presenting his or her federal claims and for that reason is barred from presenting those claims to the

appellate courts of the state will also be barred by the procedural default rule from pursuing those claims on collateral review in federal court. *Wainwright,* 433 U.S. at 82, 97 S.Ct. 2497. However, if a petitioner defaults on his federal claim in state court, he may nonetheless be heard on that claim in federal habeas court if he either "can show 'cause' for the procedural default and 'prejudice attributable thereto,' *Murray v. Carrier,* 477 U.S. 478, 485, 106 S.Ct. 2639, 2644, 91 L.Ed.2d 397 (1986), or demonstrate that failure to consider the federal claim will result in a 'fundamental miscarriage of justice.' *Id.* at 495, 106 S.Ct. at 2649, *quoting Engle v. Isaac,* 456 U.S. 107, 135, 102 S.Ct. 1558, 1576, 71 L.Ed.2d 783 (1982)." *Harris v. Reed,* 489 U.S. 255, 262, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989).[17] *See also Wainwright,* 433 U.S. at 90–91, 97 S.Ct. 2497.

■■■ Second, the petitioner must exhaust the claim in the courts of the state before the district court can address the claim. *See Rose v. Lundy,* 455 U.S. 509, 515, 102 S.Ct. 1198, 1202, 71 L.Ed.2d 379 (1982); *see also Ex parte Royall,* 117 U.S. 241, 250–53, 6 S.Ct. 734, 29 L.Ed. 868 (1886). A claim is exhausted if it either has been addressed by or was before the highest state appellate court authorized to hear the claim on its merits or if there no longer exists any available remedy in the state courts. *Lundy,* 455 U.S. at 515–16, 102 S.Ct. 1198.

■■■ Finally, as a substantive matter, in addressing a habeas claim the district court must generally defer to the factual findings of the last state court to address the claim. *See, e.g., Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). Only in certain limited and defined circumstances will a federal court be permitted to disregard factual findings made by the state courts.

17. These exceptions will be discussed in greater detail *infra* where applicable to partic-

ular claims of the petitioner.

## B. Intent, Participation, and the "Third Man" Defense.

As Assistant Attorney General, now Circuit Judge, Edward Carnes aptly observed, "[t]his case ... is in a very unusual posture, because the great majority of the issues raised ... are based upon the Petitioner's present counsel['s] assertion" of an entirely new version of the events of March 11, 1984. *Record of Petitioner's Rule 20 Proceedings* ("R20") at 1713–1714. Specifically, petitioner now suggests (or at least claims that his trial attorneys should have argued) that he was not one of the two robbers described by Mrs. Cantrell at trial. According to petitioner, the evidence supports the conclusion that he was instead a "third man," involved in the robbery but not in Cantrell's murder, who entered the house during a lull in the shooting just in time to be caught in the back by the dying Mr. Cantrell's last shot. This new conception of events has wound its way into almost every argument in this case. In an attempt to untangle the resulting knots, the court will discuss the question of intent and petitioner's so-called "third man" theory generally before turning to individual analyses of the many issues in which this theory plays a central role.

 Petitioner's arguments are built upon a nuance in Alabama's capital murder scheme. To put the matter simply, in Alabama the age-old felony murder doctrine does not apply in capital cases. *See, e.g., Lewis v. State,* 456 So.2d 413, 416 (Ala.Crim.App.1984) ("[N]o defendant is guilty of a capital offense unless he had an intent to kill, and that intent to kill cannot be supplied by the felony murder doctrine."). Alabama law does list robbery as one of the circumstances which will elevate a murder to capital offense status. *See* § 13A–5–40(a)(2). However, mere participation in a robbery which leads to a kill-

ing is not sufficient for a capital conviction. Alabama's capital murder statute applies only when the defendant is guilty of an intentional murder. *See Ex parte Murry,* 455 So.2d 72, 74 (Ala.1984).

 In this case, the State acknowledges that Mr. Cantrell was actually killed by the unidentified first man, not the petitioner. *See, e.g.,* R20 at 1714–15. The murder element of Johnson's capital charge can be met by proof of complicity in an intentional murder carried out by another, but this requires more than proof of joint participation in a robbery. "[T]he accomplice liability doctrine may be used to convict a non-triggerman accomplice if, but only if, the defendant was an accomplice in the intentional killing as opposed to being an accomplice merely in the underlying felony. An accomplice to the intentional killing is one who aids and abets the killing by any assistance rendered through 'acts or words of encouragement or support or presence, actual or constructive, to render assistance should it become necessary.' ... [T]here must be sufficient evidence from which a rational jury could conclude that the defendant possessed [a 'particularized intent'] to kill." *Ex parte Raines,* 429 So.2d 1111, 1112–13 (Ala. 1982), *cert. denied,* 460 U.S. 1103, 103 S.Ct. 1804, 76 L.Ed.2d 368 (1983) (quoting Ex parte *Ritter,* 375 So.2d 270, 274 (Ala. 1979)). Thus, in order to convict Johnson, the State was required to prove that he, with an intent to kill, aided another in killing Mr. Cantrell.[18] *See Russaw v. State,* 572 So.2d 1288, 1292–93 (Ala.Crim.App. 1990). Petitioner claims that his attorneys failed to challenge this weak link in the State's case, and that if pressure had properly been brought to bear on this issue a capital conviction could have been avoided.

The State's proof of intent took the form of evidence that the petitioner participated

---

18. Alabama's imposition of the death penalty for aiding and abetting a capital murder appears to satisfy the Eighth Amendment's cruel and unusual punishment clause. *See Bush v. Singletary,* 988 F.2d 1082, 1086–88 (11th Cir.

1993) (discussing Florida's similar capital aiding and abetting scheme); *Tison v. Arizona,* 481 U.S. 137, 158, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987).

in a shoot-out in which Mr. Cantrell was killed. This evidence was of two kinds. First, the State put Lindsey on the stand to testify that the petitioner had admitted to shooting and perhaps wounding a robbery victim. Second, and more importantly for our purposes, the State attempted to identify Johnson as the second robber in the Cantrell home, and then put on testimony from Mrs. Cantrell that this robber had shot at her husband. As the Alabama Court of Criminal Appeals observed in its decision on Johnson's Rule 20 petition, proof that Johnson was the second robber would clearly satisfy the capital murder requirements. "While the shots of the second 'masked' robber were not the shots that killed the victim, there was no reasonable basis for the jury to doubt that the second robber had the intent to kill, attempted to kill, and actively participated in the killing." *Johnson v. State*, 612 So.2d 1288, 1298 (Ala.Crim.App.1992); *see also Smith v. State*, —— So.2d ——, 1999 WL 339272 (Ala.Crim.App. May 28, 1999); *Watkins v. State*, 495 So.2d 92, 102–03 (Ala. Crim.App.1986) (finding the required participation and noting that " 'community of purpose may be formed in a flash' "). Many of petitioner's arguments before this court boil down to a claim that his trial attorneys could have and should have challenged the State's contention that he was that second robber, and so put the State to its proof on the question of his intentional participation in Mr. Cantrell's murder.

As petitioner correctly notes, the State had ample physical evidence that he was present at the scene but little solid evidence pointing to him as the second robber. Mrs. Cantrell did not recognize Johnson, and indicated only that he was about the same height and build as the second robber. Also, while Johnson's brown boots and "shiny" gun matched Mrs. Cantrell's general description of the second robber,

she never identified these rather common objects as the ones she saw the night of the murder. Thus the State's main argument on this point was simply that Johnson was there, and there were only two men, so he must have been the second man.

This, of course, is where the petitioner's new "third man" theory comes into the picture. According to Johnson, the evidence at trial could be interpreted to indicate that there were three robbers on the scene, and that Johnson was not the second but the third man to enter the Cantrell home. If so, a properly instructed jury might conclude that he did not participate in the shoot-out with Cantrell, find evidence of intentional murder lacking, and opt instead for felony murder, a non-capital offense.

The petitioner bases this theory primarily on discrepancies in Mrs. Cantrell's testimony at trial. Her testimony was a bit confused and difficult to follow, as well as inconsistent with the physical evidence in some significant respects.[19] However, her story was essentially this. Two intruders pushed past her into the house. The first man in the door turned over a couch in the living room and took up a position behind it. Mrs. Cantrell fell to the floor at her husband's feet and was unable to see much of anything after that point, so the second man's location during the shooting is unclear. After a brief verbal exchange between her husband and the intruders, the second man opened fire. A barrage of shots was exchanged, followed by quiet. The first man said "come on in Bubba, I have got him." *Trial Record* ("Tr.") at 387–88. Just after that, Mr. Cantrell got off one last shot. Mrs. Cantrell heard a man say "Oh!," Tr. at 366–67, then heard shuffling as if "they were trying to help him out" Tr. at 368. After that,

---

**19.** For example, while she testified that the second robber was the only one of the two who fired, both sides appear to agree that it was in fact the first man in the door who shot and killed Cantrell. Likewise, there are some minor internal inconsistencies in her story.

*Compare, e.g.,* Tr. at 388 (first man said "we have got him") *with* Tr. at 364 (first man said "I have got him") *and* Tr. at 364, 383–84 (first shot fired before victim spoke) *with* Tr. at 391 (first shot fired after victim spoke).

A: It didn't take them long ... to start moving over further towards the door.

Q: Further towards the door?

A: That is right.

Q: So neither one of them was at the door when your husband fired the last shot?

A: No, they wasn't.

Q: They were not?

A. No.

Tr. at 386. Mrs. Cantrell speculated that the men "were probably going through things, looking for things." *Id.* Then they left.

According to petitioner, trial counsel overlooked a critical feature of Mrs. Cantrell's testimony—she placed the two intruders away from the door when the last shot was fired and one of the intruders was hit. This is important, Johnson claims, because the State's evidence that Johnson was present at the scene was based largely on a bullet which allegedly went *through the door* and hit him. Thus if both Mrs. Cantrell's testimony and the State's physical evidence were believed, Johnson could not be the second man. The petitioner further contends that other evidence could be drawn upon to support this conclusion, including (1) Lindsey's testimony that Johnson had gone with "some friends," i.e. more than one, to get money; (2) other police information that more than two people were involved in the robbery; (3) the position of the bullet wound on the right side of Johnson's back, consistent with coming in the door, not going out; and (4) the timing of the lull in shooting, the first man's direction to "come on in," and Cantrell's last shot.

With these finishing touches, Johnson's story would go something like this. He and several others went to rob the Cantrells. He waited outside while two other men went in. They shot Cantrell, and thinking the fight was over called Johnson in. As he walked in, he was hit in the right side of his back by Cantrell's dying shot.

The court acknowledges that, if the spotlight is narrowly focused on Mrs. Cantrell's trial testimony, it reveals a conflict within the State's own evidence. This flaw was not fatal to the State's case, however. The balance of the available evidence, including Johnson's own rendition of events to his lawyers, points to two intruders with Johnson as the second man.[20] Because of the other evidence the State had available, if Johnson's lawyers had tried to exploit the problems with her testimony they would have had little to work with. For the reasons set out below, the court concludes that a third man defense would not have significantly strengthened Johnson's case, and that Johnson suffered no constitutional deprivations for want of such a defense.

The court now turns to petitioner's specific assignments of error predicated on the "third man" theory and the question of intent.

### 1. Sufficiency of the Evidence.

The petitioner argues that the State failed to satisfy its burden to prove his guilt beyond a reasonable doubt at trial. He argues in particular that the evidence adduced at trial (1) fails to demonstrate that he was a participant in the murder of Mr. Cantrell and (2) does not demonstrate that he had the requisite intent to kill or aid another in killing required under the capital murder statute. These claims are substantially the same, in essence being that although petitioner was present at the scene and a participant in the robbery, he did not have the required level of participation in the actual murder to be found guilty of a capital crime.

### i. Procedural Default on the Sufficiency of the Evidence Claim.

█ The State first contends that the claim is procedurally barred because the matter was not raised on direct review to the Alabama Court of Criminal Appeals.

**20.** It appears that Johnson and another man went into the house, while one or two others waited outside with a car.

This court agrees. While petitioner's appellate counsel attacked the sufficiency of the evidence regarding Johnson's presence at the scene on direct appeal, no mention was made of the intent element and counsel certainly did not advance the third man theory petitioner now relies on for consideration by the state appellate courts. In its opinion on the appeal from the denial of the Rule 20 petition, the Alabama Court of Criminal Appeals held that it was barred from reviewing these portions of the sufficiency of the evidence claim. "We ... hold that to the extent that this claim differs from the insufficiency of evidence issue asserted on direct appeal, this claim is procedurally barred from review under Rule 20.2(a)(5), A.R.Cr.P.Temp., because it could have been but was not raised on appeal." *Johnson,* 612 So.2d at 1292. Because the claim was not properly asserted or addressed on appeal, the claim was defaulted.[21] *See Wainwright,* 433 U.S. at 82, 97 S.Ct. 2497; *cf. Hart v. Estelle,* 634 F.2d 987 (5th Cir.1981) (exhaustion requirement not satisfied if "a different legal theory" or an "entirely new factual claim [ ]" is presented in federal court). It therefore cannot properly be considered by this court.

### ii. Merits of the Claim.

Alternatively, the court finds plaintiff's sufficiency of the evidence claim unpersuasive on the merits.

First, the court acknowledges the limited role a habeas court may play in weighing the constitutional sufficiency of the evidence in a state criminal prosecution. *See, e.g., Martin v. State of Alabama,* 730 F.2d 721, 724 (11th Cir.1984). The sole question to be determined is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the petitioner guilty beyond a reasonable doubt.[22] *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *reh'g denied,* 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979). The State is not required to rule out every hypothesis except that of the guilt of the defendant. *Jackson,* 443 U.S. at 326, 99 S.Ct. 2781; *Martin,* 730 F.2d at 724. When the record reflects historical facts which support conflicting inferences, there is a presumption that the jury resolved those conflicts in favor of the prosecution and against the defendant. In other words, the federal courts must defer to the judgment of the jury in assigning credibility to the witnesses and in weighing the evidence. *See Jackson,* 443 U.S. at 326, 99 S.Ct. 2781; *Wilcox v. Ford,* 813 F.2d 1140 (11th Cir.1987). The court's decision making process on the sufficiency of the evidence question is informed by reference to the essential elements of the crime for which the petitioner was convicted as defined by state law. *Wilcox,* 813 F.2d at 1143 (citing *Jackson,* 443 U.S. at 324 n. 16,

**21.** The petitioner seeks to excuse this default based upon (1) ineffective assistance of counsel in failing to raise the issue at trial and on appeal; (2) Alabama's failure to adhere to its own default rules as exemplified in *Blount v. State,* 572 So.2d 498 (Ala.Crim.App.1990) and *Falkner v. State,* 586 So.2d 39 (Ala.Crim.App. 1991); and (3) the actual innocence exception to procedural default. Plaintiff's first claim is essentially subsumed in his ineffective assistance claims, as only defective performance satisfying *Strickland's* test will provide cause for default. *See Jackson v. Herring,* 42 F.3d 1350, 1361 (11th Cir.1995). The court will therefore discuss this argument in conjunction with plaintiff's other ineffective assistance claims. Plaintiff's actual innocence contentions will likewise be dealt with below. Plaintiff's third argument is not well taken.

*Blount and Falkner* simply demonstrate the application of an exception to Alabama's default rules for claims which could not practically have been brought previously. It is a state's prerogative to fix the contours of its procedural rules, and federal courts must accord these rules the proper respect so long as they are applied consistently. The mere existence of established exceptions to more general rules does not demonstrate that they have not been, nor may this court second-guess the Alabama courts' interpretation of their own rules.

**22.** Due process requires the state to prove each element of the offense beyond a reasonable doubt. *Bishop v. Kelso,* 914 F.2d 1468, 1470 (11th Cir.1990) (citing *Jackson,* 443 U.S. at 316, 99 S.Ct. 2781).

99 S.Ct. 2781); *Buffo v. Graddick*, 742 F.2d 592, 595 (11th Cir.1984).

■■■ The evidence presented at trial was adequate to prove that petitioner was present and that he intended to help his associate kill Mr. Cantrell. The state presented a strong case that Johnson was present at the scene of the crime. Evidence at the scene indicated that a bullet had been fired by the victim and had passed through a pane of glass in the carport door, only to disappear. A bullet, of the type used by the victim and with markings matching the type of gun used by the victim, was recovered from the petitioner's back. The bullet wound location was consistent with the trajectory of the missing bullet, and fragments of glass found in the head of that bullet matched the physical characteristics of the window pane the shot passed through. This set of coincidences was not explained by any other evidence in the record, and thus alone was sufficient to allow a reasonable juror to infer beyond a reasonable doubt that Johnson was present during the gun-fight which led to Mr. Cantrell's death.

While the state's proof of Johnson's intent and participation in the murder was not quite so iron-clad, it too was constitutionally sufficient. The most important evidence allegedly came from the mouth of Johnson himself. David Lindsey testified that Johnson visited his home the day after Mr. Cantrell was murdered. According to Lindsey, Johnson had with him a "shiny" .357 Magnum [23] matching the description of the gun carried by one of Cantrells' killers. The next morning, Lindsey drove the petitioner to a motel in Oxford, Alabama, where they met some of Johnson's friends. Lindsey testified that

Johnson told them that he "had to get the hell out of Hartselle." He also stated that he and others had gone into a place to get some gold and that his buddy had been shot. According to Lindsey, appellant stated, "I got shot, but I got off a couple of rounds, and I believe I got that son of a bitch." The jury was entitled to, and apparently did, believe Lindsey's testimony. The record therefore contains what amounts to an admission by the petitioner that he participated in an intentional killing. In light of the other evidence, a jury could readily conclude that it was Mr. Cantrell's murder which Johnson was describing. In the court's view, this evidence, along with that already outlined above, was sufficient to support the jury's finding that Johnson was guilty of capital murder.

Nor is the court persuaded that Mrs. Cantrell's testimony barred such a conclusion. Mrs. Cantrell's testimony does suggest that only one of the two intruders she saw shot at her husband, and that neither of these two were behind the carport door when her husband apparently fired at and hit the petitioner. The significance of this testimony is undermined, however, by the physical evidence. Mrs. Cantrell's testimony was, frankly, inconsistent with that evidence in a number of respects. The evidence indicated that an active gun battle was waged between the victim and not one but two intruders. More significantly, a number of shots from both sides passed through the carport door, indicating that one of the intruders must have been firing from behind the door during part of the gunfight.[24] As discussed above, one of the victim's shots through the door apparently struck Johnson, allowing a jury to infer that he was the shooter behind the door.

**23.** This testimony was partially corroborated by the introduction at trial of a nickel-plated Ruger .357 Magnum found in the petitioner's possession a few days after the killing. Johnson's gun, when found, had only three rounds in it, again consistent with the three rounds apparently fired by the intruder near the carport door. *See infra.*

**24.** The evidence suggests that an intruder fired two shots at the victim through the door and another from a position near the door. This was also apparently petitioner's trial counsel's understanding of the facts. *See* R.20 at 759 (DiGiulian testified in a deposition that "there was one man standing in full view. The back door was open and one man was partially behind that back door shooting around the door.").

No evidence, except Mrs. Cantrell's confused testimony, suggests otherwise. Indeed, the other physical evidence [25] and Johnson's statements to Lindsey are entirely consistent with this conclusion. Therefore the jury was entitled to overlook any inconsistencies in Mrs. Cantrell's testimony, and base its findings regarding the petitioner's participation on the substantial remaining evidence instead.

The court is satisfied that, on this evidence, the jury was justified in finding beyond a reasonable doubt that the petitioner, Anthony Keith Johnson: (1) was present at the scene of the robbery and murder of Kenneth Cantrell; (2) knowingly and wilfully participated in the robbery; (3) fired his firearm at Mr. Cantrell; and (4) intended to kill him. Moreover, this evidence justified the jury in finding that if the bullets fired by Johnson did not strike and kill Mr. Cantrell, bullets fired by one or more of his companions accomplished the victim's death and that Johnson had intended and participated in the killing.

### 2. Ineffective Assistance of Counsel.

Petitioner advances a number of ineffective assistance of counsel claims, most related in some manner to his "third man" theory.

### i. Claims of Ineffective Assistance at Trial Generally.

Johnson contends that the performance of his trial attorneys was so deficient that he was denied the effective assistance of counsel guaranteed him by the Sixth Amendment to the United States Constitution. First, he argues that overall his trial attorneys were so hapless as to render

"the adversary process itself presumptively unreliable." *United States v. Cronic,* 466 U.S. 648, 659, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). He also finds fault with his trial attorneys for committing many specific errors, each purportedly growing out of their misapprehension of the elements necessary to his conviction of capital murder and their related failure to recognize the possibilities of a "third man" defense. The grounds asserted include counsel's failure (1) to argue that he was not a participant in the shooting, but was instead a "third man"; (2) to object to the submission of improper jury instructions on capital murder and complicity to the jury; (3) to argue that the State had not proved Johnson intended to kill Mr. Cantrell; (4) to request a felony murder jury instruction; and (5) to object to the prosecutor's closing argument; as well as (6) counsel's improper concession on closing argument that Johnson would be guilty of capital murder if he was merely present at the robbery and murder of Mr. Cantrell.

 The Supreme Court has stated that, under the Sixth Amendment, a defendant has not only the right merely to have counsel at a criminal trial, but the right to counsel that provides him or her with effective assistance. There are two grounds upon which a claim of ineffective assistance of counsel can be advanced. First, a petitioner can argue, under *United States v. Cronic,* 466 U.S. 648, 658, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), that "circumstances ... are so likely to prejudice the accused" that the counsel provided is presumptively ineffective. The petitioner also has the option of arguing that specific errors of coun-

---

**25.** For example, petitioner points out that the location of his bullet wound on his right mid-back indicates that he could not have been leaving the house when he was hit. Therefore, according to petitioner, he must have been shot while coming in after the fight was almost over. However, the wound location is also consistent with the theory that the petitioner had taken up a position behind the door during the fight. Thus petitioner's argument does not place in doubt the conclusions suggested by Lindsey's testimony and the oth-

er evidence. Likewise, petitioner's counsel make much of the use of the pronoun "we" in the phrase "come on in, we have got him." Petitioner claims that this suggests that the first two men had killed Cantrell, and were calling a third man into the house from outside. The court does not find this choice of words particularly significant, as "we" could as easily mean you and I, and so be used by one of the two intruders in speaking to the other.

sel at trial were sufficiently serious that the attorneys were not acting as competent counsel and that those errors prejudiced the petitioner. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

### ii. Counsel's Alleged Failure to Understand an Essential Element of Capital Murder.

Many of Johnson's claims of ineffectiveness hinge on important factual allegations—that his attorneys failed to understand the intent and participation elements of capital murder and failed to recognize the significance of Mrs. Cantrell's trial testimony, and so failed to craft an effective defense. Because of their failures, trial counsel advanced a flimsy defense—that the petitioner was not present at the scene of the crime—rather than a stronger defense based upon the petitioner's lack of intent to kill and his non-participation in the robbery and murder. Whether asserted under the rubric of *Cronic* or *Strickland*, most of petitioner's claims are thus at bottom the same: His attorneys' failure to understand the law and facts applicable to his case was unacceptably poor performance, and denied him the right to counsel. The court will therefore evaluate these

factual allegations before turning to petitioner's more specific assignments of error.

In evaluating factual questions this court does not write on a blank slate. Alabama's courts have made factual findings in their review of Johnson's post-conviction claims, and the court owes those findings a "high measure of deference." *Marshall v. Lonberger*, 459 U.S. 422, 432, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983). This court must accord such findings a presumption of correctness unless one or more of the exceptions listed in 28 U.S.C. § 2254(d) is found applicable.[26] *See Sumner v. Mata*, 449 U.S. 539, 551, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981); *Williams v. Turpin*, 87 F.3d 1204, 1208 (11th Cir.1996); *McBride v. Sharpe*, 25 F.3d 962, 971 (11th Cir.1994) *(en banc)*; and *Griffin v. Wainwright*, 760 F.2d 1505, 1510 (11th Cir. 1985). The Rule 20 court made no explicit written findings of fact on whether trial counsel comprehended the intent requirement of capital murder under Alabama law. The presumption of correctness, however, attaches not only to findings of fact made by the trial court that conducted the evidentiary hearing concerning the petitioner's ineffective assistance claim, but also to factual findings made by an appel-

---

26. In April of 1996, the Congress enacted the Anti–Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") which *inter alia* amended 28 U.S.C. § 2254 to provide that "a determination of a factual issue made by a State court shall be presumed to be correct" unless rebutted by the petitioner "by clear and convincing evidence." It is reasonably clear, however, that the provisions of that act do not apply retroactively to this habeas corpus proceeding. In *Lindh v. Murphy*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), the United States Supreme Court held that the amendments to Chapter 153 of Title 28, United States Code, which includes 28 U.S.C. § 2254, do not apply retroactively to noncapital habeas cases. The court reasoned that Congress did not indicate an intent to make the Chapter 153 amendments apply retroactively because it was silent as to that chapter while explicitly providing that the new Chapter 154, dealing specifically with habeas corpus proceedings in capital cases, would be applied to pending petitions. The court noted that some parts of Chapter 154 specifically

refer to and incorporate provisions of Chapter 153, most notably 28 U.S.C. § 2264(b). This court notes that, by its explicit terms, Chapter 154 applies only to habeas corpus proceedings in capital cases where the provisions of Section 2261(b) and (c) are met. Those sections set out specific requirements regarding provisions for the appointment of counsel for indigent prisoners sentenced to death whose convictions and sentences have been affirmed on direct appeal. There is nothing in this record to suggest, and the State of Alabama has not asserted, that it has satisfied the requirements of Section 2261(b) and (c) and is entitled to the benefits of the AEDPA. In any event, the court has decided the issues in this case under the prior law, they generally being more favorable to the petitioner than that established by AEDPA. The court is satisfied that AEDPA does not aid the petitioner. *See Hays v. Alabama*, 85 F.3d 1492, 1495 n. 1 (11th Cir.1996), *cert. denied*, 520 U.S. 1123, 117 S.Ct. 1262, 137 L.Ed.2d 341 (1997). Thus, the relevant statutory provisions are cited as they existed before AEDPA's effective date.

late court of the State with access to the record of the hearing on the claim. *Sumner,* 449 U.S. at 545–46, 101 S.Ct. 764; *Jones v. Jones,* 938 F.2d 838, 842–43 (8th Cir.1991).

The Alabama Court of Criminal Appeals explicitly found that "[t]rial counsel was [sic] aware that intent to kill was a required element of the capital offense." *Johnson,* 612 So.2d at 1298. That court also determined more broadly that "counsel made a reasoned, strategic decision not to argue ... that Johnson was present but did not intend that the victim be killed" based on a desire to avoid arguing to the jury in the alternative and "counsel's judgment that, as a practical matter, there was little or no chance that the jury would fail to find ... intent to kill if [it] concluded that he had been at the scene." *Id.* at 1296.

 This court is bound by these findings unless petitioner can show by clear and convincing evidence that the state court's determination was not "fairly supported by the record." 28 U.S.C. § 2254(d); *Griffin,* 760 F.2d at 1510. This court is not at liberty to disregard the state court's factual finding simply because, were the question before this court in the first instance, it might have resolved it differently. Before ignoring such findings, a federal court must do "more than simply disagree with the state court before rejecting its factual determinations," but must instead "conclude that the state court's findings lacked even 'fair [ ] support' in the record." *Marshall,* 459 U.S. at 432, 103 S.Ct. 843, 74 L.Ed.2d 646. This court is satisfied that the Alabama Court of Criminal Appeals' findings were fairly supported by the record.

During petitioner's Rule 20 hearing, a number of questions were asked of both Mr. Propst and Mr. DiGiulian, petitioner's two trial counsel, regarding their understanding of the elements required for accomplice liability in a capital case. Unfortunately, both the questions and the answers were somewhat ambiguous. For this reason, the evidence of Mr. Propst's understanding of the law was at best ambivalent.

*See, e.g.,* R20 at 599–608. However, the record contains sufficient evidence that DiGiulian did know of the intent and participation requirements to support the finding of the Court of Criminal Appeals on this point. At the Rule 20 hearing, DiGiulian testified:

> [Mr. Schafer:] ... Isn't it a fact that the reason you didn't argue lack of proof of intent was because you didn't really think it was legally relevant, that if there was a felony and a killing occurs during the course of the felony, that that was enough to convict?
>
> [Mr. DiGiulian:] Well, I don't know that that is exactly correct, but I'd say that's pretty close to it. I think if there is a killing out there and the evidence is such that it wasn't accidental, that it was an intentional shooting, that the jury can infer an act of intent from that.
>
> \* \* \* \* \* \*
>
> [Mr. Schafer:] On page 83 and 84, am I not correct in understanding that you were basically agreeing when I say that your understanding is that if a killing occurred during the course of a felony, then there was going to be a conviction? A I think what I answered—and it's in here—is that if there was an intentional shooting and the jury believed that Keith was there and *was a participant in the acts that led to the killing and involved in the killing,* then yes, they would conclude that he intended that, I think is what I testified to.
>
> \* \* \* \* \* \*
>
> Q It was your understanding as recorded on 83, 84 that, quote, if he, petitioner, *was a participant* in the events, even though he was not the trigger man, that he could be convicted of capital murder under those circumstances and could be sentenced to death, end quote.
>
> A That was my understanding.

R20 at 702–05 (emphasis added).

On cross-examination by counsel for the respondent, DiGiulian testified further on this point:

[Mr. Gibbs:] ... You're not of the opinion, are you, sir, that the defendant's mere presence at the scene without some showing of his participation in the actual murder in some way would, in and of itself, be sufficient to convict him of capital murder as opposed to some lesser included offense that he could be convicted of?

[Mr. DiGiulian:] It's my understanding, right or wrong, that *there would have to be some evidence of some participation.*

R20 at 744–45 (emphasis added); *see also* R20 at 713, 752. *But see* R20 at 697, 699–700. This understanding was apparently carried into action at trial, as petitioner's counsel asked for and obtained a jury instruction emphasizing the State's burden to prove beyond a reasonable doubt that Johnson was guilty of an intentional killing before he could be convicted of the capital offense. Tr. at 1252–1253.

The court of Criminal Appeals' broader finding that counsel's choice of trial tactics was a thoughtful and strategic one is likewise supported by record evidence. Both Propst and Digiulian testified during the Rule 20 proceedings that they were satisfied that the jury could and would convict if the State could prove that Johnson was present at what was clearly an intentional killing, *see, e.g.,* R20 at 753–54, and that they felt that the argument of alternative theories to the jury would be ill-advised. *See, e.g.,* R20 at 615–616. Thus the court concludes that it must accept the Court of Criminal Appeals' factual findings as correct, so far as they go.[27] The court therefore presumes that at least one of plaintiff's counsel understood the requirements of accomplice capital murder, and that together the two developed a strategy based on this legal background, their understanding of the facts of the case, and their judgment regarding a jury's probable response to these facts. They understood far more than petitioner now gives them credit for.

However, counsel did not understand all that petitioner claims they should have, either. It appears that counsel did not recognize the import of the portions of Mrs. Cantrell's testimony which petitioner relies on, nor did they consider the possibility that this testimony could have been used to undermine the State's proof on intent. Counsel also did not evaluate possible avenues of attack on the intent issue which would not require alternative arguments to the jury; e.g., requests for additional jury instructions. It is unclear whether the Court of Criminal Appeals meant to sweep these matters within its broader findings. However, even if it meant to do so, the Court of Criminal Appeals could not have properly found that petitioner's counsel evaluated possible strategies regarding intent in settling on their approach at trial. What testimony there was regarding this issue during the Rule 20 hearing indicated that they did not. *See, e.g.,* R20 at 610–11, 616, 625–26, 690–91, 699, 729, 757–58. This court's evidentiary hearings made it fairly clear that counsel simply did not think much about the intent issue at all. *See, e.g.,* TEH2 at 33, 35, 41, 69, 85; *Transcript of February 29, 1996 Evidentiary Hearing* ("TEH1") at 51. Thus this court is left to determine whether they should have, and if so, whether any consequences of constitutional significance flowed from their failure to do so.

### iii. United States v. Cronic.

The petitioner first claims that the performance of his attorneys in this regard was *per se* deficient under the test set out in *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). In *Cronic* the Supreme Court held:

The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adver-

---

**27.** The court notes that its own evidentiary hearing touched on some of the same issues. Though plagued by a failure of memory on the part of both Messrs. Propst and DiGiulian, it elicited much the same somewhat ambiguous responses. *See Transcript of March 20, 1996 Evidentiary Hearing* ("TEH2") at 32–33, 35, 66–69.

sarial testing. When a true adversarial criminal trial has been conducted—even if defense counsel may have made demonstrable errors—the kind of testing envisioned by the Sixth Amendment has occurred.

*Id.* at 656, 104 S.Ct. 2039 (footnotes omitted). The Court indicated that counsel could be presumed ineffective without a showing of prejudice (1) where there was "the complete denial of counsel;" (2) where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing;" and (3) "when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct at trial." *Id.* at 659–60, 104 S.Ct. 2039. *See Vines v. United States,* 28 F.3d 1123, 1127 (11th Cir.1994).

This claim rests on the second of these grounds. In other words, Johnson claims that his attorneys did not subject the State's case to meaningful adversarial testing at trial. *United States v. Cronic,* 466 U.S. at 659, 104 S.Ct. 2039. According to the petitioner, his trial attorneys never subjected the State's argument and evidence on intent to adversarial scrutiny nor did they formulate any strategy concerning that element of the offense.

 The State contends that *Cronic* is applicable in only two kinds of cases: where the defendant is completely denied the right to counsel and where external circumstances exist which would render any lawyer incapable of providing the defendant with the effective assistance of counsel. The court recognizes that " '*Cronic* represents a narrow exception which the Supreme Court has carved out of the general rule that a petitioner claiming ineffec-

tive assistance of counsel must demonstrate that he was prejudiced by specific alleged errors in his counsel's performance,' " *Stone v. Dugger,* 837 F.2d 1477, 1479 (11th Cir.1988) (per curiam) (quoting *Smith v. Wainwright,* 777 F.2d 609, 620 (11th Cir.1985) (emphasis in original), *cert. denied,* 477 U.S. 905, 106 S.Ct. 3275, 91 L.Ed.2d 565 (1986)), *cert. denied,* 489 U.S. 1071, 109 S.Ct. 1354, 103 L.Ed.2d 821 (1989). However, the court does not believe the exception is quite so narrow as the State would make it. By its own terms, the *Cronic* rule is applicable where the conduct of the defendant's trial counsel resulted in a complete breakdown in the adversarial process. *See Cronic,* 466 U.S. at 659, 104 S.Ct. 2039 (*citing Davis v. Alaska,* 415 U.S. 308, 318, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)). *See also Harding v. Davis,* 878 F.2d 1341, 1345 (11th Cir.1989) (illustrating such a situation); *Stone,* 837 F.2d at 1479; *Chadwick v. Green,* 740 F.2d 897, 900 (11th Cir.1984).

 In evaluating the reach of this exception, it appears that the crucial inquiry is whether counsel's conduct is such that it can be recognized as completely inappropriate *in any case,* so bad that the defendant's counsel wasn't really acting as a lawyer at all. Thus *Cronic* properly applies only in cases in which a lawyer fails to carry out his most basic duties as an advocate, resulting in "ineffectiveness ... so egregious that the defendant was in effect denied any meaningful assistance at all." [28] *Chadwick,* 740 F.2d at 901. In *Cronic* the Supreme Court itself provided an illustration of this situation and fleshed out what it meant by failure to subject the State's case to "meaningful adversarial testing." The Supreme Court cited as examples a series of cases which culminated

---

28. The First Circuit Court of Appeals, in *Scarpa v. DuBois,* 38 F.3d 1, 12–13 (1st Cir.1994), elaborated further on this aspect of *Cronic:* "In our view, the Court's language in *Cronic* was driven by the recognition that certain types of conduct are in general so antithetic to effective assistance—for example, lawyers who leave the courtroom for long stretches of time during trial are unlikely to be stellar advocates in any matter—that a case-by-case analysis simply is not worth the cost of protracted litigation. No matter what the facts of a given case may be, this sort of conduct will almost always result in prejudice." *See Cronic,* 466 U.S. at 658–59, 104 S.Ct. 2039.

in the decision in *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), and involved a defendant's constitutional right to cross-examine the witnesses against him. In *Brookhart v. Janis,* 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966), the case most analogous to the petitioner's, the Supreme Court condemned as a violation of the defendant's right to the effective assistance of counsel a decision by counsel to waive, over the defendant's personal objections, cross-examination of a government witness. *Id.* at 7–8, 86 S.Ct. 1245, 16 L.Ed.2d 314. Read in the light of *Cronic,* counsel's failure to cross-examine was an error so fundamental as to strip the trial of key constitutional safeguards and so prevent the attorney from subjecting the State's case to "meaningful adversarial testing." *Cronic,* 466 U.S. at 659, 104 S.Ct. 2039.

However, the Court in *Cronic* carefully distinguished attorney errors trenching directly on constitutional rights "of the first magnitude" from less egregious mistakes. *Id.* at 659 & n. 26, 104 S.Ct. 2039. Errors particular to the facts of an individual case are qualitatively different from those involving a complete failure to advocate for the client. Less obvious errors cannot be disentangled from the specific circumstances of the case, and so must be considered in light of those circumstances. *See Strickland,* 466 U.S. at 693, 104 S.Ct. 2052 (*Strickland*-type "[a]ttorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial."); *see also Cronic,* 466 U.S. at 659 n. 26, 104 S.Ct. 2039. Virtually by definition, these errors "cannot be classified according to likelihood of causing prejudice" or "defined with sufficient precision to inform defense attorneys correctly just what conduct to avoid." *Strickland,* 466 U.S. at 693, 104 S.Ct. 2052. Consequently, the Court has declined to accord presumptively prejudicial status to them. *See id.*

■■■ Petitioner's most significant contention in this case is that his counsel failed to seize upon available factual and legal arguments to negate one of the elements of the crime he was charged with. These are serious allegations, and implicate the important responsibilities of attorneys to understand the facts and law involved in their cases. However, as the discussion below reveals, the errors petitioner alleges are intimately tied to the specific facts of his case. Neither the magnitude of counsel's alleged errors nor their ultimate effect can be analyzed without detailed reference to the record. More importantly, perhaps, petitioner was not left effectively unrepresented. His counsel *did* challenge the government's case, if not in the most effective manner possible. At bottom, petitioner simply claims that, given the facts of the case, counsel should have handled things differently. The court concludes that this is not the sort of situation in which an attorney's conduct can be assessed generically and condemned as an utter failure of representation. A case specific inquiry is required, and *Cronic* therefore does not apply. *See Chadwick,* 740 F.2d at 901 (failure of counsel "to investigate and pursue all avenues of defense" is more appropriately analyzed under *Strickland* "rather than as a fundamental breakdown of the adversarial process such that prejudice is presumed under *Cronic.*").

### iv. *Strickland v. Washington.*

■■■ In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court established the standard by which most claims of ineffective assistance of counsel are to be evaluated:

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the defi-

cient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687, 104 S.Ct. 2052. For a petitioner to establish the first prong of a *Strickland* claim, that his counsel was deficient, he must show that his counsel's representation "fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. 2052. "[S]crutiny of counsel's performance must be highly deferential." *Id.* at 689, 104 S.Ct. 2052. The reasonableness of counsel's decisions should not be viewed with the benefit of hindsight. Instead, the court must "reconstruct the circumstances of counsel's challenged conduct, and ... evaluate the conduct from counsel's perspective at the time." *Id.*

> Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

*Id.* at 690, 104 S.Ct. 2052 (emphasis added).

▇ Because much effort has been expended in this case in arguing about *why* petitioner's counsel did what they did, some further words are in order on this subject. An attorney's course of action during a trial may be fixed by many factors, including raw instinct, legal judgment and experience, legal knowledge or the lack of it, factual understandings and misunderstandings, and simple oversights. Flashes of genius and unfortunate mistakes are both part of real life in the courtroom for even the best trial attorneys. As the Eleventh Circuit has put it, "[t]here may be some attorneys who have tried difficult cases without ever making a mistake, but we doubt it." *Waters v. Thomas,* 46 F.3d 1506, 1520 (11th Cir.1995) (en banc). The law recognizes this reality, and therefore does not insist upon perfection. *See id.* at 1518 ("the test for ineffectiveness is not whether counsel could have done more; perfection is not required."); *Atkins v. Singletary,* 965 F.2d 952, 960 (11th Cir.1992) ("Trial counsel did enough. A lawyer can almost always do something more in every case. But the Constitution requires a good deal less than maximum performance."); *see also Harich v. Dugger,* 844 F.2d 1464 (11th Cir.1988) (en banc) (finding an attorney's representation effective despite an alleged misunderstanding of the law). Attorney mistakes can and must be tolerated, so long as the attorney's overall conduct falls within the "wide range" of reasonable professional assistance.

> "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial.... We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately."

*Waters,* 46 F.3d at 1512 (quoting *White v. Singletary,* 972 F.2d 1218, 1220–21 (11th Cir.1992)).

■ However, this does not mean that the subjective reason for a particular action by counsel is entirely irrelevant. Under *Strickland's* scheme, an attorney's legal and factual analysis is significant in at least one respect. The deference a court must give to an attorney's decisions depends to some extent upon whether those decisions were based on a careful and informed assessment of the available options. The Supreme Court has instructed that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690–91, 104 S.Ct. 2052. This is because trial counsel, who is in the field and has access to subjective information unavailable to a distant reviewing court, is often in a better position to make a judgment call than the court itself. *See, e.g., Stanley v. Zant*, 697 F.2d 955, 970 (11th Cir.1983) (Vance, J.), *cert. denied*, 467 U.S. 1219, 104 S.Ct. 2667, 81 L.Ed.2d 372 (1984). Experienced counsel's judgment under these circumstances thus provides its own guarantee of reasonableness, a guarantee which the court should not lightly ignore. However, mistakes which do not flow from counsel's informed judgment are subject to a somewhat more searching inquiry, as they provide no such guarantee.

■ Nonetheless, even in these circumstances the burden to prove ineffective assistance is always a heavy one, as the successful claimant must ultimately bear the burden of proving that "the approach taken by defense counsel would not have been used by professionally competent counsel." *Harich*, 844 F.2d at 1470. The Eleventh Circuit Court of Appeals has emphasized the deference which is owed any time a court undertakes to second-guess an attorney regarding the difficult task of defending a criminal trial:

A jury trial is, by its nature, an enterprise that is filled with imponderables from the viewpoint of a trial lawyer. It is an undertaking that calls not only on the lawyer's head, but also on his heart and nerve. At times in the trial arena, audacity or imagination or patience accomplish more than pure logic might suggest is possible. The truth is that it is often hard for even a good lawyer to know what to do. Trying cases is no exact science. And, as a result, we must never delude ourselves that the fair review of a trial lawyer's judgment and performance is an activity that allows for great precision or for a categorical approach. When reviewing whether an attorney is ineffective, courts "should always presume strongly that counsel's performance was reasonable and adequate." *Atkins v. Singletary*, 965 F.2d 952, 958 (11th Cir.1992). And, "a court should be highly deferential to those choices ... that are arguably dictated by a reasonable trial strategy." *Devier v. Zant*, 3 F.3d 1445, 1450 (11th Cir.1993).

*Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir.1994). The court must always be on guard as "the distorting effects of hindsight," *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052, make it all too easy to criticize an attorney's performance simply because his trial strategy was not ultimately successful. It is for this reason that the Supreme Court has set the bar for ineffective assistance claims so high. *See, e.g., Waters*, 46 F.3d at 1511–12.

■ Even once this hurdle is crossed, however, the petitioner must still establish that he was prejudiced by reason of that deficiency in order to make out a *Strickland* claim. To demonstrate prejudice, the petitioner must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. Thus, the petitioner must demonstrate more than that the unreasonable actions of counsel "had some conceivable effect on the outcome of the proceeding." *Id.* at 693, 104 S.Ct. 2052. The petitioner is not required, however, to "show that counsel's deficient

conduct more likely than not altered the outcome in the case." *Id.*

■■■ The Supreme Court has stated that *Strickland's* prejudice test requires more than a showing that the trial outcome might have been different had trial counsel not been deficient. The *Strickland* standard was designed to guarantee not a crafty lawyer but a fair and accurate trial.

> [A]n analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective. To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him.

*Lockhart v. Fretwell,* 506 U.S. 364, 369–70, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). Thus, in order to prevail the petitioner must demonstrate that the outcome of his trial was either unreliable or fundamentally unfair.

### a. Petitioner's Allegations.

As already noted, Johnson asserts that his attorneys were unaware that under applicable federal and state law, the prosecution was required to prove that he intended the death of Mr. Cantrell in order to convict on capital murder, and failed to recognize factual arguments which could have been made to undercut this critical element of the State's case. Johnson claims that counsel's lack of understanding was the cause of a number of particular errors, each of which was unreasonable and each of which was, individually or in concert with other errors, prejudicial to his defense.

### b. Ineffective Trial Strategy.

Petitioner's most sweeping allegation is that counsel improperly selected the com-

pletely ineffective defense that Johnson was not present at the scene—a defense allegedly so bad that it was "no defense at all"—rather than choosing the more promising alternative of a "third man"/lack of intent defense. *Petitioner's Memorandum* at 41. According to Johnson, the State had ample evidence proving that he was present at the scene, but little or no evidence indicating that he had acted with an intent to kill. Testimony offered by Mrs. Cantrell could have been exploited to suggest that the petitioner was just entering the house when the victim fired his last shot. Thus petitioner claims that, whether true or not, an argument supportable by the facts could have been presented that he was not one of the two men involved in the shooting, but that he stayed outside the house in the carport until after the gunfight appeared to have ended. This theory would have been far superior to the argument actually advanced—that the petitioner was not present at all—because glass fragments and a bullet from the victim's gun strongly indicated that the petitioner was present at the crime scene.[29] Petitioner asserts that nothing other than trial counsel's ignorance can explain their tactical decision to choose this theory and ignore the "third man" defense.

It is, frankly, unclear whether petitioner means to challenge counsel's strategic choices before trial, or is attacking only choices made during the trial. The court will therefore address both. In doing so, the court will make "every effort ... to eliminate the distorting effects of hindsight," *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052, and will therefore take some pains in setting the stage for counsel's challenged decisions before analyzing them.

---

**29.** The petitioner also apparently argues that trial counsel should have attempted to show that none of the bullets found in the victim's body were traceable to the petitioner's weapon and, therefore, even if he were present, he lacked the required intent to kill the victim

because he either did not fire or missed so consistently at short range as to validate an inference that he fired with no intent of harming the victim. This subsidiary claim will be addressed, *infra.*

### (1) Pre–Trial Choice of Strategy.

The court finds counsel's pre-trial decision to pursue a theory that Johnson was not present entirely reasonable in light of the information available to counsel, and particularly in light of what their client told them regarding his involvement in the crime.[30] *See also Johnson,* 612 So.2d at 1296. In preparing Johnson's case for trial, counsel spoke with several witnesses, and had repeated conversations with the petitioner himself. They also participated in a preliminary hearing at which they were given the opportunity to cross-examine a number of the State's key witnesses. It is no exaggeration to say that none of the information counsel gathered in this fashion suggested even the possibility of a "third man" defense. Mrs. Cantrell's preliminary hearing testimony was not infected by the problems which petitioner points to in her trial testimony. Indeed, at the hearing Mrs. Cantrell did not say much about the actual course of the gunfight and its aftermath, maintaining that after the first shots were fired she "couldn't tell nothing. It sounded like a bunch of fireworks." *Transcript of Preliminary Hearing Held April 19, 1984* ("PHT") at 54; *see id.* at 53, 70. On the other hand, she certainly did not seem to be of the opinion that a third man had entered the house, and indicated that the two intruders she described were all that were present "to [her] knowledge." PHT at 78.

The other evidence available to counsel bore out Mrs. Cantrell's version of events. Counsel's notes and their testimony before this court establish that the petitioner told his lawyers a story very similar to Mrs. Cantrell's, a story which included the information that it was *he* who was the second intruder in the house and that *he* fired several shots at the victim. *See, e.g.,* TEH2 at 22–24, 29–30, 57–60, 74–75, 79. As already discussed above, the physical evidence appeared consistent with this story as well. *See supra* at pp. 1332–34. Thus counsel had no reason to suspect that further developments might uncover "third man" scenario, particularly in light of what their own client had told them. *See Strickland,* 466 U.S. at 691, 104 S.Ct. 2052 (emphasizing that an attorney's decisions can quite properly be heavily influenced by what he learns from his client). Without a third man argument, no plausible challenge could be made to the State's proof of intent, as the second man participated in a shoot-out and so clearly displayed an intent to help his comrade kill Mr. Cantrell.

Under these circumstances, counsel's argument that Johnson was not present was a reasonable tactical approach to the case, and indeed was the only realistic approach available. In this regard, the court notes that the evidence that the petitioner was present was persuasive, but not overwhelming. First, counsel knew that no eyewitness could identify the petitioner as being present at the crime scene. The State's evidence was therefore entirely circumstantial. Second, the .357 magnum handgun that was found with the petitioner at the hotel in Oxford, Alabama, was not clearly matched to any of the bullets at the

---

30. Subsequent to the submission of briefs, this court determined that the Rule 20 court, on whose findings the Alabama Court of Criminal Appeals relied in coming to its factual and certain legal conclusions, had, on the basis of the attorney-client privilege, prevented Johnson's trial counsel from testifying as to what the petitioner had told them that had influenced their strategic decisions. Earlier decisions of the Eleventh and Fifth Circuit Courts of Appeals, however, have concluded that a petitioner waives the attorney-client privilege if he or she attempts to introduce the testimony of his attorneys in an effort to demonstrate ineffectiveness of such attorneys at trial. See *Crutchfield v. Wainwright,* 803 F.2d 1103 (11th Cir.1986) (en banc) (Tjoflat, J., concurring) and *Laughner v. United States,* 373 F.2d 326, 328 (5th Cir.1967). Based upon that determination, the court ordered an evidentiary hearing on the "narrow factual issue" of "what petitioner told counsel about the crime and his role in it in order to assess whether their strategic and tactical choices were reasonable in light of the information known to them." Order of January 16, 1996, at 3. At the evidentiary hearing, the petitioner's counsel testified concerning their decision not to argue that petitioner was not present at the time of the offense.

crime scene. Third, the bullet found in petitioner's back could not itself be definitely traced to Mr. Cantrell's gun. Next, a hair found in a brown cap allegedly worn by the petitioner during the robbery and murder did not match the hair of the petitioner. Boots allegedly worn by the petitioner during the shooting did not contain glass fragments from a shattered glass door pane. Finally, the strongest evidence linking the petitioner to the crime scene, glass found in the nose of the bullet removed from the petitioner's back which shared the same refractive index as one of the shattered door panes at the Cantrell house, was not revealed to counsel until the eve of trial. TEH2 at 37–41. Thus, particularly at the time they settled on their strategy initially, counsel had some material to work with in arguing that a sufficient link could not be forged between Johnson and the crime. Their choice to make this argument was therefore a reasonable one.

Because trial counsel chose a reasonable strategy in arguing that petitioner was not present at Mr. Cantrell's house, the court need not consider whether Johnson's case was adversely impacted by that defense. The court must, however, inquire whether the decision not to argue a "third man"/intent defense when the opportunity presented itself at trial was a reasonable one, and whether the petitioner was prejudiced by the failure to argue that defense.

### (2) Failure to Argue Intent During Trial.

■■■ The petitioner claims that Mrs. Cantrell's testimony created an opening to challenge the State's evidence on intent, and that it was unreasonable for his counsel not to exploit this opportunity. Essentially, petitioner alleges that his counsel should have shifted on the fly from the strategy they had developed prior to trial to one focusing on intent. The court is not persuaded that their failure to do so was professionally unreasonable, for at least two reasons. First, under the circumstances the court does not believe that every reasonable attorney would have no-

ticed the glitch in Mrs. Cantrell's testimony. Second, there was very little counsel could have done to underscore such a flaw within the constraints of Johnson's ongoing trial; thus, the court concludes that even if counsel had recognized Mrs. Cantrell's error they might still have tried the case in much the same way.

In evaluating both of these aspects of counsel's performance, it is critical to remember the circumstances under which counsel was forced to act. As already noted, Mrs. Cantrell's pretrial testimony contained no hint of the revelations which petitioner now relies upon. Her hearing testimony was consistent with the physical evidence and with Johnson's own story, and trial counsel had quite properly developed a defense based on this understanding of events. By the time Mrs. Cantrell testified at trial, counsel had already unveiled this defense to the jury in opening argument and so, to a great extent, were stuck with it. See TEH1 at 24–25. Counsel's perspective on the trial would, quite naturally, have been colored by this underlying strategy, and their minds largely focused on pursuing it.

Petitioner's claim is that counsel should nonetheless have picked up on nuances in Mrs. Cantrell's trial testimony which suggested an entirely different approach. By far the most significant part of this testimony was elicited by Johnson's counsel on cross-examination. It is brief enough to be repeated here. According to Mrs. Cantrell, after her husband's last shot,

A. It didn't take [the intruders] long . . . to start moving over further towards the door.

Q: Further towards the door?

A. That is right.

Q. So neither one of them was at the door when your husband fired the last shot?

A. No, they wasn't.

Q: They were not?

A. No.

Tr. at 386. The import of this testimony is far from obvious. It could have lasted no

more than a minute before passing across counsel's radar screen and disappearing forever. Yet, the petitioner insists that in that brief span his counsel should have recognized the conflict between this testimony and what they knew of the State's physical evidence, linked this information to a legal theory they had long ago rejected, and evolved a strategy entirely different from the one they had prepared to pursue. The court acknowledges that some lawyers might be capable of such a feat, at least on an especially good day. Others might be left with a nagging feeling that something about the testimony was strange.[31] But even the best lawyers (including, the court suspects, petitioner's current counsel) [32] have missed such subtleties entirely in the heat of battle. The court cannot say that, under the circumstances, every reasonably competent attorney would have realized the significance of Mrs. Cantrell's testimony. Thus petitioner's counsel were not constitutionally inadequate merely because they did not.

This conclusion is buttressed by the court's opinion that, regardless of their subjective state of mind, counsel's outward actions were objectively reasonable.[33] Petitioner's current counsel have not been very precise in describing what they think trial counsel could and should actually have done with a "third man" argument, if they had noticed the opportunity to make one. Counsel had already embarked on a "Johnson was not there" defense, and would have had to walk very softly indeed in injecting an entirely new theory into the

case. As the Eleventh Circuit has observed in similar circumstances, "[a]lthough inconsistent and alternative defenses may be raised, competent trial counsel know that reasonableness is absolutely mandatory if one hopes to achieve credibility with the jury." *Harich*, 844 F.2d at 1470.

Even if they had been willing to risk their credibility in this manner, counsel would have had little evidence to work with in constructing an argument on intent. The petitioner's own testimony would not have been helpful, as counsel ethically could not have put their client on the witness stand and examine him on intent when they knew that he had shot at Mr. Cantrell. Had he testified falsely, his own attorneys would have had to cast him adrift to "tell his story," and would have been unable to rehabilitate him after what would surely have been a searing cross-examination. Further questioning of Mrs. Cantrell would not have helped either, as she had indicated clearly at the preliminary hearing that only two men were present.

The most counsel could have hoped to do would have been to point out during closing argument to the jury, and perhaps via argumentative questions aimed at Mrs. Cantrell and others,[34] the flaws in the State's case on intent. To sketch out the petitioner's relatively complicated factual theory in a manner which the jury would understand would have required fairly explicit and extensive argument. The court doubts that subtle innuendo would have worked, further exacerbating the problem

---

**31.** Every trial attorney is familiar with such nagging doubts, which may or may not blossom into realization later, hopefully in time to do something about it, if indeed there is anything to be done.

**32.** The court notes that current counsel's task in this regard was much easier than the one they set for trial counsel. A slow and considered perusal of a paper record in the comfort of one's own office, likely aided by the efforts of several young law associates, is an entirely different, and vastly less demanding, task than thinking on one's feet in the heat of trial. It is not therefore surprising that petitioner's cur-

rent counsel eventually noticed this flaw in the record, while trial counsel did not.

**33.** Although Eleventh Circuit precedent is not entirely clear on this point, at least one en banc decision appears to suggest that this inquiry is relevant in assessing ineffective assistance claims. *See Harich*, 844 F.2d at 1470–71. The court will therefore assume it is, although the court's ultimate conclusions do not depend on this part of the discussion.

**34.** The court also notes that cross-examination of a murder victim's widow is always a delicate undertaking in any event.

of arguing in the alternative. Under these circumstances many attorneys would, quite reasonably, have elected not to embark on the risky and difficult endeavor of raising this issue with the jury, and would have contented themselves with little if any comment on the inconsistencies in Mrs. Cantrell's testimony. Thus "a competent attorney completely informed on the ["third man"] defense ... could well have taken action identical to counsel in this case." *Harich,* 844 F.2d at 1471. The court therefore concludes that petitioner's counsel's conduct was not professionally unreasonable in this regard.

For much the same reason, the court finds that no prejudice resulted from trial counsel's failures to pursue a defense based on lack of intent. Little evidence could have been marshaled in support of such a defense, and the evidence against Johnson was strong. After all, the jury had before it evidence that Johnson had admitted to firing at Mr. Cantrell, along with physical evidence consistent with this story. Even Mrs. Cantrell's trial testimony indicated, with the exception of a few inconsistencies, that two intruders were involved in the crime and that both participated in the murder of her husband. As the Alabama Court of Criminal Appeals put it, "her testimony clearly states that two men forced their way into her house and ... fired shots at her husband." *Johnson,* 612 So.2d at 1297. Petitioner has therefore failed to demonstrate a reasonable probability that even aggressive pursuit of a lack of intent defense would have changed the outcome of his case.

### c. Failure to Argue Intent to the Judge.

Petitioner contends that, even if his attorneys could not have risked arguing an

alternative theory of lack of intent to the jury, they should have made this argument to the judge. Based on Mrs. Cantrell's testimony and other evidence, counsel could have pursued the issue of intent via (1) a request for a lesser included charge on felony murder, (2) an objection to the jury charges on capital murder and complicity; or (3) argument on a motion for judgment of acquittal. None of these predominately legal avenues of attack would have involved the jury. Trial counsel have admitted that the tactical problems with alternative arguments are much less severe when the jury is not affected. *See, e.g.,* R20 at 616, 690. They offer no tactical reason for their failure to argue lack of intent to the judge, indicating instead that they simply did not think about doing so. Their decision on this score therefore cannot properly be regarded as a strategic one.

■ Nonetheless, the court is not persuaded that the latter two allegations of deficiency asserted by petitioner have any merit. The court finds that counsel acted reasonably in these respects. For the reasons set out above, the court finds no constitutional deficiency in counsel's underlying failure to notice the import of Mrs. Cantrell's testimony. There was therefore no error in failing to bring this testimony to the attention of the judge.

■ More importantly, such an act would have been futile. As the court has already pointed out, the amassed evidence was more than sufficient to convict the petitioner of capital murder as an accomplice. There was therefore absolutely no grounds on which to object to jury charges on that offense,[35] and no available arguments sufficient to warrant a judgment of acquittal.[36] Therefore the court finds no

---

**35.** The instructions the trial court gave on this subject were entirely appropriate, and apparently followed the Alabama model instructions. *See, e.g., Smith v. State,* —— So.2d ——, 1999 WL 339272 (Ala.Crim.App. May 28, 1999) (approving virtually identical instructions); *Sockwell v. State,* 675 So.2d 4 (Ala. Crim.App.1994), *aff'd,* 675 So. 2d 38 (Ala. 1995) (same); *Russaw v. State,* 572 So. 2d

1288 (Ala.Crim.App.1990) (discussing Alabama's model instructions on accomplice capital murder).

**36.** Petitioner complains that his indictment indicated that he was the killer of Mr. Cantrell, and was not consistent with a conviction as an accomplice. Unfortunately for petitioner, however, Alabama long ago abolished the

prejudice in counsel's failure to make these meaningless gestures.

■■■ Counsel's failure to seek a felony murder instruction, however, poses a more difficult question. As a practical matter, any criminal defense attorney facing a capital robbery-murder trial should at least consider requesting such an instruction. Lesser included offenses are a key part of a defense attorney's arsenal in a capital case, particularly where, as here, a general challenge to the evidence is the only viable defense. It was also clear from the beginning that the State would have a hard time proving that Johnson was the triggerman. No arcane "third man" scenario was required for counsel to see the possible significance of this fact. Yet they asked for lesser included offense instructions on robbery and intentional murder, but not felony murder. It is difficult to understand why they did not at least consider such an instruction, which would have fit their facts at least as well as the others if not better. In the court's view, this failure falls close to the line of constitutional minimum performance, if not below it.

■■■ However, the court must agree with the Alabama Court of Criminal Appeals that the petitioner was not prejudiced by this mistake. *See Johnson,* 612 So.2d at 1298. While a felony murder instruction must be given in a capital case if the evidence warrants it, *see Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), the Supreme Court made it clear in *Schad v. Arizona,* 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991) that an instruction need not be given if there is not sufficient evidence to support it. More importantly, an instruction is of no use if the jury is not given a legitimate reason to choose the lesser offense over the capital one. Thus, in order to disturb his conviction based on a claim of ineffectiveness, the petitioner must demonstrate a reasonable probability that, if his counsel had asked for a felony murder instruction, the judge would have given it and the jury would have convicted on the lesser offense instead of capital murder.

In analyzing this question, the court must begin from two key premises, both flowing from the Supreme Court's admonition to "presume ... that the judge or jury acted according to law." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. First, this means that the court must give due weight to the jury's existing verdict. It is important to remember that a jury has already found, beyond a reasonable doubt, that the petitioner had the required intent to justify a conviction on capital murder. The jury was given proper instructions on this point [37] and, as the court has already pointed out, its decision was supported by the evidence. *See also id.* The court cannot lightly brush aside the jury verdict.

■■■ Second, in answering the difficult hypothetical question of "what might have happened if" counsel had acted differently, the court cannot indulge in the temptation to guess at the predilections of particular decision makers. The court's job is not to predict the interplay of reason and emotion in the minds of a particular judge or jury, but instead to play out the logical and lawful consequences of a particular set of circumstances.

*An assessment of the likelihood of a result more favorable to the defendant, must exclude the possibility of arbitrariness, whimsy, caprice, "nullification," and the like.* A defendant has no entitlement to the luck of a lawless deci-

---

distinction between principals and accessories in its criminal law. It is the law of this State that one charged as a principal properly may be convicted as an accomplice and *vice versa.* There is no requirement that the State notify the defendant in the indictment or otherwise that it is proceeding on an aiding and abetting theory. *E.g., Hyter v. State,* 545 So.2d 194, 197 (Ala.Crim.App.1988); *Wallace v.*

*State,* 530 So.2d 849, 855–856 (Ala.Crim.App. 1987); *Lewis v. State,* 469 So.2d 1291, 1297 (Ala.Crim.App.1984), *aff'd sub nom. Ex parte Blake,* 469 So.2d 1301 (Ala.1985).

**37.** *See Yu v. United States,* 1998 WL 160964, at *7 (S.D.N.Y.1998) (underscoring the importance of this fact).

sionmaker, even if a lawless decision cannot be reviewed. The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision. It should not depend on the idiosyncracies of the particular decisionmaker. . . .

*Strickland,* 466 U.S. at 695, 104 S.Ct. 2052 (emphasis added). In order to prevail, petitioner must prove more than that a sympathetic jury might have shown mercy and in essence "nullified" his capital conviction for reasons other than lack of evidence. He must show that the jury could properly have found him guilty of felony murder but not capital murder.[38] *See also Johnson,* 612 So.2d at 1298.

The problem with petitioner's argument, of course, is that the jury has already found him guilty of capital murder. Presuming, as it must for these purposes, that the jury applied the law on accomplice liability and reasonable doubt properly, the court sees no logical basis to conclude that an additional alternative charge would have led the jury down a different path. Such a charge would change neither the evidence nor the standard for a conviction on capital murder, and so for an objective and rational jury should not change the result. Of course, as a practical matter the court recognizes that the jury might have chosen felony murder simply to avoid the possibility of a penalty of death, though this seems unlikely given the jury's choice

to pass over the other non-capital options presented. *See also Kilgore,* 124 F.3d at 995 (finding no prejudice from counsel's failure to request additional lesser included charges in similar circumstances). Paraphrasing the Supreme Court's observations in a similar circumstance, the court finds it difficult to believe "that a jury unconvinced that petitioner was guilty of . . . capital . . . murder, but loath to acquit him completely (because it was convinced he was guilty of [felony murder]), might choose capital murder rather than [intentional] murder as its means of keeping him off the streets. . . . [W]e can see no basis to assume such irrationality."[39] *Schad,* 501 U.S. at 647–48, 111 S.Ct. 2491. However, whether the court's assessment is accurate or not does not appear to matter, as *Strickland* forbids any inquiry into the possibility of such "lawless" and result-oriented modes of jury decision making. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. Applying *Strickland's* presumptions, the court must conclude that the addition of a new lesser included charge would not have changed a rational jury's decision.

Nor can petitioner avoid this result by contending that if counsel had only asked for a felony murder instruction and argued to the jury regarding the inconsistencies in Mrs. Cantrell's testimony, that the result might have been different. The court has already found that the latter argument was not constitutionally required, and that such an argument would not have been effective in any event. The jury heard all

---

**38.** The court notes that, in this regard, *Strickland's* requirements appear to be in tension with the pragmatic, psychological approach underlying the Supreme Court's decisions in *Beck and Schad.* As the discussion below reveals, strict application of *Strickland's* objective approach makes it very difficult if not impossible to prevail on a claim premised solely on the failure to ask for a lesser included instruction. Thus a few courts, without discussing *Strickland's* admonitions, have appeared to apply a more flexible and pragmatic approach in predicting a jury's response to a lesser included charge. See *O'Rourke v. Endell,* 153 F.3d 560, 571–74 (8th Cir.1998); *Kilgore v. Bowersox,* 124 F.3d 985, 995 (8th Cir.1997); *United States v. Jackson,* 726 F.2d

1466, 1470 (9th Cir.1984). However, in this court's view *Strickland's* mandate is clear and binding. The court must therefore leave the fine adjustment of the law in this area to a higher authority, and do its best to apply what the Supreme Court has written.

**39.** The court notes, however, that felony murder fit the circumstances better than the other lesser included charges presented. This might make a difference in a pragmatic analysis of the attractiveness of that charge to a jury in comparison to the other alternatives presented, *see also Kilgore,* 124 F.3d at 995 (analysis different if alternative charges given "did not make sense"), but makes no difference to the objective analysis mandated by *Strickland.*

the evidence and, with or without a "third man" argument, would in all probability have reached the same conclusion. A rational jury would not change this conclusion merely because of the other alternatives provided. Neither the "third man" nor the felony murder charge claims of ineffectiveness are constitutionally sufficient. They do not become so merely because they have been packaged together.

Thus the court concludes that, even if counsels' failure to request a felony murder charge can properly be regarded as constitutionally deficient performance, no prejudice resulted. Petitioner therefore cannot prevail on this claim of ineffective assistance of counsel.

### d. Defense Counsel's Argument to the Jury.

Johnson now argues that during his closing argument, one of his trial lawyers "affirmatively invited the jury to convict Petitioner of capital murder on evidence that he was merely present." According to present counsel, this argument "demonstrates conclusively and succinctly that counsel were totally ill-equipped to effectively represent Petitioner." In his closing argument, DiGiulian stated:

> You are going to have to go back there, and you are going to have to find, in order to convict and find Keith guilty, you are going to have to find that the State has proved an intentional killing occurred, a forcible robbery or intent to rob, and going to have to find that Keith was one of the men that was out there. That is what you are going to have to do in order to find each and every one of those beyond a reasonable doubt and to a moral certainty. Each one of you is going to have to do that.

Tr. at 819–20.

On this claim, the Alabama Court of Criminal Appeals found that "[c]ontrary to Johnson's assertions, DiGiulian did not affirmatively state to the jury it was not necessary for the state to prove that he [Johnson] had the intent to kill." *Johnson*, 612 So.2d at 1299.

It should first be noted that present counsel have isolated and focused upon a very small part—exactly three sentences—of DiGiulian's lengthy and detailed closing argument on behalf of his client. As with most matters, the argument must be considered as a whole and in the context of the entire trial, including the defense strategy *and* the trial court's instruction to the jury. Moreover, as the Eleventh Circuit has stated, closing argument represents "an inherently subjective task" and counsel is due special deference in the manner in which such arguments are made. *Thompson v. Wainwright*, 787 F.2d 1447, 1455 (11th Cir.1986), *cert. denied*, 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 825 (1987).

Before closing arguments began, the trial judge reminded the jury that the arguments of the lawyers were not to be taken as the law applicable to the case. Tr. at 757. Following the closing arguments, the judge once again instructed the jury that it was his duty to decide and define the law. Tr. at 838. During his instructions, the judge repeatedly and emphatically instructed the jury that a necessary element of the capital offense was that the defendant had committed an intentional killing or had intentionally aided and abetted an intentional killing, and that the jury could not convict the defendant unless it was convinced beyond a reasonable doubt of that necessary element. Tr. at 856, 858–859, 861–862, 864–865, 866.

Notwithstanding habeas counsel's insistence that Johnson's trial lawyers did not appreciate the essential requirement that their client could not be convicted unless the State proved that he intended the death of Mr. Cantrell or another, it is manifest that they did, in fact, understand just that. Before beginning their closing arguments, trial counsel submitted and requested the judge to give a three paragraph instruction that emphasized the State's burden to prove beyond a reasonable doubt that Johnson was guilty of an intentional killing before he could be convicted of the capital offense. Tr. at 1252–

53. The court gave the instruction as requested. Tr. at 864–65.

It was in this context that final arguments from both the prosecution and the defense focused on the petitioner's involvement in the crime. References to finding Johnson guilty if he were present were far from concessions that the capital charge could be proven on a felony murder theory. Instead, they constituted nothing more than a recognition of the state of the evidence. If the jury believed that Johnson was the "second man" who fired shots at Mr. Cantrell, he was guilty of capital murder. With the evidence in this case, Johnson could avoid a conviction for capital murder only if the jury entertained a reasonable doubt about whether he was that "second man." Intent to kill was not a real issue in the case because that "second man," whoever he was, was a willing, armed participant in the robbery who fired shots at the decedent.

▬ The comment in question was consistent with the defense trial strategy [40]— Anthony Keith Johnson was not one of the men who went into the Cantrell home and robbed and murdered Mr. Cantrell. When viewed in its proper context, no reasonable argument can be made that DiGiulian invited the jury to convict on less than proper proof. Moreover, there is nothing to suggest that the jury disregarded the court's clear and unequivocal instructions on the elements necessary to convict the petitioner of capital murder.

That being the case, the performance of trial counsel was not constitutionally deficient and petitioner has not shown a reasonable probability that in the absence of the challenged statement the outcome of the trial would have been different.

### e. Failure to Object to the Prosecutions' Improper Closing Argument.

The petitioner charges that his trial attorneys were constitutionally ineffective because of their failure to object to certain comments made by the prosecutor in closing arguments. In his argument, the prosecutor stated:

His honor will charge you in this case, ladies and gentlemen, concerning complicity. He will charge you in this case that if these two men went in there, and if they went in there to rob this dear lady and her husband, the act of one is the act of both, the act of one is the act of all, and what one does the other one is responsible for. You listen to his charge. When those two men busted through that door out there that night, everything that each one of them did the other one was responsible for under the law of the State of Alabama, and one is just as equally guilty for the death of this man as the other.

Tr. at 827–28. According to habeas counsel, the prosecutor "invited the jury to convict on evidence sufficient to support only a felony murder charge" and his statement was "both wrong on the law and wrong on the facts."

On this claim, the Alabama Court of Criminal Appeals noted that the trial judge gave an instruction to the jury that "closing arguments, like opening statements, do not constitute the law" and that it was "the court's duty to decide and define the law for the jury." *Johnson,* 612 So.2d at 1300. The trial judge's instruction, the Court of Criminal Appeals found, was adequate to correct any harm arising from the State's claimed misstep. In addition, the Court of Criminal Appeals found that because the misstatement, if it was a misstatement, was on an aspect of the case "not material to the theory of defense," it could not have affected the jury's consideration of the issues before them.

▬ Controlling decisional law of this circuit generally sanctions the approach taken by the Court of Criminal Appeals. In *Shriner v. Wainwright,* 715 F.2d 1452,

---

**40.** As discussed above, trial counsel's selection and pursuit of this strategy represented constitutionally adequate performance.

1459 (11th Cir.1983), the prosecutor referenced a crime for which the defendant was not charged, introducing to the jury a non-statutory sentencing factor for consideration in their determination of whether the death penalty was warranted. The Eleventh Circuit refused to undo the sentence on this ground, stating "with a properly instructed jury, there is nothing to show the jury relied on the prosecutor's remarks." *Id.; see also United States v. Agurs,* 427 U.S. 97, 110, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976) (prosecutorial misconduct should be evaluated not on the basis of culpability but by its effect on the fairness of the trial).

This position has been regularly restated. In *United States v. Smith,* 918 F.2d 1551, 1561 (11th Cir.1990), the court held:

> Because statements and arguments of counsel are not evidence, improper statements can be rectified by the district court's instruction to the jury that only the evidence in the case be considered. *See United States v. Barshov,* 733 F.2d 842, 847 (11th Cir.1984), *cert. denied,* 469 U.S. 1158, 105 S.Ct. 904, 83 L.Ed.2d 919 (1985); *see also Springer v. Wal–Mart Assocs.' Group Health Plan,* 908 F.2d 897, 901 (11th Cir.1990) ("Counsel's closing argument, of course, is not competent evidence."). In this case, the district court properly instructed the jury that opening and closing statements by counsel were not evidence in the case.

*See also United States v. Gainey,* 111 F.3d 834, 837 (11th Cir.1997) (same) and *United States v. Simon,* 964 F.2d 1082, 1087 (11th Cir.1992) (same).

The trial judge here instructed the jury that the counsel's arguments were not to be taken as descriptions of the law and gave the jury the proper instructions on the offenses of which Johnson was charged. While an objection by counsel might have provoked from the trial judge a more definitive statement in disavowing the prosecution's comments, the judge sufficiently shielded the jury from those comments. The court can find no basis for concluding that the fairness of the trial was adversely impacted or that its outcome might reasonably be expected to have been different had counsel objected to the prosecution's remarks.

### f. Accumulated Attorney Error.

The petitioner finally contends that, even if the errors of his counsel did not individually work to prejudice his cause, when considered as a whole and in the context of the entire trial, the cumulative effect of these errors was to undermine confidence in the outcome of the trial. He argues that, whether under the rubric of *Strickland* or *Cronic,* counsel's egregious mistakes should be rectified. The court cannot agree.

The petitioner seemingly would apply a volume discount theory, bundling all of trial counsel's perceived errors, big and small, into one great mass with a Sixth Amendment denial of counsel label. However, this approach is sanctioned neither by *Cronic* nor *Strickland,* the two cases which set out the available avenues for relief on a claim that counsel was ineffective. As the court has already noted, counsel's alleged mistakes were not the sort of conduct that creates a presumption of harm under *Cronic.* A denial of the Sixth Amendment right to counsel as envisioned in *Cronic* occurs where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Cronic,* 104 S.Ct. at 2047. In such cases, the adversary process itself becomes presumptively unreliable and there is no requirement to show any specific prejudice. That is simply not what happened here.

Nor is *Strickland*'s rule adaptable to the generalized allegations leveled by petitioner. By its very nature, the *Strickland* analysis focuses on particular errors and the harm which flows from them. *Strickland* makes it clear that, to prove a claim of ineffective assistance of counsel, a habeas petitioner must identify a specific error and show prejudice flowing from that error. Nothing in *Strickland* suggests

that a combination of several errors can be prejudicial when none, standing alone, would be sufficient to authorize relief.[41]

Most importantly, as demonstrated *supra,* counsel's claimed errors did not deprive the petitioner of the effective assistance of counsel. The factual premise for most of the petitioner's ineffectiveness claims is simply wrong. It is clear that counsel did not fail to comprehend the differences between felony murder and capital murder. The evidence is, and the court finds, counsel chose the strategy they did because it was the best available to them. The issue at the trial was whether the petitioner was involved in the robbery and murder of Mr. Cantrell at all. The evidence was such that counsel could hardly have argued, with credibility, that Johnson was involved in the robbery but not the murder. There was more than enough evidence to convince the jury that the petitioner fired shots at Mr. Cantrell, and that the petitioner must have intended to kill Mr. Cantrell.

It is important to note that trial counsel were operating in the real world of a criminal trial. If they were to do anything for their client, they had to convince the jury that the petitioner was not involved in the robbery and murder at all. They were not afforded the serenity of conducting a finely tuned academic examination of a record already made, and had no time to devise fine-spun legal arguments with the benefits of hindsight and time for ample thought and research. In short, trial counsel were forced to act in the heat of battle. They did as well as the petitioner was constitutionally entitled to expect.

The court does not contend that counsel, standing "eye ball to eye ball" with the opponent, never "blinked." Mistakes were clearly made. As is true of all lawyers in almost all cases, it would not have hurt for counsel to have been a little more thoughtful and a little more prepared. The petitioner's attorneys may not have done a great job, or even an especially good job. Likely, there are things they themselves wish they had done differently. But the bottom line is this: counsel did an adequate job. They correctly recognized that their client's only real chance was to put the State to its proof that he was involved at all, and they did so. Their challenge to the State's case provided the constitutional guarantee of accuracy that lies at the heart of the Sixth Amendment. "Trial counsel did enough." *Atkins v. Singletary,* 965 F.2d 952, 960 (11th Cir.1992). The Constitution requires no more.

### v. Failure to Give a Felony Murder Instruction.

 The petitioner asserts that he was entitled to an instruction on felony murder under *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). The court notes that the petitioner failed to raise this claim at trial and, therefore, it is defaulted. *Johnson,* 612 So.2d at 1292. Additionally, for the reasons given above, he cannot rely on his claim of ineffective assistance of counsel to excuse the default.

### vi. The Actual Innocence Exception to Procedural Default.

 Petitioner's last major assertion regarding the "third man" defense is that the theory proves that he was actually innocent of the crime of capital murder. Under established Supreme Court precedent, proof that a constitutional defect led

---

**41.** One might consider here the holding in *Footman v. Singletary,* 978 F.2d 1207 (11th Cir.1992). There, the Eleventh Circuit held that every single incident undergirding a claim of ineffective assistance of counsel must be exhausted, and that it is not enough simply to aver a broad claim of ineffectiveness in order to have exhausted claims of specific errors. If the prejudicial effect of alleged errors can be compounded, why require the exhaustion of specific counsel errors? If all are but a part of a single claim, then the averment of the single claim (without identifying the specific factual basis for each ground) should be sufficient to exhaust the claim. The court does not believe that the combination of several non-prejudicial errors can form the cornerstone upon which to erect a viable ineffectiveness of counsel claim.

to the conviction of an innocent man would excuse any procedural default in failing to point that defect out to the state courts. However, as petitioner has failed, even arguably, to prove that he is innocent of capital murder, this doctrine will not excuse any defaults in this case.

One way by which a habeas petitioner may avoid the consequences of his procedural default is by demonstrating that refusal by the federal court to hear the defaulted claim will result in a "fundamental miscarriage of justice." *Smith v. Murray*, 477 U.S. 527, 537–38, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986); *Murray v. Carrier*, 477 U.S. 478, 495–96, 106 S.Ct. 2639, 2644, 91 L.Ed.2d 397 (1986). A "fundamental miscarriage of justice" occurs "in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent." *Id.* at 496, 106 S.Ct. 2639. The petitioner may be actually innocent either of the crime allegedly committed or of the penalty being exacted. *Sawyer v. Whitley*, 505 U.S. 333, 339–40, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992).

On habeas review, in order to prove actual innocence, the petitioner must come forward with "new reliable evidence" proving his innocence which was "not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). Petitioner must then "show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 327, 115 S.Ct. 851. The petitioner must also demonstrate that, absent independent constitutional error, he or she would likely have been found innocent of the crime or of the penalty. *Id.* at 314–16, 115 S.Ct. 851.

As the discussion above makes clear, petitioner meets none of these requirements. Petitioner bases his claim on a new factual theory, not newly discovered evidence. He has not come forward with any new evidence in support of his petition. All of the relevant evidence was before the jury, including those portions of Mrs. Cantrell's testimony which the petitioner now

relies on. The jury nonetheless found him guilty of capital murder and, as the court has pointed out, that decision was supported by the evidence. Nor can the petitioner avoid this conviction by leaning yet again on his "third man" argument. No constitutional error led to his conviction, as no error was made in failing to present a "third man" defense. Even had a "third man" argument been made, the court is satisfied that the jury properly could have and most likely would have convicted Johnson anyway. The evidence, including the evidence before the jury at trial and before this court now, demonstrates that Johnson is guilty of capital murder. He is far from innocent, and the "actual innocence" exception to procedural default simply does not apply.

### C. Other Claims, of Ineffective Assistance of Counsel.

#### 1. Other Claims of Trial Counsel Error.

Petitioner makes a number of claims of trial counsel ineffectiveness. Several have been discussed elsewhere, as they are intertwined with more general claims of error. However, two of petitioner's claims are unrelated to the remainder of petitioner's case, and require separate analysis. The court will examine each in turn.

#### i. Cross-examination of David Lindsey.

The petitioner claims that his trial counsel's cross-examination of prosecution witness David Lindsey was so inadequate that he was denied the Sixth Amendment right to effective assistance of counsel. In particular, Johnson claims that his counsel failed to identify for the jury certain claimed discrepancies between statements Lindsey had given to police—statements that trial counsel allegedly were not aware of but that they had in their possession—and testimony given by him at the preliminary hearing and at trial. These discrepancies include the following: (1) in his March 15, 1984, statement to police Lindsey re-

ferred to one of the people in the hotel room where Johnson was arrested as "a boy named Russell" but later identified the man as "Russell Lovell"; (2) in his March 15, 1984, statement Lindsey claimed that his mother-in-law told him that the petitioner had been shot, whereas in subsequent statements Lindsey claimed that he learned this fact from the petitioner, and (3) in his statements to police Lindsey recounted that Johnson had told him that he and "two brothers" had been involved in the robbery while at trial Lindsey stated that the petitioner had told him that he and "some friends" were involved in the robbery. The petitioner also claims that his trial counsel failed to take advantage of contradictions between statements Lindsey made in the preliminary hearing and those he made at trial. Among these were: (1) testimony at the preliminary hearing that Johnson was looking for "money and gold" and his testimony at trial that he was only out to get some "gold"; (2) alleged differences as to whose question, Lindsey's or someone else's, prompted the petitioner to respond that he had shot at the victim; and (3) Lindsey's apparent uncertainty regarding the number of people that petitioner reported to have entered the victim's home with him. Johnson also complains that his attorneys did not adequately impeach Lindsey when they failed to take full advantage of an alleged affair between Johnson and Lindsey's wife; by not further inquiring into a criminal investigator's report that Lindsey was considered by some to be a "thief"; and that he was not well thought of when he left his employment as an oil rigger. Finally, petitioner claims that counsel inappropriately failed to call as witnesses the three people who had shared the hotel room with petitioner in order to rebut Lindsey's testimony that, at the hotel, Johnson stated he shot at the victim and believed that he had hit him.

This issue was before and considered by the Alabama Court of Criminal Appeals. That court stated:

> Defense counsel demanded a preliminary hearing for discovery purposes to cross-examine prosecution witnesses before trial. One of those witnesses was David Lindsey. Defense counsel reviewed that preliminary hearing transcript, including Lindsey's testimony, in detail before trial. They also interviewed the officer in charge of the investigation several times, and they talked a great deal with Johnson about the facts of the case. Their conduct of the defense was based upon what Johnson told them, and Johnson told them "the whole story." In addition to all those efforts, defense counsel employed an investigator to help them find any useful impeachment information about Lindsey. That investigator worked on the case for more than nine weeks.

> Defense counsel effectively cross-examined David Lindsey. Defense counsel brought out a contradiction between Lindsey's trial testimony and the testimony that he had given at the preliminary hearing. Defense counsel suggested that Lindsey was biased against Johnson because Johnson and Lindsey's wife had had an affair. Trial counsel forced Lindsey to admit that he had been convicted of illegal possession of controlled substances, specifically methamphetamines, and that Lindsey shot the drug into his arms. As defense counsel argued to the jury, "Mr. Lindsey was a man who mainlined speed, shot it up his arm."

> While Johnson's present counsel makes it clear that he would have followed a different strategy in cross-examining Lindsey, that is not the test for ineffective assistance of counsel. "There are countless ways to prove effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland v. Washington, supra,* 466 U.S. at 689, 104 S.Ct. at 2065.

> Moreover, Johnson has not even proven an evidentiary basis for his alternative strategy. Johnson has not shown that any additional information in the investi-

gator's report would have been useful in impeachment, or even admissible. Johnson did not offer as witnesses at the evidentiary hearing any of the four men who were present at the motel and who he now hopes could have impeached Lindsey's testimony. Absent a showing that real impeachment evidence· was available and could have been put forward at trial, Johnson has not shown that it would have made any difference at all to cross-examine Lindsey concerning those statements. Finally, the deposition of Lindsey by Johnson's present counsel does not establish that their latest cross-examination strategy would have been any more effective than the cross-examination of Lindsey that actually occurred.

Therefore, Johnson has failed to show that trial counsel's cross-examination of Lindsey was outside "the wide range of reasonable professional assistance," or that there is a reasonable probability that if counsel had used a different cross-examination strategy, ·the trial would have ended differently. *Strickland v. Washington, supra,* 466 U.S. at 689, 104 S.Ct. at 2065.

*Johnson,* 612 So.2d at 1300–01.

 The Eleventh Circuit has mandated a similar approach to claims of ineffectiveness on cross-examination. Decisional law makes it clear that where an attorney "substantially impeach[ed]" the witness, no claim for ineffectiveness can succeed unless the petitioner comes forward with "specific information" that "would have added to the impeachment of the State's witnesses." *Aldrich v. Wainwright,* 777 F.2d 630, 636–37 (11th Cir.1985); *see Card v. Dugger,* 911 F.2d 1494, 1506 (11th Cir.1990). Without such

information, petitioner cannot bear his burden of proving prejudice. Moreover, claims that an attorney should have cross-examined on "inconsequential" matters establish neither constitutionally deficient performance nor prejudice. *Mills v. Singletary,* 63 F.3d 999, 1021 n. 36 (11th Cir.1995). Application of these principles readily disposes of petitioner's claims.

### a. Allegedly Contradictory Statements.

 The court will assume, for the sake of argument, that petitioner's counsel were unaware of certain aspects of Lindsey's past statements, and that this lack of awareness represents constitutionally deficient performance.[42] Whether counsel's representation was deficient in this respect is of no moment because the petitioner was not harmed by their alleged failures. The so-called contradictions petitioner points to in Lindsey's testimony are for the most part irrelevant and inconsequential, if indeed they are inconsistencies at all. For example, the claimed conflict between Lindsey's reference to "money and gold" at the pretrial hearing and the reference to "gold" at the trial is either trivial or nonexistent. Likewise, the court finds little significance in Lindsey's confusion about who asked the petitioner how he had been injured. The critical portion of Lindsey's testimony was Johnson's response to the question, and that testimony .remained substantially the same in every version of Lindsey's testimony. Finally, little can be made, in this context, of Lindsey's apparent uncertainty about the number of people petitioner reported as entering the Cantrell home on the night of the robbery

---

42. As a practical matter, the court doubts that petitioner can establish even this. As with every other aspect of counsel's performance, the law requires not perfect preparation but reasonable preparation. Constitutionally effective counsel are not required to have a detailed knowledge of every factual matter concerning a witness, but only need to have a fair awareness of the matters relevant to the witness's testimony and credibility. The issue

is not whether counsel attacked a prosecution witness on every conceivable point but whether they subjected ·his testimony to the adversarial testing. that is integral to the trial process. The court believes that they did. *See Roberts v. Singletary,* 794 F.Supp. 1106, 1122 (S.D.Fla.1992) ("No constitutional error results from counsel's failure to exploit every potential inconsistency.").

and murder. The point of the testimony remained the same: Petitioner stated that he was present (with others) at the time and place of the crime, and *had shot at the victim.*

It is not at all uncommon for witnesses to vary small details in their testimonies. This is a fact of real life, and does not necessarily indicate that the witness is lying. While demonstrating that a witness made mistakes on an unusually large number of small details might be a reasonable trial strategy, making too much of a few small errors often has little positive benefit except to display for the jury the lawyer's skill at splitting hairs.[43] On the other hand, counsel's actual cross cast a general shadow over Lindsey's character and veracity by bringing out his drug use and hinting at a motive for lying in the form of an affair between the petitioner and Johnson's wife. The court cannot imagine that a jury unpersuaded by this information would have rejected Lindsey's testimony based on inconsistencies in some rather minor details. *See Aldrich,* 777 F.2d at 637. W. Johnson's defense was not prejudicially impacted by the his attorneys' cross-examination of Lindsey.

### b. Counsel's Efforts to Undermine Lindsey's Character.

■■■ The petitioner's complaint that his counsel were insufficiently energetic in their efforts to undermine Lindsey's character as a reliable witness is also flawed. First, Johnson has yet to explain what more trial counsel could have done to demonstrate that Johnson and Mrs. Lindsey had engaged in an illicit romantic relationship. Second, Johnson's counsel was not required to exhaust to their fullest every lead that might have undermined Lindsey's reliability. Counsel pursued information on Lindsey via an investigator, and chose and utilized the argument they found to weigh the most strongly against

his character—that he took drugs while in the Army and was on pain medication when the relevant events occurred. These were substantial arguments, and counsel's choice was therefore reasonable.

Nor do counsel's actions undermine confidence in the conviction. Mr. Johnson has not demonstrated that, even if counsel had exhausted every lead and put on display before the jury every possible character flaw of Lindsey, there exists a reasonable probability that the outcome of the trial would be any different. The picture counsel actually painted on cross-examination was an ugly one, but the jury apparently believed Lindsey anyway. Johnson has simply failed to carry his burden of coming forward with "specific information" which counsel should have found and which would have altered the course of the trial. *See Aldrich,* 777 F.2d at 636.

### c. Failure To Present Conflicting Witness Testimony.

At trial, Lindsey testified that the petitioner told him that "I got shot, but I got off a couple of rounds and I believe I got that son of a bitch." Apparently, three other friends of the petitioner's, Gene Loyd, Jay Roberson, and Russell Lovell, were present in the motel room when the statement was allegedly made. Trial counsel did not offer the testimony of any of these men to contradict Lindsey's statement. Habeas counsel now claim, with no discernable evidentiary support, that the testimony of the three men would have been beneficial to the defense because "not one of the potential witnesses corroborated Lindsey."

■■■ A state habeas petitioner who claims that his attorneys were ineffective at trial because they failed to call certain persons as witnesses must prove that the proposed witnesses would have testified

---

**43.** This judge's experience as a member of a criminal trial jury a number of years ago and reports from other lawyers and judges who have also served as jurors, suggests that the sort of "nitpicking" demanded by present counsel is exactly the sort of thing that convinces "real people" that trial lawyers often are intent on misleading the jury to achieve an unjust result. In other words, juries often don't respond well to this kind of approach.

favorably to his defense. *See Aldrich,* 777 F.2d at 636. Here, Johnson has offered no evidence that any of the three individuals who were present with him in the Oxford motel would have testified in a way that was inconsistent with the testimony given by Lindsey. Petitioner points only to unsworn statements taken from the three men by the police, which did not confirm Lindsey's testimony about Johnson's damning admissions. Unfortunately for the petitioner, none of these statements indicates that the petitioner did not admit to the crime either. They do not directly contradict Lindsey's testimony. *See infra* at pp. 1364–65; *see also Card,* 911 F.2d at 1506 (finding no ineffectiveness where "none of the evidence that petitioner claims could have been introduced directly contradicts or undermines the testimony of" the State's witness). Petitioner offers only speculation, based on these vague statements, that the missing witnesses would have been helpful. Such speculation is "insufficient to carry the burden of a habeas corpus petitioner." *Aldrich,* 777 F.2d at 636. In these circumstances, the petitioner cannot prove that his defense was harmed by the failure to call any of these three men as impeachment witnesses.[44]

### ii. Ineffective Assistance Because of Claimed Improper Objection to Statistical Evidence.

In the nose of the bullet taken from Johnson's back, tiny shards of glass were discovered, indicating to investigators that the bullet had earlier penetrated a glass surface. In the Cantrell's home, a door opening into the room in which the shooting occurred was ornamented with glass panes, three of which were shattered in the gunfight that resulted in the death of Mr. Cantrell. At trial, the prosecution called a forensics expert to link the small fragments of glass to one of the broken door panes. With respect to two of the panes, there was no match. But the refractive properties of the third pane seemed to closely match those of the glass shards found on the bullet from Johnson's back.[45] At this point, the trial judge inquired into the reliability of the evidence showing a relationship between the refractive indexes:

> Court: Does your science provide you any judgment as to the mathematical probabilities of these two comparisons as to indicate them from being from the same source or not?
>
> The Witness: There has been some statistics that have been done and accumulated from the F.B.I. that I am familiar with.
>
> Court: What is the mathematical probability?

Tr. at 732–33. Trial counsel then objected on hearsay grounds. The judge overruled the objection, stating that, as an expert, the forensic scientist could testify as to the statistics.

> The Witness: The data that has been accumulated by the Federal Bureau of Investigation that they have found the same physical properties in three point eight percent [3.8%] of their glass samples that they have examined.
>
> The Court: What does that mean? Can you—can you explain it any more? I don't know that I understand that exactly. Maybe the jury does. I don't believe I do.
>
> The Witness: From a statistical standpoint, utilizing the FBI, four out of one hundred samples could have the same physical properties.

---

**44.** The court notes that, if the failure to contact petitioner's proposed witnesses was an error on the part of trial counsel, petitioner's current counsel are equally guilty. Indeed, they may have even less of an excuse for their failure than do Johnson's trial attorneys. "Although counsel may have been pressed for time in [June 1985], the intervening decade should have revealed whatever evidence it is contended should have been discovered prior to trial." *Aldrich,* 777 F.2d at 636.

**45.** The refractive index of glass is a measurement of the angle at which light passing through the glass is bent.

**1358**

The Court: Four out of one hundred?

The Witness: Yes, sir.

*Id.*

■ Johnson now complains that his trial counsel failed to make a proper objection to this evidence. He argues that trial counsel incorrectly objected on the basis that the expert witness based his conclusion on hearsay evidence when they should have objected that the State had failed to lay a proper foundation for the expert's opinion. As resolution of the deficient performance issue would require the court to delve into the murky depths of Alabama law on expert testimony,[46] the court finds it "easier to dispose of [the] ineffectiveness claim on the ground of lack of sufficient prejudice," and so will take the Supreme Court's advice and deal solely with this issue. *Strickland,* 466 U.S. at 697, 104 S.Ct. 2052.

Petitioner's argument on the prejudice question relies heavily on an Eleventh Circuit case which addressed the admission of expert testimony in somewhat similar circumstances. In *Chatom v. White,* 858 F.2d 1479 (11th Cir.1989), the court found a petitioner had been denied the effective assistance of counsel when his trial attorney failed to object to an expert's testimony concerning an "atomic absorption test" that the prosecution used to prove that the petitioner shot and killed the victim in that case.

The state's case against Chatom consisted entirely of circumstantial evidence, no eyewitness could place Chatom as the individual who shot the officers nor could anyone even place Chatom in the vicinity of the area of the swamp where the shooting occurred. *See generally Chatom,* 348 So.2d 828 (Ala.Crim.App. 1976), *rev'd* 348 So.2d 838 (Ala.1977), *on remand* 348 So.2d 843 (Ala.Crim.App. 1977). Thus, the introduction of the atomic absorption test constituted a pivotal point in the trial in that it had the potential to reasonably establish in the jurors minds the fact that Wilson did not fire a gun and reasonably raise the inference that Chatom did. The Alabama

---

**46.** This issue is a confusing one. By one Justice's own admission, the Alabama Supreme Court has sent some "mixed signals" in this area. *W.S. by C.S. v. T.W.,* 585 So.2d 26, 28 (Ala.1991) (Houston, J., concurring). However, the general rule in Alabama now appears to be that an expert can give an opinion based on hearsay and opinions obtained from others, but only if the information relied on is first introduced into evidence. *See id.* at 28–29; *Morris v. Young,* 585 So.2d 1374, 1377 (Ala.1991). The rules in place at the time of Johnson's trial were even more restrictive, and apparently allowed the expert to testify only from either (1) personal knowledge or (2) facts provided in a hypothetical. *See Nash v. Cosby,* 574 So.2d 700 (Ala.1990) (altering the rules). Nonetheless, the Alabama courts have apparently deviated from this rule from time to time, and have allowed an expert to testify based on hearsay outside the record, though only if it was of a type "customarily relied upon by experts and likely to be trustworthy." *Brown Mechanical Contractors v. Centennial Ins. Co.,* 431 So.2d 932, 944 (Ala.1983). It is unclear how these cases can be reconciled with those stating a more stringent standard. The *Brown* standard mirrors the more general rule that hearsay evidence can be admitted via an expert's testimony if these requirements are met, and one commentator has

opined that *Brown* may reflect an understanding that the hearsay was or at least could have been admitted into evidence, and so could properly be relied on by the expert. *See* Charles W. Gamble, *McElroy's Alabama Evidence* § 127.02(5) & n. 7; *Volkswagen of Am., Inc. v. Marinelli,* 628 So.2d 378 (Ala.1993). In any event, given the uncertain state of the law, it is difficult to determine whether petitioner's counsel's hearsay objection was such a bad one. Indeed, it is even unclear whether it was all that different from petitioner's "foundation" objection, which allegedly would have required proof that "experts in the field commonly use the data as the basis for similar conclusions." *Petitioner's Memorandum* at 51. Note that under Alabama law this same standard would be required for admission over a hearsay objection under the rule of *Brown* and *Marinelli,* so the proper objection might have been hearsay after all. The court also notes that the trial court asked and was informed that the FBI glass data was commonly used in the field, perhaps satisfying either standard. To confuse matters further, there is some dispute about how broadly the State's expert's testimony should be interpreted. *See, e.g., Johnson,* 612 So.2d at 1301 (taking a narrow view). Because of all of these complexities, the court prefers to simply leave this issue unresolved.

Court of Criminal Appeals recognized the importance of the test results at trial when it stated:

The most damaging evidence against the appellant [at trial] consisted of the results of an 'atomic absorption test.' The atomic absorption test allegedly will show whether a person has recently fired a gun. The State, by use of the atomic absorption test sought to show that Wilson had not fired a gun on November 17, 1975. If Wilson did not fire a gun on the day in question, then there would be a strong inference that someone else, possibly the appellant, shot [the deputies].

*Chatom,* 348 So.2d at 831 (emphasis added).

*Chatom,* 858 F.2d at 1485-86. The Eleventh Circuit found prejudice in large part because the circumstantial evidence in the case left a "close question" as to Chatom's guilt, and the atomic absorption evidence "could raise or may have supported a multitude of inferences damaging to Chatom." *Id.* at 1487.

This case differs from *Chatom* in several key respects. The evidence against Johnson was significantly stronger than that offered by the State in *Chatom.* More importantly, the issue on which the statistical evidence was useful—Johnson's presence at the scene—was one of the strongest parts of the State's case. As the Alabama Court of Criminal Appeals rightly pointed out, while helpful, the statistical evidence was essentially cumulative.

Even without the probability statement, the properly admitted evidence concerning the refractive indexes of the glass was very specific and probative. Moreover, given the position of the victim at the time of the gunfight (sitting on a couch in the living room) and the height of the bullet wound in Johnson's back as compared with the height of the bullet hole in the glass pane of the carport door at the victim's house, the jury could reasonably conclude that the bullet which was removed from Johnson's back was fired by the victim. This conclusion is bolstered by the fact that the bullet

removed from Johnson's back was also of the same caliber, had been made by the same manufacturer, and had the same number of lands and grooves as other bullets fired from the pistol used by the victim.

Finally, Johnson has not even suggested any alternative explanation for how he came to have a bullet with all those similarities to other bullets fired from the victim's pistol lodged in his back shortly after the exchange of gunfire took place. Therefore, in light of this overwhelming independent evidence linking the bullet removed from Johnson's back to the bullet that Cantrell fired at the second robber, there certainly is not a reasonable probability that if trial counsel had made a different objection to the probability evidence, the result of the trial would have been different. Hence, the trial court properly denied Johnson's claim of ineffective assistance of counsel on this ground.

*Johnson,* 612 So.2d at 1301-02. This court agrees.

Even though it was largely circumstantial, the evidence against Johnson was very strong. The fact that the bullet removed from his back matched up with the evidence from the scene in so many characteristic ways created a very high probability that the jury would have found that the bullet came from Mr. Cantrell's gun even without the statistical evidence. This court's review of the record suggests that this evidence constituted a small part of the overall picture linking Johnson to the robbery and murder of Mr. Cantrell. There being no prejudice, there is no claim of ineffective of counsel in this regard.

## 2. Claims of Ineffective Assistance of Counsel on Appeal.

In addition to his claim that his trial counsel were ineffective, Johnson asserts that his counsel on appeal, John Mays, was constitutionally inadequate in three respects. First, according to the petitioner, appellate counsel inadequately framed the

statement of facts in his briefs to the Alabama Court of Criminal Appeals and the Supreme Court of Alabama, including in the brief inaccurate factual assertions and omitting pertinent facts while asserting irrelevant ones. Second, he claims that counsel performed inadequately in presenting only two grounds for reversal when other, more substantial, claims were available. Finally, the petitioner contends that appellate counsel's brief to the Supreme Court of Alabama was merely a copy of his brief to the Court of Criminal Appeals, without alteration or any attempt to respond to the reasoning of the lower court. The petitioner claims that by simply submitting his first brief to the Alabama Supreme Court, Mays tacitly assented to the Court of Criminal Appeals' analysis.

■ The standards applicable to petitioner's claims of ineffectiveness against trial counsel apply equally to the charges leveled against his appellate lawyer. *Heath v. Jones,* 941 F.2d 1126, 1130 (11th ·Cir. 1991), *cert. denied,* 502 U.S. 1077, 112 S.Ct. 981, 117 L.Ed.2d 144 (1992); *Orazio v. Dugger,* 876 F.2d 1508 (11th Cir.1989). To prevail, Johnson must demonstrate both that his attorney's performance fell below reasonable professional standards and that he was prejudiced by that substandard performance. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. The courts indulge a presumption that counsel was effective and must not, from the vantage point of hindsight, second guess counsel. *Id.* at 689. On habeas review the court must "review the merits of the [omitted or poorly presented] claim." *Cross v. United States,* 893 F.2d 1287 (11th Cir.), *cert. denied,* 498 U.S. 849, 111 S.Ct. 138, 112 L.Ed.2d 105 (1990).

### i. Adequacy of Statement of Facts On Appeal.

■ In his brief to the Alabama Court of Criminal Appeals, the petitioner's appellate counsel presented the facts surrounding the petitioner's conviction in a narrative that summarized the events at trial, accurately stating for the most part the testimony of each witness and the actions taken by the attorneys and the court.

Mays did not attempt to reorder the relevant events in a persuasive or elegant fashion, but simply recited them in the order in which they occurred. It is this format that forms the primary basis for the petitioner's criticisms. To some degree, the criticism is well-deserved—Mays' recitation of the facts was a far cry from a stylized masterpiece. One could certainly imagine a rendition of the trial testimony that would likely be more effective or persuasive. Despite his inartful drafting, however, Mays adequately communicated the underlying facts necessary to support his argument. No egregious errors or misstatements were made. The result was a useful, if workmanlike, summary of the record for the use of the appellate court. Under these circumstances, the court simply cannot conclude that Mays' recitation of the trial evidence was "outside the wide range of professionally competent assistance." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052.

### ii. Adequacy of Issues Presented on Appeal.

■ The petitioner argues that the two guilt-related arguments raised as errors by his appellate counsel—that a particular juror should not have been struck for cause and that a motion for judgment of acquittal should have been granted because the trial evidence was insufficient to support his conviction—were two of the less serious errors that should have been raised. He further claims that, rather than the faulty and weak arguments actually raised, appellate counsel should have asserted many of the more substantial claims presented in this petition.

At the outset, it must be observed that appellate counsel is neither required nor expected to present every possible issue on direct appeal. The duty of counsel in all criminal cases to exercise professional judgment in the selection of which issues to present was recently restated by the Court of Appeals for the Eleventh Circuit:

Even in a death-penalty case, the court expects counsel to be highly selective about the issues to be argued on appeal and about the number of words used to press those issues.... [D]irecting busy lawyers to sharpen and to simplify their arguments ... experience has taught us—makes cases stronger, not weaker. Our views on what constitutes effective advocacy are not heretical. Justice Story wrote these words: "Who's a great lawyer? He, who aims to say the least his cause requires, not all he may." Joseph Story, Memorandum—book of arguments before the Supreme Court, 1831–32, in *Life and Letters of Joseph Story* 2:90 (William W. Story ed. 1851). Justice Holmes once said, "One has to try to strike the jugular and let the rest go." Oliver Wendell Holmes, *Speeches* 77 (1934).

The Supreme Court of the United States has also stressed in its opinions that the best advocacy relies on selectivity. It is well settled that counsel need not "raise every 'colorable' claim" on appeal. *Jones v. Barnes*, 463 U.S. 745, 103 S.Ct. 3308, 3314, 77 L.Ed.2d 987 (1983). The Supreme Court wrote, "Most cases present only one, two, or three significant questions.... Usually, ... if you cannot win on a few major points, the others are not likely to help, ..." *Jones*, 103 S.Ct. at 3313 (quoting R. Stern, Appellate Practice in the United States 266 (1981)). And, the former Chief Judge of this circuit, John C. Godbold, has given this advice: "[C]ounsel must select with dispassionate and detached mind the issues that common sense and experience tell him are likely to be dispositive. He must reject other issues or give them short treatment." John C. Godbold, *Twenty Pages and Twenty Minutes Revisited* 14 (1987) (revised version of *Twenty Pages and Twenty Minutes—Effective Advocacy on Appeal*, 30 Sw.L.J. 801 (1976)). *United States v. Battle*, 163 F.3d 1, 1–2 (11th Cir.1998).

It is clear from Mays' testimony during the Rule 20 proceedings that he discussed the issues in the case with trial counsel, carefully studied the trial record, researched the issues, and elected to argue on appeal those that in his judgment offered the greatest opportunities for success. He also took into account how the appellate court might respond to the selected issues. For example, Mays specifically considered and rejected many of the issues petitioner now presses upon him. After considering raising a question about Johnson's participation and intent to kill, Mays decided that argument "would not wash." R20 at 765–766, 769, 784–787, 798. He reached the conclusion that the appellate record adequately supported a finding that the petitioner was involved in the robbery and killing of Mr. Cantrell and that Johnson intended to kill him. R20 at 784, 798. Counsel chose instead to argue the propriety of the court's removal of a potential juror based upon her views concerning the death penalty. He felt it was a strong issue, knowing, as he did, that the improper removal of a single juror under those circumstances would require reversal of the conviction. R20 at 781–82. "This process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986) (*quoting Jones v. Barnes*, 463 U.S. 745, 751–52, 103 S.Ct. 3308, 3314, 77 L.Ed.2d 987 (1983)).

The record establishes that Mays engaged in the kind of considered decision making that the courts have said is virtually unassailable. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. The Supreme Court's observation about trial counsel is equally true with regard to appellate counsel: "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Id.* at 689, 104 S.Ct. 2052. Furthermore, while habeas counsel argues that Mays should have raised on appeal most, if not all, of the issues they have raised here, this court's examination of those issues

suggests that they would have met with no more success than those actually raised on direct appeal. Accordingly, appellate counsel's failure to raise them can hardly be considered ineffective assistance of counsel under *Strickland*.

### iii. Brief to Alabama Supreme Court on Direct Appeal.

 The petitioner claims that appellate counsel should have specifically addressed the conclusions reached by the Court of Criminal Appeals in his petition for a Writ of Certiorari to the Supreme Court of Alabama. The State responds that Mays believed the arguments presented in his initial brief were sufficient to alert the Alabama Supreme Court of the issues counsel had raised before the Court of Criminal Appeals.

The court's analysis, above, demonstrates that Mays considered the course of the appeal in Johnson's case. Certainly, another lawyer might well have prosecuted the appeal differently. That does not, however, require a finding that petitioner's counsel was ineffective for failing to file a more vigorous and expansive brief with the Alabama Supreme Court. Such an act was well within the boundaries of "reasonably professional judgment." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. Perhaps most importantly, the petitioner has utterly failed to demonstrate a reasonable probability that a different brief would have produced a different result. As a result, his claim that his appellate counsel was ineffective is without merit.

### D. The *Brady* Claim.

 Petitioner asserts that the State violated the rule set forth in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), when it failed to produce "all information favorable to the defense" as requested in the defendant's pretrial discovery motion. As the Supreme Court recently noted, "there are three essential components of a true *Brady* violation: the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; it must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* —— U.S. ——, 119 S.Ct. 1936, —— L.Ed.2d —— (1999). The items petitioner points to as *Brady* material are (1) a case report prepared by the Alabama Bureau of Investigation (ABI), which suggested that the police had identified suspects other than Johnson, indicated that the victim had fired the first shot, and contained statements taken from the men present in the motel room at the time of petitioner's arrest; and (2) documentary evidence that the state was investigating two other suspects in connection with the murder of Mr. Cantrell.[47] Petitioner claims that the suppressed information was exculpatory and material to his defense because it suggested that two other individuals actually killed Mr. Cantrell and that the victim fired the first shot—both facts which tended to negate the requisite intent element of capital murder.[48] In addition, petitioner alleges that the materials contained information that could have been used to impeach the

---

**47.** This evidence consists of (1) an undated set of notes which indicated that a woman named Louise Blevin told someone that Garland McCulloch would do anything for money, had guns, and was a companion to Johnson and others; (2) a sheet of paper with "Garland #1" scribbled on it; and (3) a page of notebook paper with the names Ray McCulloch, Garland McCulloch, Wayne McCulloch, and Jerry, along with the words "beverages," "Hartselle," and "79 Olds."

**48.** Petitioner asserts that the ABI Report indicates Mr. Cantrell fired the first shot, which,

he seems to argue, would negate the intent element of capital murder. The court does not understand this argument. There is no indication that the segment of the ABI Report dealing with the exchange of gunfire is meant to convey a chronology of events. Even if it were, however, the order of gunfire in a shootout during a robbery could have virtually no exculpatory effect as to any element of capital murder. See *Johnson,* 612 So.2d at 1294–95 (*citing Hopper v. Evans,* 456 U.S. 605, 613, 102 S.Ct. 2049, 2054, 72 L.Ed.2d 367 (1982)).

testimony of two of the state's witnesses, David Lindsey and Sergeant H.D. Newell.

### 1. The "Exculpatory Evidence" Requirement.

"*Brady* requires the disclosure of material evidence favorable in the sense of mitigation or exculpation, and also requires the prosecution to disclose evidence important and useful for impeachment purposes." *Calley v. Callaway*, 519 F.2d 184, 221 (5th Cir.1975) (en banc), *cert. denied*, 425 U.S. 911, 96 S.Ct. 1505, 47 L.Ed.2d 760 (1976) (*citing Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)). While admitting that none of the alleged *Brady* material would have been admissible, petitioner alleges that the exculpatory requirement of *Brady* has been satisfied because the materials could have been used to impeach the testimony given at trial by Sergeant Newell and David Lindsey. Documents contained in the police file indicated that the McCulloch brothers were responsible for the shots fired during the robbery, and that several other suspects may also have been involved. Petitioner argues that because this explanation of events is inconsistent with the state's theory of the crime, Sergeant Newell's testimony at trial could have been impeached with the information, thereby discrediting his account of the crime and, consequently, the State's case. The statements of the men present in the motel room at the time of petitioner's stay would have been useful for impeachment of Lindsey, argues Johnson, because they are inconsistent with Lindsey's testimony. Petitioner argues that this information individually or collectively satisfies the exculpatory requirement of *Brady*. Because the duty to disclose evidence includes impeachment evidence as well as exculpatory evidence, *United States v. Bagley*, 473 U.S.

667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), this information would be subject to disclosure if Johnson is correct about its value as impeachment material.

The court finds that very little, if any, of the allegedly suppressed information could have been useful to the defense counsel before or at trial. The information regarding the existence of other suspects established, at best, that there may have been participants other than Johnson in the attempted robbery of the Cantrells. This fact was clear, of course, from the evidence at trial, both testimonial and forensic. It also conformed perfectly with the petitioner's rendition of the events at the Cantrell home—a rendition which Johnson conveyed to his attorneys and which guided their strategy at trial.[49] Accordingly, the court is entirely unable to see how evidence that suggested the existence of additional participants but did not call into doubt Johnson's participation could have been utilized by counsel to discredit Sergeant Newell's testimony.

The court is also somewhat skeptical about the value to the defense of the statements from the men who were in the motel room with Johnson. However, for purposes of argument the court is willing to indulge the petitioner's claim that these statements could have contributed to defense counsel's efforts to impeach David Lindsey. As will be shown below, however, the effect at trial of any such efforts would likely have been inconsequential.

### 2. The Suppression Requirement.

Because it is not central to the petitioner's *Brady* claim, the court will assume for the purposes of this discussion that Johnson has satisfied the requirement that the allegedly exculpatory materials actually be suppressed by the government. The court

---

**49.** Petitioner claims that his counsel could have argued more subtle distinctions. For example, they could have contended that the McCulloch brothers were the killers and Garland was the A.B.I.'s number one suspect. The court fails to see how this would have been useful. The McCullochs apparently were involved and, at least according to the petitioner, Garland McCulloch killed Cantrell. But this does not mean that Johnson was not involved, or indeed that he was not the second man. None of the notes or statements were sufficiently detailed to shed any light on this question.

merely notes that the Eleventh Circuit has firmly held that "there is no suppression, and thus no Brady violation, if either the defendant or his attorney knows before trial of the allegedly exculpatory information." *Felker v. Thomas,* 52 F.3d 907 (11th Cir.1995) (*citing United States v. Valera,* 845 F.2d 923, 927–28 (11th Cir.1988), *cert. denied,* 490 U.S. 1046, 109 S.Ct. 1953, 104 L.Ed.2d 422 (1989); *Halliwell v. Strickland,* 747 F.2d 607, 609 (11th Cir.1984), *cert. denied,* 472 U.S. 1011, 105 S.Ct. 2711, 86 L.Ed.2d 726 (1985); *United States v. Cravero,* 545 F.2d 406, 420 (5th Cir.1976), *cert. denied,* 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977)). *See also Wright v. Hopper,* 169 F.3d 695, 702 (11th Cir.1999) ("the state is not required to furnish a defendant with exculpatory evidence that is fully available through the exercise of due diligence"). In the court's view, a strong argument could be made that certain information allegedly suppressed—including the identities of the other suspects and of the men in the hotel room—was known to the defendant long before trial. Much of this information was available from Johnson's own personal knowledge. *See Felker,* 52 F.3d at 910.

### 3. The Materiality Requirement.

 Even assuming for the sake of argument that the materials in question were exculpatory or impeaching and were suppressed by the prosecution, the petitioner falls short on the third prong of a valid *Brady* claim: materiality. The Supreme Court has recently said that suppressed exculpatory evidence "is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Strickler,* 119 S.Ct. at 1948 (*quoting Bagley,* 473 U.S. at 682, 105 S.Ct. 3375). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490

(1995). The materiality of undisclosed evidence is to be determined from an evaluation of the evidence "collectively, not item-by-item." *Id.* at 436, 115 S.Ct. 1555. In addition, the admissibility of the material in question is not dispositive of whether it is exculpatory. *Sellers v. Estelle,* 651 F.2d 1074, 1077 n. 6 (5th Cir.1981); *see also United States v. Phillip,* 948 F.2d 241, 250 (6th Cir.1991).

An examination of all the materials allegedly suppressed by the prosecution reveals almost no likelihood that disclosure of the materials would have had any significant impact on the trial. At best, disclosure of the materials would have had two consequences: (1) defense counsel would have had more evidence that people other than Johnson were involved in the robbery; and (2) they would have been able to cross-examine David Lindsey about his testimony that Johnson essentially admitted participation in the robbery and killing. These "advantages" would be of minimal value to the defense, both separately and collectively. Even if the cumulative effect of all the alleged *Brady* material is considered, the petitioner has not met his burden of establishing a reasonable probability that the result would have been different. *Strickler,* 119 S.Ct. at 1953 (*citing Kyles,* 514 U.S. at 434, 115 S.Ct. 1555).

The likelihood that the disclosure of information regarding the other suspects would have impacted the strategy of the defense in such a way as to result in a different outcome is negligible. As noted earlier, this information was a surprise to no one, and was in fact consistent with Johnson's own story about what had happened. The participation of others, whether as the first man into the house or a getaway driver, has absolutely no impact on the guilt of the petitioner as established at trial. The only possible theory such evidence could have supported is the "third man" theory rejected by the court earlier in this opinion. In the court's view, the fact that counsel for the petitioner was cognizant of nearly all of the information and

chose not to pursue any in-depth investigation indicates fairly convincingly that disclosure of further information on this point would have changed very little.

The allegedly suppressed statements of the men present in the motel room would also have been of little value to Johnson's trial counsel. The Fifth Circuit has made clear that the threshold for a *Brady* claim based on potentially impeaching evidence is somewhat stringent. In *Calley v. Callaway*, that court held that "when *Brady* is invoked to obtain information not favorable on the issue of guilt or innocence but useful for attacking the credibility of a prosecution witness, the information withheld must have a definite impact on the credibility of an important prosecution witness in order for the nondisclosure to require reversal." *Calley*, 519 F.2d at 222. Here, none of the statements in question indicate that the individuals were constantly present in the motel room nor that they witnessed every occurrence that took place in the room. Likewise, none of the men stated that they heard Johnson provide an innocent explanation for his wound. Most of them did not mention Johnson's alleged admission at all. While Russell Lovell's statement acknowledges that he "never heard Keith state anything about being shot," R20 at 985, even this statement contains nothing that directly contradicts Lindsey's testimony. It simply cannot be said that the declarations of witnesses that do not contradict, but merely fail to corroborate, Lindsey's testimony about what Johnson said in the motel room would have had any "definite impact on [Lindsey's] credibility" as a witness. *Calley*, 519 F.2d at 222.

In conclusion, there is no evidence that a violation of the rule announced in *Brady v. Maryland* occurred in the petitioner's case. Even if it is assumed that the circumstances satisfy the *Brady* requirements that the state suppressed evidence that is favorable or exculpatory, petitioner can make no showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375.

### E. The *Cage* Claim.

Mr. Johnson asserts that the jury was improperly instructed on the meaning of "proof beyond a reasonable doubt," contrary to the Supreme Court's holding in *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990) (per curiam), *overruled on other grounds, Estelle v. McGuire*, 502 U.S. 62, 73 n. 4, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). It is by now well-established that the Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970). The concept of reasonable doubt "plays a vital role in the American scheme of criminal procedure." *Id.* at 363, 90 S.Ct. 1068. An obvious corollary to the *Winship* principle is that a jury instruction which by its language lowers the government's burden below that of proof beyond a reasonable doubt is prohibited. *See Cage*, 498 U.S. at 40–41, 111 S.Ct. 328. In fact, conviction by a jury improperly instructed on reasonable doubt is one of the few constitutional errors which will always invalidate the conviction. *Sullivan v. Louisiana*, 508 U.S. 275, 279–80, 113 S.Ct. 2078, 2081–82, 124 L.Ed.2d 182 (1993) (citing *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927); *McKaskle v. Wiggins*, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984)). The Eleventh Circuit, relying largely on the rule announced in *Sullivan*, has held that claims under *Cage v. Louisiana* are excepted from the general practice "that a new rule of law will not be applied to cases on collateral review where conviction was final prior to the new rule's announcement." *Nutter v. White*, 39 F.3d 1154, 1157 (11th Cir.1994) (citing *Teague v. Lane*, 489 U.S. 288, 310, 109 S.Ct. 1060, 1075, 103 L.Ed.2d 334 (1989)).

# 1366

## 1. Procedural Default.

█ Before turning to the merits of the petitioner's *Cage* claim, however, the court must address a threshold issue raised by the State—whether the claim has been procedurally defaulted, as found by the Alabama Court of Criminal Appeals during Johnson's Rule 20 proceedings. *See Johnson v. State,* 612 So.2d 1288, 1292 (Ala.Crim.App.1992). There is no dispute that Johnson's attorneys failed to object to the reasonable doubt instruction given to the jury and failed to raise the issue on appeal. Under former Rules 20.2(a)(3) and 20.2(a)(5), A.R.Crim.P.Temp.,[50] which were applicable at the time, the claim was procedurally barred. The Alabama Court of Criminal Appeals' denial of relief thus rested upon "adequate and independent state grounds" and is not subject to collateral review by a federal court. *Harris v. Reed,* 489 U.S. 255, 261, 109 S.Ct. 1038, 1042, 103 L.Ed.2d 308 (1989).

█ The petitioner would excuse his procedural default on this issue by claiming that his attorneys, both trial and appellate, were ineffective by reason of their failure to challenge the reasonable cause instruction. *See, e.g., Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). As will be seen, the jury instruction now challenged by habeas counsel, taken as a whole, was not objectionable and neither trial nor appellate counsel were ineffective because they did not challenge it. There is, therefore, neither "cause" nor "prejudice" sufficient to excuse the petitioner's procedural default. The claim is thus defaulted.

## 2. The Merits of the Claim.

Alternatively, if the challenge to the reasonable doubt instruction had not been defaulted and if the court were to address the claim on the merits, the petitioner's *Cage* claim would still fail. At the close of the evidence at Johnson's trial, the judge gave the jury the following instruction on reasonable doubt:[51]

> The Court charges the jury that [sic] the burden of proof is upon the State, and it [is] the duty of the State to show beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis every circumstance necessary to show that the Defendant is guilty, before the Defendant is required to introduce any evidence in his favor or to explain any circumstance surrounding him, and if there is a reasonable doubt of the Defendant's guilt, then you must acquit the Defendant.

> The State has the burden of proving guilt of the Defendant beyond a reasonable doubt, and this burden remains on the State throughout the case. The Defendant is not required to prove his innocence.

> I charge you, members of the jury, that the State has the burden of proof in this case, and if, after hearing all the evidence, your mind is left in such a state that you must resort to speculation or guesswork as to the Defendant's guilt or innocence, then the State has not proved to you beyond a reasonable doubt that the Defendant is guilty, and you must acquit the Defendant.

> The Court charges the jury that a person charged with a felony should not be convicted unless the evidence excludes to a moral certainty every reasonable hypothesis but that of his guilt; no matter how strong the circumstances are, they do not come up to the full measure

**50.** Rule 20.2(a)(3), A.R.Crim.P.Temp., provided: "A petitioner will not be given relief under this rule based upon any ground ... [w]hich could have been but was not raised at trial." Rule 20.2(a)(5), A.R.Crim.P.Temp., provided: "A petitioner will not be given relief under this rule based upon any ground ... [w]hich could have been but was not raised on appeal."

**51.** Though lengthy, the entire jury instruction on the State's burden of proof is reproduced here; the Supreme Court has directed the court to assess whether "taken as a whole, the instructions correctly conveyed the concept of reasonable doubt to the jury." *Holland v. United States,* 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954).

of proof, which the law requires, if they can [sic] reasonably reconciled with the theory that the Defendant is innocent. Where the proof of any element of the crime charged against the Defendant is based on circumstantial evidence, then I charge the jury that to justify a conviction of crime the actions of the defendant must be inconsistent with every reasonable theory of innocence.

I want to talk to you a little bit about reasonable doubt. I will read something to you first, and then I will talk to you a little more at length. This is the standard that you will use in evaluating this testimony to determine whether or not the State has met the burden of proof. A reasonable doubt is a fair doubt, based upon reason and common sense, and arising from the state of the evidence. While it is rarely possible to prove anything to an absolute certainty, suspicion or conjecture, a reasonable doubt may arise not only from the evidence produced, but also from a lack of evidence. The burden is upon the State to prove the Defendant guilty beyond a reasonable doubt of every essential element of the crime charged. A Defendant has the right to rely upon failure of the prosecution to establish such proof. A Defendant may also rely upon evidence brought out on cross-examination of witnesses for the prosecution and upon evidence presented on behalf of the Defendant.

The law never imposes upon a Defendant in a criminal case the burden or duty of producing any evidence.

A reasonable doubt exists in any case when, after careful and impartial consideration of all the evidence in the case, the jurors do not feel convinced to a moral certainty that a defendant is guilty of the charge.

Upon considering all the evidence, or lack of evidence, if you have a reasonable doubt about the Defendant's guilt, arising out of any part of the evidence or lack of evidence, you should find the Defendant not guilty.

I charge you, members of the jury, that the law requires proof of guilt beyond a reasonable doubt. The concept of reasonable doubt is applicable to every single element of the crime charged. The concept of reasonable doubt is also certainly applicable to the identity of any person charged with a crime. If you are not satisfied beyond a reasonable doubt as to any element of the offense charged, you must find the Defendant guilty. The same is true of identity. If you are not satisfied beyond a reasonable doubt that any offense charged was committed by the defendant, you must then find the Defendant not guilty.

I charge you, members of the jury, that the State must prove beyond a reasonable doubt the identity of the perpetrator of a crime. If you are not satisfied beyond a reasonable doubt as to the identity of the Defendant as the perpetrator of the offense charged, you must find the Defendant not guilty.

The Jury is instructed that, if the evidence is reasonably consistent with the Defendant's innocence, you should promptly acquit him.

The Jury is instructed that the Defendant cannot be convicted unless the evidence is inconsistent with any reasonable theory of innocence.

Now, let me say without reading something on the subject of reasonable doubt. As I said, this is the standard that you are going to have to measure this case by.

Now, this is how you will determine whether or not the State has met the burden of proof. Have they proved the Defendant's guilt beyond a reasonable doubt and to a moral certainty.

The law, when it uses the expression beyond a reasonable doubt and to a moral certainty, doesn't mean two different things.

Beyond a reasonable doubt and to a moral certainty are simply two ways of expressing the same idea or same concept. In my judgment the law has had a

little difficulty in positively defining the concept of reasonable doubt. Most of the definitions take on a negative concept. One positive definition has been said to be a reasonable doubt is a doubt for which a good reason can be given or can be assigned. Proof beyond a reasonable doubt is not proof beyond every possible doubt. Proof to a moral certainty is not proof to a mathematical or scientific certainty, because anything concerning human affairs and human conduct of necessity must be open to some possible doubt to say the least. A reasonable doubt is not a fanciful doubt. It is not a vague or speculative or uncertain doubt. It is what it says. It is a reasonable doubt. It is such a doubt as would arise by the evidence offered by the State or by the Defense or by a lack or want or insufficiency of evidence offered by the State. It is stated in the final analysis that if a jury, after considering all of the evidence, have an abiding conviction in their mind and heart of the guilt of the Defendant, they don't have a reasonable doubt. If they don't have such an abiding conviction, they do.

One definition has been expressed by our Supreme Court in this language, and I like this, the doubt which requires an acquittal in a criminal case is actual and substantial. It is not any doubt or some mind indulging doubt or every question which may be suggested and on which they must act. It is not mere possibility or speculation that the imagination creates. It is a doubt the evidence generates when the jury carefully weighing all the evidence cannot say they feel an abiding conviction of the defendant's guilt.

As I said, this is not a mathematical or scientific concept, and I have found that, depending on what training and background people have, some people have a little difficulty with that. You take an engineer, a scientist, a mathematician or an accountant, when you say proof to him, it takes on a very concise and direct concept. What we deal with here is human affairs and human endeavors. The law paints in broad strokes. So it only knows how to deal with human affairs by human measurements and by human concepts. And so in evaluating this case and in evaluating this testimony, don't be overawed by the fact that you are concerned with the law. The inherent experience, instincts, common sense and the background and history of all of your previous experiences as human beings are great and valuable tools in applying and evaluating this.

The law even goes so far on the concept of reasonable doubt to say that each juror, if he has—if he or she has difficulty with the definition that I have given you, has his or her own right to take the words "reasonable doubt" and give them the logical and consequential conclusion and definition that he or she finds. In the final analysis you determine what is a reasonable doubt and what is not a reasonable doubt.

Tr. at 841–49.

The petitioner contends that the instruction was flawed because the trial judge equated "beyond reasonable doubt" with "moral certainty," thereby lowering the State's burden of proof. The petitioner also argues that the trial judge's instruction that each juror "has his or her own right to take the words 'reasonable doubt' and give them the logical and consequential conclusion and definition that he or she finds" impermissibly permitted the jury to reduce the State's burden of proof below that required for conviction under the Sixth Amendment. In response, the State argues that the instruction given by the trial judge in the instant case, as it relates to the language concerning "moral certainty" and "actual and substantial doubt," is akin to the instruction analyzed in *Harvell v. Nagle*, 58 F.3d 1541 (11th Cir.1995) *cert. denied*, 517 U.S. 1225, 116 S.Ct. 1859, 134 L.Ed.2d 958 (1996), which the Eleventh Circuit Court of Appeals found to be consistent with the constitutional requirements. The State apparently does not reply to petitioner's concerns involving the

trial judge's comments about the jury's authority to disregard his earlier instructions.

In *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990) (per curiam), *overruled on other grounds, Estelle v. McGuire*, 502 U.S. 62, 73 n. 4, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), the petitioner was convicted of first degree murder and sentenced to death. At trial, the court's instruction to the jury stated in relevant part:

> If you entertain a reasonable doubt as to any fact or element necessary to constitute the defendant's guilt, it is your duty to give him the benefit of that doubt and return a verdict of not guilty. Even where the evidence demonstrates a probability of guilt, if it does not establish such guilt beyond a reasonable doubt, you must acquit the accused. This doubt, however, must be a reasonable one; that is one that is founded upon a real tangible substantial basis and not upon mere caprice and conjecture. It must be such doubt as would give rise to a grave uncertainty, raised in your mind by reasons of the unsatisfactory character of the evidence or lack thereof. A reasonable doubt is not a mere possible doubt. It is an actual substantial doubt. It is a doubt that a reasonable man can seriously entertain. What is required is not an absolute or mathematical certainty, but a moral certainty.

*Id.* at 40, 111 S.Ct. 328. The Supreme Court held that the instruction was contrary to the burden of proof articulated in *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), stating:

> In construing the instruction, we consider how reasonable jurors could have understood the charge as a whole. *Francis v. Franklin*, 471 U.S. 307, 316, 105 S.Ct. 1965, 1972, 85 L.Ed.2d 344 (1985). The charge did at one point instruct that to convict, guilt must be found beyond a reasonable doubt; but it then equated a reasonable doubt with a "grave uncertainty" and an "actual substantial doubt," and stated that what was required was a "moral certainty" that the defendant was guilty. It is plain to us that the words "substantial" and "grave," as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable-doubt standard. When those statements are then considered with the reference to "moral certainty," rather than evidentiary certainty, it becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause.

*Id.* at 41, 111 S.Ct. 328.

Barely a year after *Cage* was decided, the Supreme Court clarified the standard to be applied to claims that a jury was improperly instructed on reasonable doubt. *Estelle v. McGuire*, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). The Court in *Cage* had reviewed the "reasonable doubt" instruction for whether a reasonable jury, confronted with the instruction as a whole, *could* have construed it wrongly. *Cage*, 498 U.S. at 41 (emphasis added). In *McGuire*, the Court stated that the appropriate standard was whether there existed a *reasonable likelihood* that the jury *has applied* the instruction in a manner violative of the Constitution. *McGuire*, 502 U.S. at 72, 112 S.Ct. 475 (emphasis added). For that reason, the Court "disapprove[d] the standard of review language in *Cage*." *Id.*

In *Victor v. Nebraska*, 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994), the Court explained under what circumstances a reasonable doubt instruction would fail to pass constitutional muster:

> The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course. *Cf. Hopt v. Utah*, 120 U.S. 430, 440–441, 7 S.Ct. 614, 618–20, 30 L.Ed. 708 (1887). Indeed, so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, *see Jackson v.*

*Virginia,* 443 U.S. 307, 320, n. 14, 99 S.Ct 2781, 2789, n. 14, 61 L.Ed.2d 560 (1979), the Constitution does not require that any particular form · of words be used in advising the jury of the government's burden of proof. *Cf. Taylor v. Kentucky,* 436 U.S. 478, 485–486, 98 S.Ct 1930, 1934–35, 56 L.Ed.2d 468 (1978). Rather, "taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury." *Holland v. United States,* 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954).

In a subsequent case [to *Cage*], we made clear that the proper inquiry is not whether the instruction "could have" been applied in an manner, but whether there is a reasonable likelihood that the jury did so apply it. *Estelle v. McGuire,* 502 U.S. 62, 72, and n. 4, 112 S.Ct. 475, 482 and n. 4, 116 L.Ed.2d 385 (1991). The constitutional question in the present cases, therefore, is whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the *Winship* standard.

*Victor,* 511 U.S. at 5–6, 114 S.Ct. 1239.

The Court then turned to the merits of petitioner Sandoval's [52] objection to the trial court's use of the terms "moral certainty" and "moral evidence":

> We are somewhat more concerned with Sandoval's argument that the phrase "moral certainty" has lost its historical meaning, and that a modern jury would understand it to allow conviction on proof that does not meet the beyond a reasonable doubt standard. Words and phrases can change meaning over time: A passage generally understood in 1850 may be incomprehensible or confusing to a modern juror. And although some contemporary dictionaries contain definitions of moral certainty similar to the 19th century understanding of the phrase, *see* WEBSTER'S THIRD NEW INTER-

NATIONAL DICTIONARY 1468 (1981) ("virtual rather than actual, immediate, or completely demonstrable"); 9 OXFORD ENGLISH DICTIONARY, *supra,* at 1070 ("a degree of probability so great as to admit of no reasonable doubt"), we are willing to accept Sandoval's premise that "moral certainty," standing alone, might not be recognized by modern jurors as a synonym for "proof beyond a reasonable doubt." But it does not necessarily follow that the California instruction is unconstitutional.

> Sandoval first argues that moral certainty would be understood by modern jurors to mean a standard of proof lower than beyond a reasonable doubt. In support of this proposition, Sandoval points to contemporary dictionaries that define moral certainty in terms of probability. *E.g.,* WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY, *supra,* at 1168 ("based on strong probability"); RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 1249 (2d ed. 1983) ("resting upon convincing grounds of probability"). But the beyond a reasonable doubt standard is itself probabilistic. "[I]n a judicial proceeding in which there is a dispute about the facts of some earlier event, the factfinder cannot acquire unassailably accurate knowledge of what happened. Instead, all the factfinder can acquire is a belief of what probably happened." *In re Winship,* 397 U.S. at 370, 90 S.Ct. at 1075 (Harlan, J., concurring) (emphasis in original). The problem is not that moral certainty may be understood in terms of probability, but that a jury might understand the phrase to mean something less than the very high level of probability required by the Constitution in criminal cases.

> \*　　\*　　\*　　\*　　\*　　\*

> As modern dictionary definitions of moral certainty attest, the common meaning of the phrase has changed since it was

---

52. The Victor opinion actually disposed of two separate cases, *Victor v. Nebraska* and

*Sandoval v. California.*

used in the *Webster* instruction, and it may continue to do so to the point that it conflicts with the *Winship* standard. Indeed, the definitions of reasonable doubt most widely used in the federal courts do not contain any reference to moral certainty. *See* FEDERAL JUDICIAL CENTER, PATTERN CRIMINAL JURY INSTRUCTIONS 28 (1988); 1 E. DEVITT & C. BLACKMAR, FEDERAL JURY PRACTICE AND INSTRUCTIONS § 11.14 (3d ed. 1977).

*Victor v. Nebraska*, 511 U.S. at 13–17, 114 S.Ct. 1239. Because of the context within which the term was used, however, the court concluded that "[w]e do not think it reasonably likely that the jury understood the words 'moral certainty' either as suggesting a standard of proof lower than due process requires or as allowing conviction on factors other than the government's proof." *Id.* at 16, 114 S.Ct. 1239.

The Court also rejected petitioner Victor's argument that equating a reasonable doubt with an "actual and substantial" doubt heightened the degree of doubt necessary for acquittal. Although it found the language "somewhat problematic," the Court concluded that "the context makes clear that 'substantial' is used in the sense of existence rather than magnitude of the doubt." *Id.* at 19–20, 114 S.Ct. 1239.

Most *Cage* claims that have been addressed on the merits by the Courts of Appeals have involved one or more of the phrases challenged in *Cage* and *Victor*, or variations thereof. *See, e.g., Felker v. Turpin*, 83 F.3d 1303 (11th Cir.1996) ("moral certainty" instruction); *Muhleisen v. Ieyoub*, 168 F.3d 840 (5th Cir.1999) ("grave uncertainty" and "actual or substantial doubt" instruction); *United States v. Williams*, 20 F.3d 125 (5th Cir.1994), *cert. denied*, 513 U.S. 891, 115 S.Ct. 239, 130 L.Ed.2d 162 (1994) ("firmly convinced" and "real possibility" instruction); *Harvell v. Nagle*, 58 F.3d 1541 (11th Cir.1995) *cert. denied*, 517 U.S. 1225, 116 S.Ct. 1859, 134 L.Ed2d 958 (1996) ("actual and substantial

doubt" and "moral certainty" instruction); *Gilday v. Callahan*, 59 F.3d 257 (1st Cir. 1995), *cert. denied*, 516 U.S. 1175, 116 S.Ct. 1269, 134 L.Ed.2d 216 (1996) ("moral certainty" instruction). Other claims have been based on instructions which equate reasonable doubt with doubt for which a good reason can be given or articulated. *See, e.g., Humphrey v. Cain*, 120 F.3d 526 (5th Cir.1997), *rev'd on other grounds*, 138 F.3d 552 (5th Cir.1998) (en banc); *Beverly v. Walker*, 118 F.3d 900 (2d Cir.1997) *cert. denied*, —— U.S. ——, 118 S.Ct. 211, 139 L.Ed.2d 147 (1997); *Vargas v. Keane*, 86 F.3d 1273 (2d Cir.), *cert. denied*, 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (1996); *Chalmers v. Mitchell*, 73 F.3d 1262 (2d Cir.), *cert. denied*, 519 U.S. 834, 117 S.Ct. 106, 136 L.Ed.2d 60 (1996). While few claims have met with success, several courts have criticized the use of certain language to define proof beyond a reasonable doubt. *See, e.g., Gilday*, 59 F.3d at 262 ("Equating the concept of reasonable doubt to 'moral certainty' may be, in isolation, reversible error"); *Beverly*, 118 F.3d at 903–04 ("charges which state or imply that a juror ought to be able to 'articulate' or 'give' a reason for acquittals present dangers of shifting burdens of proof"); *Harvell*, 58 F.3d at 1543 ("use of the term 'actual and substantial doubt' is somewhat problematic and perhaps even ill-advised").

In the instant case, the trial judge employed the terms "beyond a reasonable doubt" and "to a moral certainty" interchangeably [53] and even informed the jury that the two terms were synonymous. No doubt, the jury would have come to believe that the judge thought the two terms were synonymous. On its face, this raises certain constitutional concerns. As has been noted by the Eleventh Circuit, however, the ambiguity injected into an instruction by use of the terms "moral certainty" can be offset by a useful alternative instruction on reasonable doubt. *Harvell*, 58 F.3d at 1545. Here, the judge presented to the jury as

---

**53.** The trial judge equated the two terms eleven times, sometimes more explicitly than others.

an alternative definition for "beyond a reasonable doubt" in its instruction that it was not to convict Johnson unless it had an "abiding conviction" in its "mind and heart" that the petitioner was guilty. In addition, the judge instructed the jury that the petitioner could not be convicted unless the evidence presented to them was inconsistent with any reasonable theory of innocence. Further, as in *Harvell,* the trial judge instructed the jury not to go beyond the evidence and engage in speculation in order to find the petitioner guilty. "The combination of the abiding conviction language and the rest of the instruction, which emphasized the jury's obligation to focus on the evidence presented in court, convinces us that it was not reasonably likely that the jury understood the instructions to allow conviction based on proof insufficient to meet the *Winship* standard." *Id.* at 1545. *See also Bias v. Ieyoub,* 36 F.3d 479, 481 (5th Cir.1994).

In addition to equating "beyond a reasonable doubt" with "moral certainty," the trial judge couched its definition of the term "reasonable doubt" in the language of an "actual and substantial doubt," another criticized term. In *Harvell,* the Eleventh Circuit specifically addressed the use of the term "actual and substantial doubt" in a reasonable doubt instruction:

> Although the use of the term "actual and substantial doubt" is somewhat problematic and perhaps even ill-advised, the Supreme Court made clear, subsequent to *Cage,* that the use of such a term in the proper context, bolstered by adequate explanatory language, can survive constitutional scrutiny. *See Victor,* 511 U.S. at [19–21], 114 S.Ct. at 1250; *Adams v. Aiken,* 41 F.3d 175, 182 (4th Cir.1994) ("*Victor* explains that the offending words can be neutralized by words or phrases that preclude the jury from requiring more than a reasonable doubt to acquit"), *cert. denied,* 515 U.S. 1124, 115 S.Ct. 2281, 132 L.Ed.2d 284 (1995). The instruction challenged in *Victor* provided in part
>
> > A reasonable doubt is an actual and substantial doubt arising from the evidence, from the facts or circumstances shown by the evidence, or from the lack of evidence on the part of the state, as distinguished from a doubt arising from mere possibility, from bare imagination, or from fanciful conjecture.

*Id.* 511 U.S. at 17–19, 114 S.Ct. at 1249. The Supreme Court held that the actual and substantial doubt language did not violate Victor's due process rights because the rest of the sentence made clear that substantial was being used in "the sense of existence rather than magnitude of the doubt." *Id.* at [19–21], 114 S.Ct. at 1250. In other words, in context, substantial meant actual or real rather than abundant or plentiful.

> The surrounding language in the trial court's instruction in Harvell's case likewise established that substantial meant real and not imaginary. The trial court accomplished this in two ways. First, as in *Victor,* the instruction provided that substantial doubt arises from the evidence itself, stating that reasonable doubt had to be derived from the evidence, lack of evidence, or any part of the evidence. Second, Harvell's instruction stated that reasonable doubt cannot be fanciful, vague, whimsical, capricious, conjectural or speculative.

*Id.* at 1543 (footnote omitted). Other language in the charge given the jury in the present case, contrasting an "actual and substantial" doubt with other kinds of doubt, makes clear that the phrase was not intended to require more than a "reasonable" doubt. The "actual and substantial" language was used instead to explain that a "reasonable doubt" was not a metaphysical doubt, but a tangible one. First, the trial judge contrasted "actual and substantial doubt" with imaginative or speculative doubt. In addition, the trial judge further defined the requisite doubt as "a doubt the evidence generates when the jury carefully weighing all the evidence cannot say that they feel an abiding conviction of the defendant's guilt." In this court's view, the

overall instruction on reasonable doubt was therefore sufficient to "cure" the problems raised by the offending phrase and meet the requirements of the Due Process Clause.

 Finally, in the last paragraph of his instruction, the trial judge told the jury that if they had "difficulty" with the instruction he had given them, they could employ the words "reasonable doubt" according to "the logical and consequential conclusion and definition that he or she finds" and that it was, in the end, the province of the jury to "determine what is a reasonable doubt and what is not a reasonable doubt." There is little question that this construction was confusing, ill-advised and perhaps even dangerous because it could potentially have been taken to suggest that the jury could convict based upon proof different from, and less rigorous than, the very high standard set forth in the preceding paragraphs. However, the court is convinced that this final paragraph was in effect equivalent to the trial court failing to give a specific definition of "reasonable doubt" to the jury at all—a practice which has been approved by, and sometimes even endorsed, by several federal courts. *See, e.g., United States v. Oriakhi,* 57 F.3d 1290, 1300 (4th Cir.), *cert. denied,* 516 U.S. 952, 116 S.Ct. 400, 133 L.Ed.2d 319 (1995) (court should not attempt to define reasonable doubt absent a specific request for a definition from the jury); *Thompson v. Lynaugh,* 821 F.2d 1054, 1060–61 (5th Cir.), *cert. denied,* 483 U.S. 1035, 108 S.Ct. 5, 97 L.Ed.2d 794 (1987) (failure to define reasonable doubt does not deprive a defendant of due process); *United States v. Blackburn,* 992 F.2d 666, 668 (7th Cir.), *cert. denied,* 510 U.S. 949, 114 S.Ct. 393, 126 L.Ed.2d 341 (1993) (reasonable doubt should not be defined even upon request by the jury). These cases make it clear that a jury's own common sense understanding of the meaning of the term "reasonable doubt" is con-

stitutionally sufficient. That is essentially the meaning which the last portion the judge's instruction left the jury to consider.

Accordingly, the court does not find the final admonition, in conjunction with the remainder of the jury instruction, resulted in "a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the *Winship* standard. *Victor,* 511 U.S. at 6, 114 S.Ct. 1239.

### F. Fourth Amendment Claim.

The petitioner contends that the trial court impermissibly admitted into evidence the .357 magnum handgun and the bullet removed from petitioner's back, both seized by the State in violation of the Fourth Amendment.[54] Mr. Johnson claims that the handgun was illegally seized because it was the fruit of a warrantless search. He argues that the bullet was improperly removed from his back because the warrant with which the bullet was obtained was invalid. The State contends that these claims are procedurally defaulted and that under *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), the court cannot review the petitioner's Fourth Amendment claims. The State also asserts that each claim is without merit.

### 1. Procedural Default.

 The State argues that both of petitioner's claims are defaulted. A procedural bar will not prevent habeas review of a federal claim where the last appellate court authorized by state law to hear the claim decided it on its merits, *Ulster County Court v. Allen,* 442 U.S. 140, 152–54, 99 S.Ct. 2213, 2227, 60 L.Ed.2d 777 (1979), or where it is unclear whether the claim was resolved on a procedural basis or on the merits. *Harris v. Reed,* 489 U.S. 255, 265,

---

**54.** Johnson also asserts that his trial counsel's failure to move to suppress the handgun constituted ineffective assistance of counsel in violation of his Sixth Amendment rights. For

the sake of clarity, that argument will be addressed concurrently with petitioner's Fourth Amendment claims.

109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); *Caldwell v. Mississippi,* 472 U.S. 320, 327, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). In addition, if the state court of last resort affirms a lower court decision without comment, the claim will not be barred from review on the merits in the habeas court unless the lower court decision was founded upon the petitioner's procedural default. *Ylst v. Nunnemaker,* 501 U.S. 797, 802, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991). In this case, the claim concerning the removal of the bullet from the petitioner's back was the subject of plain error review on the merits under Alabama Rule of Appellate Procedure 45A by the Court of Criminal Appeals on direct review. *Johnson v. State,* 521 So.2d 1006, 1014–15 (Ala.Crim.App. 1986). As noted above, the Alabama Supreme Court affirmed the opinion of the Court of Criminal Appeals without comment. *Johnson,* 521 So.2d at 1018. Therefore, the petitioner's Fourth Amendment claim as addressed to the surgical removal of the bullet was presented to and addressed on the merits by the highest court of the State for purposes of procedural default.

The claim involving the seizure of the handgun appears on its face to be defaulted, as it was not raised at trial or on appeal and was not addressed by any Alabama appellate court on its own motion.[55] However, as demonstrated below, Johnson's only viable claim with regard to the seizure of the handgun lies in his assertion that he was denied his Sixth Amendment right to the effective assistance of counsel—a claim that has not been defaulted. *See Kimmelman v. Morrison,* 477 U.S. 365, 374 n. 1, 106 S.Ct. 2574, 2582 n. 1, 91 L.Ed.2d 305 (1986). The court therefore need not specifically determine whether petitioner has defaulted on his claim brought directly under the Fourth Amendment.

**55.** The court notes that during the trial testimony of Harold Newell, an agent of the Alabama Bureau of Investigation, the petitioner's trial counsel requested an opportunity to question the witness regarding the legality of

## 2. *Stone v. Powell.*

██ In *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), the Supreme Court declared that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." In the instant case, *Stone* clearly prevents the petitioner from directly presenting his claim concerning the seized handgun, which falls fully within the boundaries of a traditional search and seizure problem. Whether defaulted or not, this claim is not properly before the court.

 *Stone* also prevents the petitioner from raising his claim pertaining to the removal of the bullet. The petitioner does not seek habeas relief to prevent the bullet's removal, as was the case in *Winston v. Lee,* 470 U.S. 753, 757, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985). Instead, the petitioner's claim is that the bullet was unlawfully removed from his body and was then admitted in evidence at his trial. *Stone* therefore prevents consideration of a direct habeas challenge to the removal and use of the bullet at trial. "[T]he exclusionary rule, held applicable to the States in *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), 'is not a personal constitutional right'; it fails to redress 'the injury to the privacy of the victim of the search or seizure' at issue, 'for any "[r]eparation comes too late".' " *Withrow v. Williams,* 507 U.S. 680, 686, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993) (*quoting Stone,* 428 U.S. at 486, 96 S.Ct. 3037).

The Supreme Court has, however, carved out an exception to the rule of *Stone v. Powell* for certain claims. In *Kimmelman v. Morrison,* the Court held that

the search of the hotel room, ostensibly for the purpose of making some type of objection to the search. However, no objection was actually made. Tr. at 477–78.

the *Stone* restriction on federal habeas review of Fourth Amendment claims did not apply to ineffective assistance of counsel claims based on deficient representation with respect to a Fourth Amendment issue. 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). Finding that the two claims were "distinct, both in nature and in the requisite elements of proof," the Court wrote:

Although it is frequently invoked in criminal trials, the Fourth Amendment is not a trial right; the protection it affords against governmental intrusion into one's home and affairs pertains to all citizens. The gravamen of a Fourth Amendment claim is that the complainant's legitimate expectation of privacy has been violated by an illegal search or seizure. *See, e.g., Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In order to prevail, the complainant need prove only that the search or seizure was illegal and that it violated his reasonable expectation of privacy in the item or place at issue. *See, e.g., Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980).

The right to counsel is a fundamental right of criminal defendants; it assures the fairness, and thus the legitimacy, of our adversary process. *E.g., Gideon v. Wainwright,* 372 U.S. 335, 344, 83 S.Ct. 792, 796, 9 L.Ed.2d 799 (1963). The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect. *See, e.g., Strickland v. Washington,* 466 U.S. at 686, 104 S.Ct. at 2064; *United States v. Cronic,* 466 U.S. 648, 655–657, 104 S.Ct. 2039, 2044–2046, 80 L.Ed.2d 657 (1984). In order to prevail, the defendant must show both that counsel's representation fell below an objective standard of reasonableness, *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2064, and that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the pro-

ceeding would have been different. *Id.* at 694, 104 S.Ct. at 2068. Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice. Thus, while respondent's defaulted Fourth Amendment claim is one element of proof of his Sixth Amendment claim, the two claims have separate identities and reflect different constitutional values.

*Kimmelman,* 477 U.S. at 374–75, 106 S.Ct. 2574. In response to the state's concern that the ruling would strip the *Stone* restriction of practical effect, the Court noted:

Although a meritorious Fourth Amendment issue is necessary to the success of a Sixth Amendment claim like respondent's, a good Fourth Amendment claim alone will not earn a prisoner federal habeas relief. Only those habeas petitioners who can prove under *Strickland* that they have been denied a fair trial by the gross incompetence of their attorneys will be granted the writ and will be entitled to retrial without the challenged evidence.

*Id.* at 382, 106 S.Ct. 2574.

Therefore, under *Kimmelman,* petitioner is entitled to raise a claim that he was denied effective assistance of counsel by his attorneys' failure to object to the admission of the handgun allegedly seized in violation of the Fourth Amendment. This claim will be discussed on the merits below. Petitioner's other claims are either defaulted or barred by *Stone,* or both. The court will nevertheless consider these claims on the merits as well, and finds in the alternative that none of them warrant relief.

### 3. Merits of the Claims.

### i. The Bullet.

 The petitioner's claim that the removal of the bullet rose to the level of a Fourth Amendment violation is without merit. With regard to this claim, the court finds the opinion of the Alabama Court of Criminal Appeals to be a fair statement of the law to be applied and the facts surrounding petitioner's claim. In its opinion, the Alabama Court of Criminal Appeals stated:

As required by Rule 45A, A.R.A.P., we have searched the record for any plain error or defect in the proceedings below, which may or may not have been brought to the attention of the trial court, which might adversely affect the substantial rights of the appellant. In doing so we discover that the appellant objected to the introduction of the bullet which was removed from his back.

The bullet was removed from appellant's back pursuant to a search warrant issued by the Circuit Court of Morgan County. Appellant, after the warrant was issued, petitioned this court for a writ of prohibition, which we denied in *Ex parte Johnson*, 452 So.2d 888 (Ala. Crim.App.1984). While the appellant did not raise it on appeal, we believe that we should address any effect of *Winston v. Lee*, 470 U.S. 753, 757, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985), upon our decision to allow the surgical removal of the bullet, as the direct consequence of that decision was the introduction of the bullet at trial.

In *Winston*, a shopkeeper was wounded during an attempted robbery, but, being armed himself, was apparently able to wound his assailant in the left side before he fled. Lee was found eight blocks from the scene suffering from a gunshot wound to his left chest.

The Commonwealth of Virginia moved in state court for an order directing Lee to undergo surgery to remove the bullet, asserting that the bullet would provide evidence of Lee's guilt or innocence. As a result of expert testimony, which indicated that the surgery would require an incision of only 1/2 inch, and would be performed under local anesthesia without incurring the dangers of general anesthesia, the trial court granted the motion to compel Lee to undergo surgery. The Virginia Supreme Court, thereafter, denied Lee's petition for a writ of prohibition. Lee then attempted to have the operation enjoined by bringing an action, based on Fourth Amendment grounds, in the United States District Court for the Eastern District of Virginia. That court refused to issue an injunction.

Just prior to surgery, however, X-rays revealed that the bullet was, in fact, substantially deeper in Lee's chest than earlier believed, and the surgeon determined that general anesthesia would be needed. Lee moved for a rehearing, which was denied by the trial court, and that denial was affirmed by the Virginia Supreme Court. He then returned to the federal district court, which, after an evidentiary hearing, enjoined the surgery. The Court of Appeals for the Fourth Circuit affirmed, and the United States Supreme Court granted certiorari to consider whether a State could compel a suspect to undergo this type of surgery in a search for evidence of a crime.

The Supreme Court stated that "[t]he reasonableness of surgical intrusions beneath the skin depends on a case-by-case approach, in which the individual's interests in privacy and security are weighed against society's interests in conducting the procedure." The Supreme Court in discussing the risks associated with the surgical procedure noted that one surgeon had testified that due to the difficulty of discovering the exact location of the bullet, extensive probing and retracting of the muscle tissue could be required, which could lead to injury of the muscle, blood vessels, and nerves. The Court also noted medical testimony which indicated that the greater intrusion into the chest cavi-

ty and the larger incisions required would increase the risk of infection. The Court also addressed the fact that Lee would be required to undergo general anesthesia and found that "[t]his kind of surgery involves the total divestment of respondent's ordinary control over surgical probing beneath his skin."

In examining the other part of the balance, society's interest in conducting the procedure, the Court found that arguments of a compelling need for the bullet were not persuasive. The Court noted that the Commonwealth had available to it substantial additional evidence that Lee was the individual who accosted the shopkeeper on the night of the robbery. The Court went on to affirm the decision of the district court prohibiting the surgical removal of the bullet.

We believe that the instant case can be distinguished from *Winston*. Here, there was competent medical testimony which established that the bullet was lodged in fatty tissue, just beneath the skin, in the area of the shoulder blade; that surgery would be minor and would be performed with local anesthetic; and that practically no danger to life or health would be presented by the surgery. Due to the almost non-existent risk of danger to appellant as a result of the surgery and the potential value of the bullet to the State's case, we find that the appellant's interest in privacy and security did not outweigh society's interest in conducting the procedure. Therefore, we reaffirm our decision in *Ex parte Johnson, supra,* which permitted the surgical removal of the bullet, and we find that the bullet was properly introduced into evidence at trial.

*Johnson v. State,* 521 So.2d 1006, 1014–15 (Ala.Crim.App.1986). The petitioner's main concern with the analysis of the Court of Criminal Appeals is its characterization of the surgery as "minor." However, while the Supreme Court noted in *Winston* that "whether the surgery is to be characterized in medical terms as 'major' or 'minor' is not controlling," it also stated that "[t]his does not mean that the application

of medical concepts in such cases is to be ignored." *Winston,* 470 U.S. at 764 n. 8, 105 S.Ct. 1611. The *Winston* Court enumerated three facts to be considered, including (1) the extent to which the procedure threatens the safety or health of the individual; (2) the extent to which the intrusion impinges upon the individual's "dignitary interests in personal privacy and bodily integrity;" and (3) the extent to which prohibiting the intrusion would affect the "community's interest in fairly and accurately determining guilt or innocence." *Id.* at 761–63, 105 S.Ct. 1611. The evidence presented indicated that the intrusion would not be very deep and would require only a local anesthetic. There is no suggestion that the procedure had any likelihood of threatening the safety or health of the petitioner. In addition, despite Johnson's claims to the contrary, the State's need for the evidence was extremely strong, *see id.* at 762, 105 S.Ct. 1611; *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); the bullet was by far the most persuasive piece of physical evidence linking Johnson to the crime scene. After consideration of the balancing factors enunciated in *Schmerber* and *Winston,* the court concludes that Johnson did not have a constitutional right to be free from the removal of the bullet lodged in his back, in a medically approved manner, pursuant to a warrant issued on probable cause. The search was, on balance, not unreasonable under the Fourth Amendment.

In summary, because the defendant had an opportunity to challenge the removal of the bullet from his back, and did so, *Stone v. Powell* precludes this court from directly considering a Fourth Amendment challenge to its removal on a federal habeas corpus proceeding. Neither trial nor appellate counsel were ineffective by reason of their handling of the Fourth Amendment issues in connection with the removal of the bullet. Alternatively, if the court were to reach the merits of this claim, it finds that the removal of the bullet comported

with the requirements of the Fourth Amendment.

#### ii. The .357 Magnum Revolver.

As noted earlier, the petitioner's claim that the .357 magnum handgun was seized unlawfully can only be made indirectly, through a claim that his attorneys were ineffective because they did not object to the admission of the gun at trial. Since "a meritorious Fourth Amendment issue is necessary to the success of a Sixth Amendment claim," *Kimmelman,* 477 U.S. at 382, 106 S.Ct. 2574, the court will first discuss the underlying Fourth Amendment issue and then, only if necessary, address the merits of his ineffective assistance claim.

The Alabama Court of Criminal Appeals addressed Johnson's Fourth Amendment claim in the context of ineffective assistance of counsel as follows:

> Johnson claims that trial counsel were ineffective for not objecting on search and seizure grounds to the introduction into evidence of the .357 magnum pistol that was found in the motel room when Johnson was arrested.

> We hold that because the search of the motel room and seizure of the pistol were valid, the action of trial counsel in not objecting to the evidence could not have been ineffective assistance.

> First, Johnson does not have standing to raise this claim, because he did not have a legitimate expectation of privacy in the motel room. The motel room that was searched was not registered in Johnson's name, he had not rented it; that room had been rented by three other men before Johnson even arrived. One who does not have a legitimate expectation of privacy in the property or promises of another where evidence is found cannot litigate a Fourth Amendment claim. *Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). Hence, Johnson does not have a standing to adjudicate a claim involving the search of another's motel room.

> Second, the search of the area under the mattress was reasonable under the probable cause coupled with exigent circumstances exception to the warrant requirement. Not only did the presence of marijuana in plain view in the motel room justify the search for more marijuana in the motel room, but the officers also had probable cause to believe that Johnson had been in an armed robbery that resulted in a shootout, that Johnson had been wounded in the back, and that Johnson had a pistol with him. The officers, moreover, observed that Johnson had in fact been wounded, and they noticed bloodstained linens on the bed near Johnson's clothing in the motel room. Furthermore, the officers were confronted with an exigent circumstance—the danger that if the pistol was left in the motel room while the officers sought a warrant, one or more of the three other men who were in the motel room could have tampered with or removed the pistol. Hence, because the search and seizure of the pistol was justified, defense counsel did not render ineffective assistance of counsel in failing to object to the evidence on that ground. *See Love v. State,* 377 So.2d 8, 11–12 (Ala.Cr.App. 1979) (pistol seized without warrant where officer had probable cause to believe defendant committed homicide and that there was a pistol in the residence where defendant was arrested). *See also Palmes v. Wainwright,* 725 F.2d 1511, 1523 (11th Cir.), *cert. denied,* 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984) ("[t]he Sixth Amendment right to effective assistance of counsel does not require counsel to raise every objection without regard to its merits").

*Johnson,* 612 So.2d at 1302.

 In the court's view, this analysis suffers from certain factual and legal deficiencies. First, while it is axiomatic that one must have a "legitimate expectation of privacy" in the area searched in order to establish standing to challenge a search, *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the Supreme Court has specifically held that "a guest in

a hotel room is entitled to constitutional protection against unreasonable searches and seizures." *Stoner v. California,* 376 U.S. 483, 490, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964). Furthermore, although the right to exclude others may be an "important feature of a legitimate privacy expectation," *United States v. Brown,* 743 F.2d 1505, 1507 (11th Cir.1994), the Supreme Court has made clear that one need not own or have exclusive control over the property searched in order to contest a search of that property—especially, it seems, when one has a possessory interest in the object seized. In *Minnesota v. Olson,* 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990), for example, the defendant had slept in the searched apartment for only one night and had never been left alone in the apartment. Nonetheless, the court found that Olson could state a legitimate objection, noting that an overnight guest "seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host allows inside." *Id.* at 98, 110 S.Ct. 1684. In another case, the Court permitted a claim by a defendant who had a key to the searched apartment and could use it at will, despite the fact that he did not live in the apartment and it was rented and occupied by his relatives. *United States v. Jeffers,* 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951). In the present case, although the hotel room searched was registered under other names, it appears from the evidence that Johnson had been there overnight, had slept on one of the beds in the room, and was a welcome guest of the men who had rented the room. The object seized, of course, belonged to the petitioner. Under these facts, the court believes that Johnson had a "legitimate expectation of privacy" in the hotel room. *See Rakas,* 439 U.S. at 143, 99 S.Ct. 421.

 Second, it appears that, under the circumstances, the search itself may

not have been justified under the exigent circumstances exception to the warrant requirement. A basic tenet of Fourth Amendment jurisprudence is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). One of those exceptions, relied upon by the Alabama Court of Criminal Appeals, is commonly known as the "exigent circumstances" exception. When the police possess probable cause to conduct a search, but, because of exigent circumstances, do not have time to obtain a warrant, they may search without a warrant. *See, e.g., Roaden v. Kentucky,* 413 U.S. 496, 505, 93 S.Ct. 2796, 2802, 37 L.Ed.2d 757 (1973); *Chambers v. Maroney,* 399 U.S. 42, 46–52, 90 S.Ct. 1975, 1978–82, 26 L.Ed.2d 419 (1970).[56] The Alabama Court of Criminal Appeals correctly noted that the possibility of the removal of evidence by another can in some cases constitute an exigent circumstance which, coupled with probable cause, will justify a warrantless seizure. *See, e.g., Love v. State,* 377 So.2d 8, 11–12 (Ala.Crim.App. 1979). The evidence in the case at bar, however, suggests that the exigent circumstance relied upon by the state court was simply unsupported by the facts. While neither party has addressed directly the status of the other three men present in the hotel room at the time of Johnson's arrest, it appears that the men may well have been in the custody of the police. Two aspects of the record lead the court to this conclusion. First, the written statements of the other men in the room, as contained in the Alabama Bureau of Investigation report, are dated approximately one to one-and-a-half hours after Johnson's arrest and purport to have been taken at the Anniston Police Department. While cer-

---

**56.** Of course, the police must also possess probable cause for the search independent of the exigent circumstances. *See Swint v. Wadley,* 51 F.3d 988, 997 (11th Cir.1995). Here,

the court has little doubt that probable cause to search the hotel room existed at the time of petitioner's arrest.

tainly not dispositive, this raises an inference that the men were detained outside the motel room, transported to the Anniston Police Department, and questioned by the police. Second, and more significantly, Russell Lovell's written account of the events of March 14, 1984, contains this statement: "Wednesday night the police came in and took all of us to jail in Anniston." R20 at 985. It therefore appears that the three men may not have been in a position to dispose of any evidence left in the motel room while the police obtained a warrant, and no exigent circumstances for the warrantless search and seizure existed. Thus, while the court reaches no conclusive answer, it is clear that a direct challenge at trial to the search that yielded the pistol would have been far from frivolous.

 Nonetheless, the court finds that the search was valid under an alternative exception to the warrant requirement. In *Chimel v. United States*, 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1960), the Supreme Court held that, incident to a lawful arrest, the police may properly search the area within the arrestee's "immediate control." This is true irrespective of whether under the circumstances it is likely that "weapons or evidence would in fact be found." *United States v. Robinson*, 414 U.S. 218, 235, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). The police may also conduct a properly limited protective sweep incident to an arrest, so long as "the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Maryland v. Buie*, 494 U.S. 325, 337, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990).

 In the present case, the officers had a warrant for Johnson's arrest for a violation of probation and had a strong basis to believe that he had been involved in a robbery-murder involving one or more

firearms a few days earlier. Johnson was in the hotel room with several other men at the time law enforcement officers knocked on the door and announced their presence. Though arrested outside, Johnson voluntarily re-entered the hotel room to retrieve his belongings. The police were certainly entitled to follow Johnson into room. *See Washington v. Chrisman*, 455 U.S. 1, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982). Under the rule of *Buie*, the officers could also have examined the entire hotel room, and even the bathroom, for persons who presented a potential threat to their safety. Once Johnson had re-entered the hotel room and had access to areas within which a weapon might be hidden, the police were entitled to conduct a search of those areas. The fact that Johnson may have been handcuffed or even surrounded by officers by the time the search took place is irrelevant, since the area under the mattress was within his "immediate control" at the time of the arrest. *See generally New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981); *see also United States v. Abdul–Saboor*, 85 F.3d 664, 666 (D.C.Cir.1996); *Davis v. Robbs*, 794 F.2d 1129, 1130–31 (6th Cir. 1986); *United States v. Cotton*, 751 F.2d 1146, 1147–48 (10th Cir.1985); *United States v. Silva*, 745 F.2d 840, 847 (4th Cir.1984); *United States v. Palumbo*, 735 F.2d 1095, 1096–97 (8th Cir.1984); *United States v. Hudson*, 100 F.3d 1409, 1419 (9th Cir.1996); *United States v. Mitchell*, 64 F.3d 1105, 1110 (7th Cir.1995).[57] Under these circumstances, the court is convinced that the police were justified in searching the hotel room incident to Johnson's arrest.

Because Johnson has not established that his Fourth Amendment claim with regard to the .357 Magnum was meritorious, he can have no meritorious claim that his lawyers provided him ineffective assistance by their failure to make a Fourth Amendment challenge to use of that weap-

---

57. While the court could conceive of circumstances in which the search might not have been valid—for example, if the bed containing the handgun had been in an adjoining room

or otherwise inaccessible to the petitioner— Johnson has not provided any factual evidence to suggest such circumstances.

on at trial. The court may not, under *Stone v. Powell*, reach the merits of the search itself but if it were to do so, it would find the search that yielded the .357 Magnum pistol valid under the Fourth Amendment.

## III. Conclusion.

For the foregoing reasons, the petition for habeas corpus will be **DENIED.** All the petitioner's claims are either procedurally defaulted, without merit, or both. A separate order will be entered denying all relief and dismissing the petition with prejudice.

## Judgement

In accord with the Memorandum of Opinion entered contemporaneously herewith, it is hereby **ORDERED, ADJUDGED,** and **DECREED:**

1. The petition for the writ of habeas corpus is **DENIED;** and

2. Costs are taxed against the petitioner.